## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| KELLY CRAWFORD, IN HIS CAPACITY AS RECEIVER. | § § § § |
| Plaintiff, | § § |
| v. | § § |
| DAVID BLEEDEN, BEARHUNTER, LLC, XAN, LLC, DANIEL ISAAC HALIMI, HALIMI GROUP, LLC, ATHENA HUNTER, TPH BOSS, LLC, RANDALL KOHL, THE VOICE, INC., BENJAMIN LEE, METTABEL INC., DERIC SCOTT NED, POOR TRAP, INC., DEEP STATE MARKETING, INC., MICHAEL PERALTA, MPERA CORP., SEAN REZA, also known as THOMAS REZA, AMERIGOLD, INC., KYLE D. SANNA, HURRICANE HOLDINGS, INC., LTK MARKETING, LLC, CHRISTOPHER STEPHAN, ECO BLUE INC., WALTER VERA, VERASTAN GROUP, LLC, MIDWOOD CAPITAL, RICHARD JOE DOUGHERTY III, RICH DOUGH, INC., MATTHEW LEVITT, GOONER ENTERPRISES, INC., JAMES FLICEK, ELLIPSIS MARKETING, JOSHUA FERDMAN, FERDMAN GROUP, INC., ANDREW EILERS, ANDREW J. EILERS CONSULTING, INC.,ALEXANDER FLAMER, 9th LEVEL MARKETING, INC., DAVID WOLAN, HARPER METALS GROUP, LLC, , BROCK BOWERS, TOTM PRODUCTION GROUP, LLC, PHILLIP LEVY, and IQ CAPTIAL ADVISORS, INC. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § |
| Defendants. | § § § § § § |

**CIVIL ACTION NO.**

## RECEIVER'S ORIGINAL COMPLAINT

Kelly Crawford, as the Receiver of TMTE, Inc., a/k/a Metals.Com, Chase Metals, Inc.,

Chase Metals, LLC, Barrick Capital, Inc., and all other entities placed in receivership pursuant to

the orders described herein, files this Complaint against Defendants David Bleeden; Bearhunter, LLC; Xan, LLC; Daniel Isaac Halimi; Halimi Group, LLC; Athena Hunter; TPH Boss, LLC; Randall Kohl; The Voice, Inc.; Benjamin Lee; Mettabel Inc.; Deric Scott Ned; Poor Trap, Inc.; Deep State Marketing, Inc.; Michael Peralta; MPERA Corp.; Sean Reza, also known as Thomas Reza; Amerigold, Inc.; Kyle D. Sanna; Hurricane Holdings, Inc.; LTK Marketing, LLC; Christopher Stephan; Eco Blue Inc.; Walter Vera; Verastan Group, LLC; Midwood Capital; Richard Joe Dougherty; Rich Dough, Inc.; Matthew Levitt; Gooner Enterprises, Inc.; James Flicek; Joshua Ferdman; Ferdman Group, Inc.; Andrew Eilers; Andrew J. Eilers Consulting, Inc.; Alexander Flamer; 9TH Level Marketing, Inc.; David Wolan; Harper Metals Group, LLC; Brock Bowers, also doing business as BA Bowers LLC; TOTM Production Group, LLC;  Philip Levy; and IQ Capital Advisors, Inc.,  (collectively, the "Broker Defendants").

## I.
## SUMMARY

1.      In total, the Broker Defendants received more than $12 million in commissions, unearned compensation, and sales prizes, transferred to them by the Receivership Entities.[1] The Broker Defendants received these assets in exchange for their sale of precious metals and coins, sold at grossly inflated prices based on false and misleading representations, to unsuspecting elderly investors.  Payments to the Broker Defendants were made to defraud the investors, who by virtue of their investments, were, and also are, the Receivership Entities' creditors. The payments

---

[1] "Receivership Entities" means TMTE, Inc., a/k/a Metals.Com, Chase Metals, Inc., Chase Metals, LLC (collectively the "Metals Receivership Defendants"), and Barrick Capital, Inc., as well all other Receivership Entities described within the scope of, or identified in the Receivership Order issued in Civil Action No. 3:20-CV-2910-L and any supplemental or amending orders, which include, but are not limited to, Administrative Account Services, LLC, Amerivise, LLC, Best New, Inc., Delaware Wholesale, Inc., Revo, LLC, Merrill Gold, LLC, Newmont Admin. Inc., Reagan Financial Services, Inc., Resource Financial Services, Inc., First American Estate & Trust, First American Savings, Inc., Retirement Insider, LLC, USA Accounts, Inc., USA Marketing, Inc., TX Admin, Inc., and Relief Defendant Tower Equity, LLC.  Capitalized terms used in this Complaint, if not specifically defined, have the meaning provided by orders in the Underlying Lawsuit.

were made while the Receivership Entities knew they would not be able to satisfy claims owed to the investor/creditors, as well as claims held by other creditors, and while the Receivership Entities were insolvent, and without the exchange of reasonably equivalent value. Standing in the Receivership Entities' creditors' shoes for purposes of the claims asserted below and for the benefit of those defrauded creditors, including at least 1,300 elderly victims, the Receiver seeks to recover the funds fraudulently transferred to the Broker Defendants.

## II.
## RECEIVERSHIP

2.     On September 22, 2020, in Civil Action No. 20-cv-2910-L, *CFTC, et al., v. TMTE, Inc. a/k/a Metals.Com, et al.*, (the "Underlying Lawsuit") this Court entered the Order Granting Plaintiffs' Emergency *Ex Parte* Motion for Statutory Restraining Order, Appointment of Receiver, and Other Equitable Relief, (the "Receivership Order"), a copy of which is attached as **Exhibit A**, and is incorporated by reference. Pursuant to the Receivership Order, Kelly Crawford as Receiver was ordered to collect, receive and take exclusive custody, control, and possession of certain assets of the defendants and relief defendant and the entities owned or controlled by the defendants (the "Receivership Assets"), as further described in **Exhibit A**. The Receivership Order also authorized the Receiver to institute proceedings as may, in his judgment, be necessary or proper for the protection and collection of Receivership Assets.

3.     Additional relevant orders have also been entered in the Underlying Lawsuit: (1) the Consent Order of Preliminary Injunction as to Lucas Thomas Erb a/k/a Lucas Asher a/k/a Luke Asher and Simon Batashvili [Dkt. 165]; (2) the Consent Order of Preliminary Injunction as to Defendant TMTE, Inc. a/k/a Metals.com, Chase Metals, Inc., Chase Metals, LLC, Barrick Capital, Inc., and Relief Defendant Tower Equity, LLC [Dkt. 164]; and (3) the Order Granting Receiver's Motion to Identify Certain Entities in Receivership [Dkt. 230].

4.      In the Receivership Order, the Court made a preliminary finding that the Receivership Defendants "have engaged and continue to engage in a fraudulent scheme to defraud at least 1,600 persons throughout the United States into purchasing gold and silver bullion" and that the Defendants "targeted a vulnerable population of mostly elderly or retirement-aged persons." *See* Receivership Order [Dkt. 16] at p. 5.

5.      As further described below, the Broker Defendants participated in this scheme by locating and contacting Investors and using fraudulent statements and omissions as described below, to lure investors into buying bullion and coins at grossly inflated prices.

6.      The Receiver exercised diligence in investigating and discovering the claims asserted below.  Nonetheless, the claims were concealed and the Receiver was unable to discover the claims until several months after his appointment.  Indeed, most records for the Receivership Entities were on digital platforms the Receiver was unable to access for several months after his appointment, and the FBI executed a search warrant pursuant to which they seized computers and information, which deprived the Receiver of the ability to obtain such information until late August 2021.

### III.
### PARTIES

7.      Plaintiff is a natural citizen and resident of Dallas County, Texas acting in his capacity as Receiver.

8.      Defendant David Bleeden is an individual who may be served with citation at the following last known address, 20651 Medley Lane, Topanga, California 90290 or 19520 Cave Way, Topanga, California 90290.

9.      Defendant Bearhunter, LLC is a limited liability company organized under the laws of Wyoming, with its principal office located at 23351 Ostronic Drive, Woodland Hills, California

91367, and may be served with citation by serving its registered agent, Registered Agents, Inc., at 412 North Main Street Suite 100, Buffalo, Wyoming 82834.

10.    Defendant Xan, LLC is a limited liability company organized under the laws of Wyoming, with its principal office located at 20651 Medley Lane, Topanga, California, 90290, and may be served with citation by serving its registered agent, Corporation Service Company, at 1821 Logan Avenue, Cheyanne, Wyoming 82001.

11.    Defendant Daniel Isaac Halimi is an individual who may be served with citation at 10450 Wilshire Blvd., Suite 9B, Los Angeles, California 90024.

12.    Defendant Halimi Group, LLC, is a limited liability company organized under the laws of Delaware and may be served with citation by serving its registered agent, Harvard Business Services, Inc., 16132 Coastal Highway, Lewes, Delaware 19958.

13.    Defendant Athena Hunter is an individual who may be served with citation at 12449 Kling Street, Apartment 103, Studio City, California, 91604.

14.    Defendant TPH Boss, LLC, is a limited liability company organized under the laws of Delaware, with its principal office located at 1201 Orange Street, Suite 600, One Commerce Center, Wilmington, Delaware 19801, and may be served with citation by serving its registered agent, Agents and Corporations, Inc., at 1201 Orange Street, Suite 600, One Commerce Center, Wilmington, Delaware 19801.

15.    Defendant Randall Kohl is an individual who may be served with citation at 7250 Franklin Avenue, Suite 310, Los Angeles, California 90046.

16.    Defendant The Voice, Inc., is a corporation organized under the laws of Wyoming, with its principal office located at 301 Thelma Drive, Suite 102, Casper, Wyoming 82609, and

may be served with citation by serving its registered agent, LegalCorp Solutions, LLC, at 5830 East 2nd Street, Casper, Wyoming 82609.

17.     Defendant Benjamin Lee is an individual who may be served with citation at 4452 Chevy Chase Drive, La Canada, California 91011.

18.     Defendant Mettabel Inc. is a corporation organized under the laws of California, with its principal office located at 4452 Chevy Chase Drive, La Canada, California 91011, and may be served with citation by serving its registered agent, Benjamin Lee, at 4452 Chevy Chase Drive, La Canada, California 91011.

19.     Defendant Deric Scott Ned is an individual who may be served with citation at 4441 Oakwood, La Canada, California, 91011 or 621 North Curson Avenue, Los Angeles, California 90036.

20.     Defendant Poor Trap, Inc., is a corporation organized under the laws of California, with its principal office located at 2718 Wilshire Drive, Los Angeles, California 90068, and may be served with citation by serving its registered agent, LegalZoom.Com, Inc. at 101 N. Brand Blvd, 11th Floor, Glendale, California 91203.

21.     Defendant Deep State Marketing, Inc., is a corporation organized under the laws of California, with its principal office located at 621 North Curson Avenue, Los Angeles, California 90036, and may be served with citation by serving its registered agent, Deric Scott Ned, at 621 North Curson Avenue, Los Angeles, California 90036 or 4441 Oakwood, La Canada, California 91011.

22.     Defendant Michael Peralta is an individual who may be served with citation at 6174 Buckingham Parkway, Unit 103, Culver City, California 90230.

23.     Defendant MPERA Corp., is a corporation organized under the laws of Delaware, with its principal office located at 1201 Orange Street, Suite 600, One Commerce Center, Wilmington, Delaware 19801, and may be served with citation by serving its registered agent, Agents and Corporations, Inc., at 1201 Orange Street, Suite 600, One Commerce Center, Wilmington, Delaware 19801.

24.     Defendant Sean Reza, also known as Thomas Reza, is an individual who may be served with citation at 1843 Midvale Avenue, Los Angeles, California 90025 or 12225 San Vicente Boulevard, Suite 134, Los Angeles, California 90049.

25.     Defendant Amerigold, Inc., is a corporation organized under the laws of California, with its principal office located at 12225 San Vicente Boulevard, Suite 314, Los Angeles, California 90049, and may be served with citation by serving its registered agent, Alex Anguiano, at 20969 Ventura Boulevard, Suite 204, Los Angeles, California 90049.

26.     Defendant Kyle D. Sanna is an individual who may be served with citation at 1274 North Crescent Heights Blvd., Apartment 138, Los Angeles, California 90046.

27.     Defendant Hurricane Holdings, Inc., is a corporation organized under the laws of California, with its principal office located at 1342 North Detroit Street, Apartment #301, Los Angeles, California 90046, and may be served with citation by serving its registered agent, Kyle D. Sanna, at 1274 North Crescent Heights Boulevard, Apartment 138, Los Angeles, California 90046.

28.     Defendant LTK Marketing, LLC is a limited liability company organized under the laws of California, with its principal office located at 1274 Crescent Heights Blvd., Apartment #138, Los Angeles, California 90046, and may be served with citation by serving its registered

agent Kyle D. Sanna, at 1274 North Crescent Heights Boulevard, Apartment 138, Los Angeles, California 90046

29.     Defendant Christopher Stephan is an individual who may be served with citation at 18336 Soledad Canyon Road, Suite 1819, Canyon Country, California 91386.

30.     Defendant Eco Blue, Inc., is a corporation organized under the laws of California, with its principal office located at 18336 Soledad Canyon Road, Suite 1819, Canyon Country, California 91386, and may be served with citation by serving its registered agent, Christopher Stephan, at 18336 Soledad Canyon Road, Suite 1819, Canyon Country, California 91386.

31.     Defendant Walter Vera is an individual who may be served with citation at 3184 Dona Sarita Place, Studio City, California 91604 or alternatively, 20356 Cantara Street, Winnetka, California 91306.

32.     Defendant Verastan Group, LLC is a limited liability company organized under the laws of California, with its principal office located at 11750 Luanda Street, Lake View Terrace, California 91342, and may be served with citation by serving its registered agent, Alex Anguiano, at 20969 Ventura Boulevard, Suite #204, Woodland Hills, California 91364.

33.     Defendant Midwood Capital is a corporation organized under the laws of California, with its principal office located at 3184 Dona Sarita Place, Studio City, California 91604, and may be served with citation by serving its registered agent, Alex Anguiano, at 20969 Ventura Boulevard, Suite 204, Woodland Hills, California 91364.

34.     Defendant Richard Joe Dougherty, III is an individual who may be served with citation at1076 Glenbridge Circle, Westlake Village, California 91361.

35.     Defendant Rich Dough Inc. is a corporation organized under the laws of California, with the principal office located at 412 S. Wilton Place, Suite 404, Los Angeles, California 90005

and may be served with citation by serving its registered agent(s) Margaret Eum or Richard J. Dougherty III, at 412 S. Wilton Place, Suite 404, Los Angeles, CA 90005 or 1076 Glenbridge Circle, Westlake Village, California 91361.

36.    Defendant Matthew Joel Levitt is an individual who may be served with citation at 2334 Virginia Avenue, Santa Monica, California 90404 or 610 Buckwheat Court, #1305, Hayward, California 94544.

37.    Defendant Gooner Enterprises, Inc. is a corporation organized under the laws of California, with the principal office located at 610 Buckwheat Court, #1305, Hayward, California 94544 and may be served with citation by serving its registered agent Matthew Joel Levitt at 610 Buckwheat Court, #1305, Hayward, California 94544.

38.    Defendant James Flicek is an individual who may be served with citation at 6 Ackerly Street, Sag Harbor, New York 11963.

39.    Defendant Ellipsis Marketing is a corporation organized under the laws of California with the principal office located at 4726 S. Spago Drive, Dublin, California 94568, and may be served with citation by serving its registered agent Gautam Tandom at 4726 S. Spago Drive, Dublin, California 94568.

40.    Defendant Joshua Ferdman is an individual who may be served with citation by serving his attorney Paul Rigali, Larson LLP, 555 South Flower Street, Suite 4400, Los Angeles, California 90071.

41.    Defendant Ferdman Group, Inc. is a corporation organized under the laws of California with the principal office located at 1251 Armacost Ave., Suite 101, Los Angeles, CA 90025, and may be served with citation by serving its attorney Paul Rigali, Larson LLP, 555 South Flower Street, Suite 4400, Los Angeles, California 90071.

42.     Defendant Andrew Eilers is an individual who may be served with citation at 1725 Ocean Front Walk #107, Santa Monica, California 90401.

43.     Defendant Andrew Eilers Consulting, Inc. is a corporation organized under the laws of California with the principal office located at 1725 Ocean Front Walk #107, Santa Monica, California 90401, and may be served with citation by serving its registered agent Jeremy Schwarz at 324 S. Diamond Bar Blvd 640, Diamond Bar, CA 91765.

44.     Defendant Alexander Flamer is an individual who may be served with citation at 2328 3rd Street, Apartment 8, Santa Monica, California 90405.

45.     Defendant 9th Level Marketing, Inc., is, on information and belief, a corporation owned and controlled by Alexander Flamer and may be served with citation by serving Alexander Flamer at 2328 3rd Street, Apartment 8, Santa Monica, California 90405.

46.     Defendant David Wolan is an individual who may be served with citation at 2000 N. Bayshore Drive, Suite 619, Miami, Florida 33137.

47.     Defendant Harper Metals Group, LLC is a limited liability company organized under the laws of Florida with the principal office located 2000 N. Bayshore Drive, Suite 619, Miami, Florida 33137 or 344 Hauser Blvd, 5-112, Los Angeles, California 90036, and may be served with citation by serving its registered agent David Wolan at 2000 N. Bayshore Drive, Suite 619, Miami, Florida.

48.     Defendant Brock Bowers is an individual, also doing business as BA Bowers LLC, who may be served with citation at 13843 Burbank Blvd, Valley Glen, California 91401.

49.     Defendant TOTM Production Group LLC is a limited liability company organized under the laws of California with the principal office located at 13843 Burbank Blvd, Valley Glen,

California 91401, and may be served with citation by serving its registered agent Legalinc Registered Agents, Inc. at 13843 Burbank Blvd, Valley Glen, California 91401.

50.     Defendant Philip Levy is an individual who may be served with citation at 20 Rainbow Lake, Newport Beach, California 92660.

51.     Defendant IQ Capital Advisors, Inc. is a corporation organized under the laws of California with the principal office located at 260 Newport Center Drive, Newport Beach, California 92660, and may be served with citation by serving Philip Levy at 20 Rainbow Lake, Newport Beach, California 92660.


# IV.
# JURISDICTION

52.     This Court has subject matter jurisdiction over the Receiver's claims pursuant to 28 U.S.C. § 1331 because this action is related to and arises out of alleged violations of the Commodities Exchange Act. Moreover, in the Receivership Order, this Court assumed exclusive jurisdiction to adjudicate claims regarding the assets that are the basis of this Complaint, and accordingly, pursuant to 28 U.S.C. § 1367 this Court possesses supplemental subject matter jurisdiction over the Receiver's claims.

53.     The Receiver's compliance with 28 U.S.C. §§ 753 and 754 also provides subject matter jurisdiction, and together with 28 U.S.C. § 1692, provides personal jurisdiction over each of the Broker Defendants.

# V.
# VENUE

54.     Pursuant to the Receivership Order, the Court assumed exclusive jurisdiction over Receivership Assets and authorized the Receiver, as the Court's agent, to take and have possession of the Receivership Assets. Further, pursuant to 28 U.S.C. §§ 754 and 1692, the Receiver may sue

in the district in which he was appointed to enforce claims arising anywhere in the country. Accordingly, venue is appropriate in the Northern District of Texas, Dallas Division, the venue in which the Receiver was appointed.

## VI.
## FACTUAL BACKGROUND[2]

### A.     The Receivership Entities' Purpose

55.     Each of the Receivership Entities existed and operated solely to perpetrate fraud on unsuspecting, vulnerable investors, and line the pockets of Batashvili and Asher, and the Broker Defendants they supervised.

56.     The Receivership Defendants used the Broker Defendants and made the transfers at issue in this lawsuit, to accomplish their goal.

57.     Pursuant to a claims process established by the Court in the Underlying Lawsuit, more than 1,730 investors who purchased metals from the Receivership Defendants submitted claims (the "Investors").  Investigation and analysis of the claims revealed Investors hold claims totaling $63.4 million (the "Investor Claims"). The basis for the Investor Claims is the amount paid by each Investor to the Receivership Defendants in excess of the fair market value for the metals sold by the Receivership Defendants, as discussed in detail below.  These claims, as well as the claims of the regulatory agencies described below, arose at the time of each fraudulent sale.

58.     To date, the Receiver has identified less than $12 million in Receivership Assets. Accordingly, not including claims by trade creditors or penalties owed to regulatory entities, the Receivership Estate has less than 21% of the amount necessary to fully satisfy all Investor Claims. At all relevant times, the  Receivership Entities have been insolvent.

---

[2] A copy of the Complaint filed in the Underlying Action, without exhibits, is attached as **Exhibit "B"** and provides additional information about the fraudulent scheme in which the Broker Defendants participated, the conduct for which each was paid compensation, and the derivation of that compensation.

B.     **The Elderly and Retiree Targets**

59.     The Receivership Defendants, directly and by and through each of the Broker Defendants, targeted a vulnerable population of mostly elderly or retirement-aged persons with little or no experience in gold and silver bullion investments ("Precious Metals Bullion").

60.     The Broker Defendants concentrated their solicitations on these persons to gain access to retirement savings, including, but not limited to, retirement savings held in tax advantaged accounts such as individual retirement accounts; employer sponsored 401(k) and 457(b) plans; thrift savings plans; life insurance; annuities; money market accounts; and other long-term retirement savings vehicles ("Qualified Retirement Savings").

61.     The Broker Defendants' and the Receivership Defendants'[3] solicitations also targeted politically conservative and Christian investors.

62.     The Broker Defendants and each of them employed solicitations designed to instill fear in these elderly and retirement aged Investors and build trust based on representations of political and religious affinity.  For instance, the investments sold by the Broker Defendants were advertised on conservative media outlets and websites.

63.     Each of the Broker Defendants solicited Investors primarily through telephone calls and/or social media postings through the Receivership Defendants' websites-- http://www.metals.com and http://barrickcapital.com.

64.     In telephone solicitations, despite having received a cease and desist demand to stop touting this purported affiliation, brokers, including the Broker Defendants, told investors the

---

[3] "Receivership Defendants" means each of the Receivership Entities identified above and the individual defendants named in the Underlying Lawsuit; Lucas Thomas Erb a/k/a Lucas Asher, a/k/a Luke Asher ("Asher") and Simon Batashvili ("Batashvili").

Receivership Defendants were friends with conservative television and radio personality Sean Hannity and that Hannity recommended buying Precious Metals Bullion.

65. In many instances, the Broker Defendants directed Investors to open self-directed retirement accounts ("SDIRAs") and to transfer funds from their qualified retirement savings to the newly established SDIRAs to purchase Precious Metals Bullion.

66. From at least September 1, 2017, through September 2020, at the request and direction of the Broker Defendants, numerous investors—most between the ages of sixty and ninety—opened SDIRAs and transferred some or all of their qualified retirement savings into those accounts.

67. In the same time-frame, from approximately September 2017 through September 2020, the Broker Defendants, on behalf of the Receivership Defendants, directed Investors to use monies from their SDIRAs to purchase fraudulently priced Precious Metals Bullion.

68. A smaller number of Investors also invested through cash accounts.

**C. The Fraud Perpetrated on Investors[4]**

69. In telephone conversations with Investors, each of the Broker Defendants, who primarily worked at the Receivership Entities' Beverly Hills office, instilled fear in the Investors by:

    a. Misrepresenting that the federal government was going to take qualified retirement savings funds in a "Bail-in" to help banks and government programs;

---

[4] Despite reliance on conduct in which the Receivership Defendants facilitated or also engaged, the Receiver is not subject to an *in pari delicto* defense. *See F.D.I.C. v. O'Melveny & Myers*, 61 F.3d 17, 19 (1995); *see also F.D.I.C. v. O'Melveny & Myers,* 969 F.2d 744, 751-52 (9th Cir. 1992), *rev'd on other grounds O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79 (1994)); *Mosier v. Erwin & Johnson, LLP*, CV122053PSGEX, 2013 WL 12122421, at *6 (C.D. Cal. May 29, 2013).

b.      Misrepresenting that IRA custodians were in financial trouble and are likely to collapse;

c.      Misrepresenting that it was unclear who actually owned the underlying securities in IRA accounts;

d.      Misrepresenting that the government could seize funds held in qualified retirement savings but could not seize Precious Metals Bullion held in SDIRAs; and

e.      Misrepresenting that Precious Metals Bullion were a safe and conservative investment and that Investors would not lose their funds in such investments.

70.      The Precious Metals Bullion was sold in the form of numerous coins or bars, but the most egregious fraud perpetrated by the Receivership Defendants and the Broker Defendants arose from the sale of the following Precious Metals Bullion:

a.   The 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion;

b.   The 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion;

c.   The 1/4 ounce Gold British Standard Bullion; and

d.   The 1/10 ounce Silver – Bull Round Spade Guinea Shield Bullion.

71.      Approximately 75% of the Investor Claims were for sales of the foregoing Precious Metals Bullion, with the largest dollar losses sustained by the Investors—a total of more than $25 million—arising from their purchase of the 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion.

72.      Investors were charged undisclosed and excessive markups on the Precious Metals Bullion that bore no relation to the prevailing market price, despite contrary representations by the Broker Defendants.

73.     For instance, the Broker Defendants sold the Silver Royal Canadian Mint Polar Bear Bullion on an average of 200% over the fair market value price; sold Gold Royal Canadian Mint Polar Bear Bullion on an average of 146% over the fair market value price; sold the Gold British Standard Bullion on an average of 150% over the fair market value price; and sold the Silver Bull Round Spade Guinea Shield on an average of 275% over the fair market value price

74.     The Broker Defendants and each of them failed to disclose these unreasonable and excessive markups, which prevented Investors from making an informed decision regarding the purchase of the Precious Metals Bullion.

75.     An Investor's ability to profit on the Precious Metals Bullion depended on the prevailing market price appreciating significantly—above historical all-time high prices prevailing at the time of their respective purchases.  Paying the undisclosed and excessive markups, however, meant the investors could never earn a profit, let alone recover their principal investments.

76.     Because the Investors paid the undisclosed and unconscionable markups—a component of the purchase price that did not represent value subject to resale—at the moment each consummated his or her sale transaction, Investors lost more than $47 million they had invested in the Precious Metals Bullion.

77.     At the time they sold the Precious Medals Bullion to the Investors, the Broker Defendants and each of them, knew, had notice of, or recklessly disregarded the truth about the value, purportedly conservative nature of, earning potential, and security of the investments they sold.

78.     Because each of the Broker Defendants knew, had notice of, or recklessly disregarded the truth about the  unconscionably inflated prices at which they sold the Precious Metals Bullion, the Broker Defendants knew, had notice of, or recklessly disregarded the fact that

at the time of purchase, each Investor lost the majority of or a large percentage of his or her investment.

79.    The Receivership Defendants and Broker Defendants, and each of them, also hid from Investors the markups, and thus their astronomical earnings, by misrepresenting the difference between what the  Receivership Defendants paid for the Precious Metals Bullion and what they charged Investors (the "Spread").

80.    For instance, in one form customer agreement related to purchase of the Precious Metals Bullion, Investors were told:

a.    "Spread on IRA Precious Metals transaction varies between two percent and thirty-three percent (2% to 33%). These numbers, however, are only general ranges and approximations, which are subject to change for a variety of reasons…"

b.    "At the time this Transaction Agreement was transmitted for Customer's signature, (i) Metals' Spread on bullion (i.e., coins and bars that generally move in tandem with the spot price for the relevant commodity) is generally between one percent and five percent (1 to 5%) …"

c.    "Metals is prohibited by law from guaranteeing to repurchase Precious Metals that it sells."

81.    In a later customer agreement used beginning in approximately June 2019 and continuing thereafter, the disclosed Spread was decreased to between 1% to 19.9%.

82.    Neither Spread stated in these customer agreements was accurate and none of the actual Spreads on Precious Metals Bullion fell within the range of Spread represented to Investors in the customer agreements.

83.     Instead, the Spread charged to the elderly or retirement-aged Investors exceeded 100% for Silver Royal Canadian Mint Polar Bear Bullion, 45% for Gold Royal Canadian Mint Polar Bear Bullion, and 50% for Gold British Standard Bullion.

84.     To support their false statements, however, the Broker Defendants and each of them provided Investors with fraudulent sales invoices showing exorbitant purchase prices that had no reasonable relation to the fair market value price or the price actually paid by the Receivership Defendants.

85.     Investors were also persuaded to purchase through false representations made by the Broker Defendants, and each of them, that the Precious Metals Bullion had numismatic value.

86.     Numismatic bullion, in turn, are rare, of limited availability, and have significant broad-based market demand and thus a substantially higher value than the fair market price of the precious metal contained in the Precious Metals Bullion. Semi-numismatic Precious Metals Bullion refers to bullion that are claimed to exhibit both bullion and numismatic traits, such that the value is derived from the precious metal content, limited circulation, and some recognized exclusive or collectible value.

87.     The Precious Metals Bullion, however, has no numismatic or semi- numismatic value. It is readily available to the public and not rare: i.e., more than 6 million units of Polar Bear bullion are in circulation.

88.     Each of the Broker Defendants knew, had notice of, or recklessly disregarded the truth about the absence of numismatic or semi-numismatic value in the Precious Metals Bullion they were selling.

89.     Investors most often learned the truth about the value of the Precious Metals Bullion when they received account statements from their SDIRA administrators showing an account value

based on the fair market value price for the bullion that was significantly lower than what the Broker Defendants represented.

90.     In response to the Investors' inquiries about the discrepancy on their SDIRA statements and what they had been told about their investment value, the Receivership Defendants and the Broker Defendants doubled down on their fraud.

91.     The Broker Defendants, and each of them, told Investors that the lower valuation on their SDIRA statements was an under-valuation that did not reflect the resale value of the Precious Metals Bullion ("Post-Purchase Misrepresentations").

92.     The Broker Defendants and the Metals Receivership Defendants referred to these Post-Purchase Misrepresentations as a "Tuck-In," intended to placate, calm, and lull Investors who were upset about the losses shown on their SDIRA statements. These Post-Purchase Misrepresentations and omissions were designed to conceal and perpetuate the fraudulent scheme.

93.     The Post-Purchase Misrepresentations also demonstrate the Broker Defendants' and each of their knowledge or notice that their earlier representations regarding the Precious Metals Bullion value were false.

**D.     Investigations, Cease and Desist Orders, and Regulatory Actions Begin**

94.     By at least the spring of 2019, State regulatory agencies began investigating complaints about the Receivership Defendants. Various enforcement actions, including complaints, emergency actions, disciplinary proceedings, and/or cease and desist orders ("State Regulatory Orders and Complaints") against the Receivership Defendants followed closely. Those State Regulatory Orders and Complaints include, but are not limited to:

a.      A May 1, 2019, Emergency Order and July 1, 2019, Agreed Order and Undertaking issued by the Texas State Securities Board;

b.      A May 16, 2019, Consent Cease and Desist Order issued by the Minnesota Department of Commerce Commissioner;

c.      A July 19, 2019, Consent Cease and Desist Order issued by the Colorado Securities Commissioner;

d.      A July 30, 2019, Emergency Cease and Desist Order issued by the Georgia Commissioner of Securities;

e.      An August 8, 2019, Cease and Desist Order issued by the Alabama Securities Commission;

f.      A September 6, 2019, Emergency Cease and Desist Order issued by the Kentucky Department of Financial Institutions;

g.      A November 1, 2019, Order to Cease and Desist and Order to Show Cause and May 26, 2020, Consent Order issued by the Missouri Securities Commissioner;

h.      A December 3, 2019, Administrative Complaint filed by the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth;

i.      A March 9, 2020, Cease and Desist Order issued by the Arkansas Securities Commissioner;

j.      A May 26, 2020, Complaint for Summary Order and Summary Order to Cease and Desist issued by the Nevada Securities Division of the Office of the Secretary of State;

k.      A June 4, 2020, Notice of Proposed Agency Action and Temporary Cease and Desist Order issued by the Montana State Auditor, Commissioner of Securities, and Insurance; and

l.      A June 20, 2020, Temporary Cease and Desist Order and Notice of Final Order issued by the Alaska Director of Commerce, Community, and Economic Development, Division of Banking and Securities.

95.     The Broker Defendants, and each of them, failed to disclose any of these State Orders and Complaints to Investors and prospective investors.

**E.      Same Song, Second Verse**

96.     To avoid enforcement of the State Regulatory Orders and Complaints, on August 20, 2019, Batashvili incorporated Barrick Capital, Inc.  Primarily through Barrick Capital, the Receivership Defendants, with the assistance of the Broker Defendants and each of them, continued to engage in the same fraudulent scheme and conspiracy that they perpetrated through the other Receivership Defendants.

97.     Barrick Capital and the other Receivership Defendants are a common enterprise with little or no distinction between their ownership and operations.  Both Barrick and Metals were owned and controlled by Asher and Batashvili, both operated out of the same office in Beverly Hills, both used many of the same lies to investors to sell metals; and both used many of the same Broker Defendants to sell metals to the Investors.

98.     Following entry of the State Regulatory Orders and Complaints, many of the sales representatives and other employees and agents of the Metals Receivership Defendants, including some or all of the Broker Defendants, started working for Barrick Capital.  The Broker Defendants performed the same work for Barrick Capital that they had performed for the Metals Receivership Defendants.

99.     Beginning in late August 2019, Barrick Capital, Asher, and Batashvili, directly and by and through the Broker Defendants, engaged in the exact same practices described above, regarding the same or similar Precious Metals Bullion.  The sales resulted in huge Investor Claims

owed by the Receivership Entities because the scam was the same—Barrick Capital Investors lost the majority of their investments, and thus hold claims for that lost amount, contemporaneously with their purchases.

**F.    The Fraudulent Transfers The Receiver Seeks to Recover**

100.    The Broker Defendants were paid commissions by the Receivership Entities in exchange for the fraudulent sales they made or substantially assisted.  They were paid either through payroll payments as a W-2 employee, or they, or entities they established, were paid directly from the Receivership Entities.

101.    The commissions or other value paid to the Broker Defendants are summarized on the schedule attached as **Exhibit "C"**[5], which is incorporated by reference.  These summaries are based on the records currently available to the Receiver but are subject to amendment in the event additional payments to the Broker Defendants are revealed through discovery or otherwise.

102.    As shown in the attached schedules, the payments were made to each Broker Defendant by check, direct deposit, or wire transfer on the dates and in the amounts shown in the attached schedules.  Payments were made from the Receivership Entities' Beverly Hills office, by the specific Receivership Entity identified in the summary.

103.    In addition to the cash payments, at least one Broker Defendant, Deric Ned, was given use of an exotic automobile as a sales prize.  On information and belief, other sales prizes were given to some of the other Broker Defendants as well.  These prizes were awarded from the Receivership Entities' Beverly Hills office.

104.    By making these payments and awarding these prizes to the Broker Defendants, the Receivership Defendants were unable to satisfy the claims held by the Investors.

---

[5] Schedules are identified as C-1 through C-20

105.    Payments made to the Broker Defendants also rendered the Receivership Defendants unable to pay a myriad of additional creditors, including the various States who filed actions against the Receivership Defendants for restitution and penalties.

106.    Each of the Broker Defendants established corporate entities to receive commission payments from the Receivership Entities.

    a.    Payments exchanged for the fraudulent solicitations of David Bleeden were paid, in part, to Bearhunter, LLC or Xan, LLC. Upon information and belief, these entities are owned and controlled by Bleeden.

    b.    Payments exchanged for the fraudulent solicitations of Daniel Isaac Halimi were paid, in part, to Halimi Group, LLC. Upon information and belief, this entity is owned and controlled by Halimi.

    c.    Payments exchanged for the fraudulent solicitations of Athena Hunter were paid, in part, to TPH Boss, LLC, an entity owned and controlled by Hunter.

    d.    Payments exchanged for the fraudulent solicitations of Randall Kohl were paid, in part, to The Voice, Inc. Upon information and belief, this entity is owned and controlled by Kohl.

    e.    Payments exchanged for the fraudulent solicitations of Benjamin Lee were paid, in part, to Mettabel, Inc. Upon information and belief, this entity is owned and controlled by Lee.

    f.    Payments and prizes exchanged for the fraudulent solicitations of Deric Scott Ned were paid, in part, to Poor Trap, Inc. and/or Deep State Marketing, Inc. Upon information and belief, these entities are owned and controlled by Deric Ned.

g.      Payments exchanged for the fraudulent solicitations of Michael Peralta were paid, in part, to MPERA Corporation.  Upon information and belief, this entity is owned and controlled solely by Peralta.

h.      Payments exchanged for the fraudulent solicitations of Sean Reza, also known as Thomas Reza, were paid, in part, to Amerigold, Inc.  Upon information and belief, this entity is owned and controlled by Reza.

i.      Payments exchanged for the fraudulent solicitations of Kyle D. Sanna were paid to Hurricane Holdings, Inc. and LTK Marketing.  Upon information and belief, these entities are owned and controlled by Sanna.

j.      Payments exchanged for the fraudulent solicitations of Christopher Stephan were paid, in part, to Eco Blue, Inc.  Upon information and belief, this entity is owned and controlled by Stephan.

k.      Payments exchanged for the fraudulent solicitations of Walter Vera were paid, in part, to Verastan Group, LLC. and/or Midwood Capital.  Upon information and belief these are entities owned and controlled by Vera.

l.      Payments exchanged for the fraudulent solicitations of Richard Joe Dougherty were paid in part to Rich Dough, Inc. Upon information and belief, this entity is owned and controlled by Dougherty.

m.      Payments exchanged for the fraudulent solicitations of Matthew Levitt were paid in part to Gooner Enterprises, Inc.  Upon information and belief, this entity is owned and controlled by Levitt.

n.      Payments exchanged for the fraudulent solicitations of James Flicek were paid in part to Ellipsis Marketing. Upon information and belief, this entity is owned and controlled by Flicek.

o.      Payments exchanged for the fraudulent solicitations of Joshua Ferdman were paid in part to Ferdman Corp, Inc. Upon information and belief, this entity is owned and controlled by Ferdman.

p.      Payments exchanged for the fraudulent solicitations of Andrew J. Eilers were paid, in part, to Andrew J. Eilers Consulting Inc. Upon information and belief, this entity is owned and controlled solely by Eilers.

q.      Payments exchanged for fraudulent solicitations of Alexander Flamer were paid in part, to 9inth Level Marketing, Inc.. Upon information and belief, this entity is owned and controlled solely by Flamer.

r.      Payments exchanged for the fraudulent solicitations of David Wolan were paid, in part, to Harper Metals. Upon information and belief, this entity is owned and controlled solely by Wolan.

s.      Payments exchanged for the fraudulent solicitations of Brock Bowers were paid in part, to TOTM Production Group, LLC and/or to Brock Bowers, doing business as BA Bowers, LLC. Upon information and belief, these entities are owned and controlled by Bowers.

t.      Payments exchanged for the fraudulent solicitations of Philip Levy were paid in part, to IQ Capital Advisors. Upon information and belief, this entity is owned and controlled by Levy.

## VII.
## CAUSES OF ACTION

**COUNT 1:**     **VOIDABLE/FRAUDULENT TRANSFER- ACTUAL FRAUD**

107.     The Receiver alleges and hereby incorporates by reference each allegation made in the preceding paragraphs as if each were separately set forth below.

108.     On the dates, in the amounts, and in the manner described in Exhibit C, the Receivership Entities transferred the specific amounts to each of the Broker Defendants (collectively, "the Transfers") with intent to defraud the Receivership Entities' creditors, who include, but are not limited to, the Investors.

109.     As demonstrated by numerous badges of fraud, the Receivership Entities made the Transfers with actual fraudulent intent:

   a.     As payments made to facilitate fraud and which resulted in claims held by Investors exceeding the value, if any, of the services provided by each of the Broker Defendants, the Transfers were not made in exchange for reasonably equivalent value. *See S.E.C. v. Resource Dev. Int'l, LLC,* 487 F.3d 295, 301 (5th Cir.2007) (citing *In re Agric. Res. & Tech. Group, Inc.,* 916 F.2d 528, 540 (9th Cir.1990) (Value is assessed in light of the statute's purpose "to protect the creditors"));

   b.     The Transfers and their amounts were concealed from creditors;

   c.     The Receivership Entities concealed assets, including by diverting monies received from Investors for the sale of metals to a myriad of shell entities, and bank accounts.

   d.     The Transfers were made when the Receivership Entities were (a) engaged or about to engage in a business or a transaction for which the remaining assets of the Receivership Entities were unreasonably small in relation to the business or transaction; or

(b) intended to incur, or believed or reasonably should have believed that the Receivership Entities would incur, debts beyond their ability to pay as they became due;

e.       The Receivership Entities' debts—primarily claims held by defrauded Investors—greatly exceeded their assets;

f.       All Transfers made by Barrick Capital were made after the Receivership Defendants had been sued or disciplined as reflected by the State Regulatory Orders and Complaints;

g.       The Transfers were made shortly after substantial debts were incurred;

h.       The Receivership Defendants engaged in a pattern of sharp dealing, by among things, using the Broker Defendants to sell bullion through false and misleading statements and practices;

i.       At the time of each of the Transfers, the Receivership Entities had actual knowledge or notice that by making the Transfers, they would be unable to pay creditors, including claims held by defrauded Investors. *See Hayes v. Palm Seedlings Partners–A (In re Agricultural Research and Tech. Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) (Holding knowledge that a transaction will operate to the detriment of creditors may be sufficient to establish actual fraudulent intent);

j.       At the time of each Transfer, each of the Receivership Entities was a fraudulent enterprise.  Thus, a presumption of fraudulent intent attached to each of the Transfers. *See In re IFS Fin. Corp.,* 417 B.R. 419, 439 n.15 (Bankr. S.D. Tex. 2009), *affirmed,* 669 F.3d 255 (2012).

110.    Creditors, including, but not limited to Investors, exist whose claims arose before and/or within a reasonable time after the Transfers were made, and for whom the Receiver is authorized to assert these claims.

111.    Because the Transfers from the Receivership Entities to the Broker Defendants were fraudulent under Cal. Civ. Code § 3439(a)(1) and/or any other applicable State's adoption of the Uniform Fraudulent Transfer Act (the "UFTA"), the Receiver may avoid the Transfers under Cal. Civ. Code § 3439.07 or any other applicable statutory enactment of the UFTA.

112.    The Receiver requests all available remedies provided by the UFTA, including, but not limited to, avoidance of all transfers of monies and property from the Receivership Entities to the Broker Defendants.

**COUNT 2:    VOIDABLE/FRAUDULENT TRANSFERS - CONSTRUCTIVE FRAUD**

113.    The Receiver alleges and hereby incorporates by reference each allegation made in the foregoing paragraphs as if each were separately set forth herein.

114.    The Transfers were made when the Receivership Defendants were (a) engaged or about to engage in a business or a transaction for which the remaining assets of the Receivership Entities were unreasonably small in relation to the business or transaction; or (b) when the Receivership Entities intended to incur, or believed, or reasonably should have believed, that the Receivership Entities would incur, debts beyond their ability to pay as they became due.

115.    The fraudulent sales solicitations made by the Broker Defendants provided no value to the Receivership Entities and instead simply enlarged the pool of defrauded investors who hold claims against the Receivership Entities. The Receivership Entities, accordingly, did not receive reasonably equivalent for the Transfers.

116.    Moreover, since the Broker Defendants were aware of complaints from Investors that the sales price of the Precious Metals Bullion far exceeded the fair market value of the Precious

Metals Bullion as shown by the SDIRA custodians, the Broker Defendants were not acting in good faith with respect to the Transfers.

117.    The Transfers were accordingly fraudulent pursuant to Cal. Civ. Code § 3439(a)(2) et seq., and/or any other applicable State's adoption of the UFTA and the Receiver may avoid the Transfers under Cal. Civ. Code § 3439.07 or any other applicable statutory enactment of the UFTA.

118.    The Receiver requests all available remedies provided by the UFTA, including, but not limited to, avoidance of all transfers of monies and property from the Receivership Entities to the Broker Defendants.

**COUNT 3:    UNJUST ENRICHMENT - CONSTRUCTIVE TRUST**

119.    The Receiver alleges and hereby incorporates by reference each allegation made in the foregoing paragraphs as if each were separately set forth herein.

120.    The Broker Defendants have been unjustly enriched by the Transfers and property they received from the Receivership Entities.

121.    The Receivership Entities owe restitution to the Investors, and the Broker Defendants' retention of the Transfers and prizes is unjust and injures the Receivership Entities.

122.    Accordingly, the Receiver seeks to recover from the Broker Defendants such amounts for the benefit of creditors and defrauded Investors under the equitable doctrine of unjust enrichment and requests the imposition of a constructive trust over all such funds, property and the proceeds thereof.

**COUNT 4:    MONEY HAD AND RECEIVED**

123.    The Receiver alleges and hereby incorporates by reference each allegation made in foregoing paragraphs as if each were separately set forth below.

124.    The Broker Defendants received the Transfers and other property from the Receivership Entities, that in equity and good conscience belong to the Receivership Entities. The Receiver seeks to recover the Transfers and other property for the benefit of the Investors and other creditors of the Receivership Entities.

125.    The Receiver sues for the recovery of all monies had and received by the Broker Defendants.

## COUNT 5:    ATTORNEY'S FEES

126.    The Receiver seeks the recovery of all reasonable attorney's fees and expenses incurred in obtaining judgment against the Broker Defendants, as allowed by law or in equity, and also any attorney's fees and expenses required to pursue or defend any appeals in this action.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Receiver, Kelly M. Crawford respectfully prays that this Court order disgorgement or alternatively award the Receiver judgment against the Broker Defendants in an amount to be determined through discovery, plus prejudgment and post judgment interest, attorney's fees, expenses, and court costs; and that the Court grant such other and further relief as prayer for herein, both at law and in equity, to which he may show himself justly entitled.

Respectfully submitted,

SCHEEF & STONE, LLC

*/s/ Peter Lewis*
PETER LEWIS
State Bar No. 12302100
Peter.lewis@solidcounsel.com
500 North Akard, Suite 2700
Dallas, Texas 75201
(214) 706-4200  Telephone
(214) 706-4242 Facsimile

BROWN FOX PLLC

CHARLENE C. KOONCE
State Bar No. 11672850
charlene@brownfoxlaw.com
8111 Preston Road, Suite 300
Dallas, Texas 75225
(214) 327-5000 Telephone
(214) 327-5001 Facsimile

**ATTORNEYS FOR PLAINTIFF**