## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| KELLY CRAWFORD, IN HIS CAPACITY AS RECEIVER. §<br>§<br>§ | |
| **Plaintiff,** § | |
| v. § | **C.A. NO. 3:21-CV-02181-X** |
| DAVID BLEEDEN, BEARHUNTER, LLC, XAN, LLC, DANIEL ISAAC HALIMI, HALIMI GROUP, LLC, ATHENA HUNTER, TPH BOSS, LLC, RANDALL KOHL, THE VOICE, INC., BENJAMIN LEE, METTABEL INC., DERIC SCOTT NED, POOR TRAP, INC., DEEP STATE MARKETING, INC., MICHAEL PERALTA, MPERA CORP., SEAN REZA, also known as THOMAS REZA, AMERIGOLD, INC., KYLE D. SANNA, HURRICANE HOLDINGS, INC., LTK MARKETING, LLC, CHRISTOPHER STEPHAN, ECO BLUE INC., WALTER VERA, VERASTAN GROUP, LLC, MIDWOOD CAPITAL, RICHARD JOE DOUGHERTY III, RICH DOUGH, INC., MATTHEW LEVITT, GOONER ENTERPRISES, INC., JOSHUA FERDMAN, FERDMAN GROUP, INC., ANDREW EILERS, ANDREW J. EILERS CONSULTING, INC.,ALEXANDER FLAMER, 9th LEVEL MARKETING, INC., DAVID WOLAN, HARPER METALS GROUP, LLC, TOTM PRODUCTION GROUP, LLC, §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| **Defendants.** § | |

## RECEIVER'S FIRST AMENDED COMPLAINT

Kelly Crawford, as the Receiver of TMTE, Inc., a/k/a Metals.Com, Chase Metals, Inc.,

Chase Metals, LLC, Barrick Capital, Inc., and all other entities placed in receivership pursuant to

the orders described herein, files this Complaint against Defendants David Bleeden; Bearhunter,

LLC; Xan, LLC; Daniel Isaac Halimi; Halimi Group, LLC; Athena Hunter; TPH Boss, LLC;

Randall Kohl; The Voice, Inc.; Benjamin Lee; Mettabel Inc.; Deric Scott Ned; Poor Trap, Inc.;

Deep State Marketing, Inc.; Michael Peralta; MPERA Corp.; Sean Reza, also known as Thomas Reza; Amerigold, Inc.; Kyle D. Sanna; Hurricane Holdings, Inc.; LTK Marketing, LLC; Christopher Stephan; Eco Blue Inc.; Walter Vera; Verastan Group, LLC; Midwood Capital; Richard Joe Dougherty; Rich Dough, Inc.; Matthew Levitt; Gooner Enterprises, Inc.; Joshua Ferdman; Ferdman Group, Inc.; Andrew Eilers; Andrew J. Eilers Consulting, Inc.; Alexander Flamer; 9TH Level Marketing, Inc.; David Wolan; Harper Metals Group, LLC; TOTM Production Group, LLC,  (collectively, the "Broker Defendants").

# I.
# SUMMARY

1.      In total, the Broker Defendants received more than $12 million in commissions, unearned compensation, and sales prizes, transferred to them by the Receivership Entities.[1] The Broker Defendants received these assets in exchange for their sale of precious metals and coins, sold at grossly inflated prices based on false and misleading representations, to unsuspecting elderly investors.  Payments to the Broker Defendants were made to defraud the investors, who by virtue of their investments, were, and also are, the Receivership Entities' creditors. The payments were made while the Receivership Entities knew they would not be able to satisfy claims owed to the investor/creditors, as well as claims held by other creditors, and while the Receivership Entities were insolvent, and without the exchange of reasonably equivalent value.  Standing in the Receivership Entities' shoes for purposes of the claims asserted below and for the benefit of the

---

[1] "Receivership Entities" means TMTE, Inc., a/k/a Metals.Com, Chase Metals, Inc., Chase Metals, LLC (collectively the "Metals Receivership Defendants"), and Barrick Capital, Inc., as well all other Receivership Entities described within the scope of, or identified in the Receivership Order issued in Civil Action No. 3:20-CV-2910-L and any supplemental or amending orders, which include, but are not limited to, Administrative Account Services, LLC, Amerivise, LLC, Best New, Inc., Delaware Wholesale, Inc., Revo, LLC, Merrill Gold, LLC, Newmont Admin. Inc., Reagan Financial Services, Inc., Resource Financial Services, Inc., First American Estate & Trust, First American Savings, Inc., Retirement Insider, Inc., USA Accounts, Inc., USA Marketing, Inc., TX Admin, Inc., and Relief Defendant Tower Equity, LLC.  Capitalized terms used in this Complaint, if not specifically defined, have the meaning provided by orders in the Underlying Lawsuit.

Receivership Entities' defrauded creditors, including at least 1,300 elderly victims, the Receiver seeks to recover the funds fraudulently transferred to the Broker Defendants.

## II.
## RECEIVERSHIP

2.        On September 22, 2020, in Civil Action No. 20-cv-2910-L, *CFTC, et al., v. TMTE, Inc. a/k/a Metals.Com, et al.*, (the "Underlying Lawsuit") this Court entered the Order Granting Plaintiffs' Emergency *Ex Parte* Motion for Statutory Restraining Order, Appointment of Receiver, and Other Equitable Relief, (the "Receivership Order"), a copy of which is attached as **Exhibit A**, and is incorporated by reference.  Pursuant to the Receivership Order, Kelly Crawford as Receiver was ordered to collect, receive and take exclusive custody, control, and possession of certain assets of the defendants and relief defendant and the entities owned or controlled by the defendants (the "Receivership Assets"), as further described in **Exhibit A**.  The Receivership Order also authorized the Receiver to institute proceedings as may, in his judgment, be necessary or proper for the protection and collection of Receivership Assets.

3.        Additional relevant orders have also been entered in the Underlying Lawsuit: (1) the Consent Order of Preliminary Injunction as to Lucas Thomas Erb a/k/a Lucas Asher a/k/a Luke Asher and Simon Batashvili [Dkt. 165]; (2) the Consent Order of Preliminary Injunction as to Defendant TMTE, Inc. a/k/a Metals.com, Chase Metals, Inc., Chase Metals, LLC, Barrick Capital, Inc., and Relief Defendant Tower Equity, LLC [Dkt. 164]; and (3) the Order Granting Receiver's Motion to Identify Certain Entities in Receivership [Dkt. 230].

4.        In the Receivership Order, the Court made a preliminary finding that the Receivership Defendants "have engaged and continue to engage in a fraudulent scheme to defraud at least 1,600 persons throughout the United States into purchasing gold and silver bullion" and

that the Defendants "targeted a vulnerable population of mostly elderly or retirement-aged persons." *See* Receivership Order [Dkt. 16] at p. 5.

5.       As further described below, the Broker Defendants participated in this scheme by locating and contacting Investors and using fraudulent statements and omissions as described below, to lure investors into buying bullion and coins at grossly inflated prices.

6.       The Receiver exercised diligence in investigating and discovering the claims asserted below.  Nonetheless, the claims were concealed and the Receiver was unable to discover the claims until several months after his appointment.  Indeed, most records for the Receivership Entities were on digital platforms the Receiver was unable to access for several months after his appointment, and the FBI executed a search warrant pursuant to which they seized computers and information, which deprived the Receiver of the ability to obtain such information until late August 2021.

### III.
### PARTIES

7.       Plaintiff is a natural citizen and resident of Dallas County, Texas acting in his capacity as Receiver.

8.       Defendant David Bleeden is an individual residing in California.  This defendant has answered and appeared.

9.       Defendant Bearhunter, LLC is a limited liability company organized under the laws of Wyoming. This defendant has answered and appeared.,.

10.       Defendant Xan, LLC is a limited liability company organized under the laws of Wyoming. This defendant has answered and appeared.

11.       Defendant Daniel Isaac Halimi is an individual residing in California. This defendant has answered and appeared.

**RECEIVER'S FIRST AMENDED COMPLAINT**                                              **PAGE 4**

12.     Defendant Halimi Group, LLC, is a limited liability company organized under the laws of Delaware. This defendant has answered and appeared.

13.     Defendant Athena Hunter is an individual residing in California. This defendant has answered and appeared.

14.     Defendant TPH Boss, LLC, is a limited liability company organized under the laws of Delaware. This defendant has answered and appeared.

15.     Defendant Randall Kohl is an individual residing in California. This defendant has answered and appeared.

16.     Defendant The Voice, Inc., is a corporation organized under the laws of Wyoming. This defendant has answered and appeared.

17.     Defendant Benjamin Lee is an individual residing in California. This defendant has answered and appeared.

18.     Defendant Mettabel Inc. is a corporation organized under the laws of California. This defendant has answered and appeared.

19.     Defendant Deric Scott Ned is an individual residing in California. This defendant has answered and appeared.

20.     Defendant Poor Trap, Inc., is a corporation organized under the laws of California. This defendant has answered and appeared.

21.     Defendant Deep State Marketing, Inc., is a corporation organized under the laws of California. This defendant has answered and appeared.

22.     Defendant Michael Peralta is an individual residing in California. This defendant has answered and appeared.

23.     Defendant MPERA Corp., is a corporation organized under the laws of Delaware. This defendant has answered and appeared.

24.     Defendant Sean Reza, also known as Thomas Reza, is an individual residing in California. This defendant has answered and appeared.

25.     Defendant Amerigold, Inc., is a corporation organized under the laws of California. This defendant has answered and appeared.

26.     Defendant Kyle D. Sanna is an individual residing in California. This defendant has answered and appeared.

27.     Defendant Hurricane Holdings, Inc., is a corporation organized under the laws of California. This defendant has answered and appeared.

28.     Defendant LTK Marketing, LLC is a limited liability company organized under the laws of California. This defendant has answered and appeared.

29.     Defendant Christopher Stephan is an individual who has been served.  The clerk has entered default against Defendant Stephan.

30.     Defendant Eco Blue, Inc., is a corporation which has been served.  The clerk has entered default against Defendant Eco Blue, Inc.

31.     Defendant Walter Vera is an individual residing in California. This defendant has answered and appeared.

32.     Defendant Verastan Group, LLC is a limited liability company organized under the laws of California. This defendant has answered and appeared.

33.     Defendant Midwood Capital is a corporation organized under the laws of California. This defendant has answered and appeared.

34.     Defendant Richard Joe Dougherty, III is an individual who has been served.  The clerk has entered default against Defendant Richard Joe Dougherty, III.

35.     Defendant Rich Dough Inc. is a corporation which has been served.  The clerk has entered default against Defendant Rich Dough Inc.

36.     Defendant Matthew Joel Levitt is an individual residing in California. This defendant has answered and appeared.

37.     Defendant Gooner Enterprises, Inc. is a corporation organized under the laws of California. This defendant has answered and appeared.

38.     Defendant Joshua Ferdman is an individual residing in California. This defendant has answered and appeared.

39.     Defendant Ferdman Group, Inc. is a corporation organized under the laws of California. This defendant has answered and appeared.

40.     Defendant Andrew Eilers is an individual who has been served.  The clerk has entered default against Defendant Andrew Eilers.

41.     Defendant Andrew Eilers Consulting, Inc. is a corporation which has been served. The clerk has entered default against Defendant Andrew Eilers Consulting, Inc.

42.     Defendant Alexander Flamer is an individual residing in California. This defendant has answered and appeared.

43.     Defendant 9th Level Marketing, Inc., is a corporation which has been served.  The clerk has entered default against Defendant 9th Level Marketing, Inc.

44.     Defendant David Wolan is an individual residing in Florida. This defendant has answered and appeared.

45.     Defendant Harper Metals Group, LLC is a limited liability company organized under the laws of Florida. This defendant has answered and appeared.

46.     Defendant TOTM Production Group LLC is a limited liability company which has been served.  The clerk has entered default against Defendant TOTM Production Group LLC.

## IV.
## JURISDICTION

47.     This Court has subject matter jurisdiction over the Receiver's claims pursuant to 28 U.S.C. § 1331 because this action is related to and arises out of alleged violations of the Commodities Exchange Act.  Moreover, in the Receivership Order, this Court assumed exclusive jurisdiction to adjudicate claims regarding the assets that are the basis of this Complaint, and accordingly, pursuant to 28 U.S.C. § 1367 this Court possesses supplemental subject matter jurisdiction over the Receiver's claims.

48.     The Receiver's compliance with 28 U.S.C. §§ 753 and 754 also provides subject matter jurisdiction, and together with 28 U.S.C. § 1692, provides personal jurisdiction over each of the Broker Defendants.

## V.
## VENUE

49.     Pursuant to the Receivership Order, the Court assumed exclusive jurisdiction over Receivership Assets and authorized the Receiver, as the Court's agent, to take and have possession of the Receivership Assets.  Further, pursuant to 28 U.S.C. §§ 754 and 1692, the Receiver may sue in the district in which he was appointed to enforce claims arising anywhere in the country. Accordingly, venue is appropriate in the Northern District of Texas, Dallas Division, the venue in which the Receiver was appointed.

# VI.
# FACTUAL BACKGROUND[2]

## A.    The Receivership Entities' Purpose

50.    Each of the Receivership Entities existed and operated solely to perpetrate fraud on unsuspecting, vulnerable investors, and line the pockets of Batashvili and Asher, and the Broker Defendants they supervised.

51.    The Receivership Defendants used the Broker Defendants and made the transfers at issue in this lawsuit, to accomplish their goal.

52.    Pursuant to a claims process established by the Court in the Underlying Lawsuit, more than 1,730 investors who purchased metals from the Receivership Defendants submitted claims (the "Investors").  Investigation and analysis of the claims revealed Investors hold claims totaling $63.4 million (the "Investor Claims"). The basis for the Investor Claims is the amount paid by each Investor to the Receivership Defendants in excess of the fair market value for the metals sold by the Receivership Defendants, as discussed in detail below.  These claims, as well as the claims of the regulatory agencies described below, arose at the time of each fraudulent sale.

53.    To date, the Receiver has identified less than $12 million in Receivership Assets. Accordingly, not including claims by trade creditors or penalties owed to regulatory entities, the Receivership Estate has less than 21% of the amount necessary to fully satisfy all Investor Claims. At all relevant times, the  Receivership Entities have been insolvent.

---

[2] A copy of the Complaint filed in the Underlying Action, without exhibits, is attached as **Exhibit "B"** and provides additional information about the fraudulent scheme in which the Broker Defendants participated, the conduct for which each was paid compensation, and the derivation of that compensation.

**B.      The Elderly and Retiree Targets**

54.      The Receivership Defendants, directly and by and through each of the Broker Defendants, targeted a vulnerable population of mostly elderly or retirement-aged persons with little or no experience in gold and silver bullion investments ("Precious Metals Bullion").

55.      The Broker Defendants concentrated their solicitations on these persons to gain access to retirement savings, including, but not limited to, retirement savings held in tax advantaged accounts such as individual retirement accounts; employer sponsored 401(k) and 457(b) plans; thrift savings plans; life insurance; annuities; money market accounts; and other long-term retirement savings vehicles ("Qualified Retirement Savings").

56.      The Broker Defendants' and the Receivership Defendants'[3] solicitations also targeted politically conservative and Christian investors.

57.      The Broker Defendants and each of them employed solicitations designed to instill fear in these elderly and retirement aged Investors and build trust based on representations of political and religious affinity.  For instance, the investments sold by the Broker Defendants were advertised on conservative media outlets and websites.

58.      Each of the Broker Defendants solicited Investors primarily through telephone calls and/or social media postings through the Receivership Defendants' websites-- http://www.metals.com and http://barrickcapital.com.

59.      In telephone solicitations, despite having received a cease and desist demand to stop touting this purported affiliation, brokers, including the Broker Defendants, told investors the

---

[3] "Receivership Defendants" means each of the Receivership Entities identified above and the individual defendants named in the Underlying Lawsuit; Lucas Thomas Erb a/k/a Lucas Asher, a/k/a Luke Asher ("Asher") and Simon Batashvili ("Batashvili").

Receivership Defendants were friends with conservative television and radio personality Sean Hannity and that Hannity recommended buying Precious Metals Bullion.

60.     In many instances, the Broker Defendants directed Investors to open self-directed retirement accounts ("SDIRAs") and to transfer funds from their qualified retirement savings to the newly established SDIRAs to purchase Precious Metals Bullion.

61.     From at least September 1, 2017, through September 2020, at the request and direction of the Broker Defendants, numerous investors—most between the ages of sixty and ninety—opened SDIRAs and transferred some or all of their qualified retirement savings into those accounts.

62.     In the same time-frame, from approximately September 2017 through September 2020, the Broker Defendants, on behalf of the Receivership Defendants, directed Investors to use monies from their SDIRAs to purchase fraudulently priced Precious Metals Bullion.

63.     A smaller number of Investors also invested through cash accounts.

C.     **The Fraud Perpetrated on Investors[4]**

64.     In telephone conversations with Investors, each of the Broker Defendants, who primarily worked at the Receivership Entities' Beverly Hills office, instilled fear in the Investors by:

> a.     Misrepresenting that the federal government was going to take qualified retirement savings funds in a "Bail-in" to help banks and government programs;

---

[4] Despite reliance on conduct in which the Receivership Defendants facilitated or also engaged, the Receiver is not subject to an *in pari delicto* defense.  *See F.D.I.C. v. O'Melveny & Myers*, 61 F.3d 17, 19 (1995); *see also F.D.I.C. v. O'Melveny & Myers*, 969 F.2d 744, 751-52 (9th Cir. 1992), *rev'd on other grounds O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79 (1994)); *Mosier v. Erwin & Johnson, LLP*, CV122053PSGEX, 2013 WL 12122421, at *6 (C.D. Cal. May 29, 2013).

b.  Misrepresenting that IRA custodians were in financial trouble and are likely to collapse;

c.  Misrepresenting that it was unclear who actually owned the underlying securities in IRA accounts;

d.  Misrepresenting that the government could seize funds held in qualified retirement savings but could not seize Precious Metals Bullion held in SDIRAs; and

e.  Misrepresenting that Precious Metals Bullion were a safe and conservative investment and that Investors would not lose their funds in such investments.

65.  The Precious Metals Bullion was sold in the form of numerous coins or bars, but the most egregious fraud perpetrated by the Receivership Defendants and the Broker Defendants arose from the sale of the following Precious Metals Bullion:

a.  The 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion;

b.  The 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion;

c.  The 1/4 ounce Gold British Standard Bullion; and

d.  The 1/10 ounce Silver – Bull Round Spade Guinea Shield Bullion.

66.  Approximately 75% of the Investor Claims were for sales of the foregoing Precious Metals Bullion, with the largest dollar losses sustained by the Investors—a total of more than $25 million—arising from their purchase of the 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion.

67.  Investors were charged undisclosed and excessive markups on the Precious Metals Bullion that bore no relation to the prevailing market price, despite contrary representations by the Broker Defendants.

68.     For instance, the Broker Defendants sold the Silver Royal Canadian Mint Polar Bear Bullion on an average of 200% over the fair market value price; sold Gold Royal Canadian Mint Polar Bear Bullion on an average of 146% over the fair market value price; sold the Gold British Standard Bullion on an average of 150% over the fair market value price; and sold the Silver Bull Round Spade Guinea Shield on an average of 275% over the fair market value price

69.     The Broker Defendants and each of them failed to disclose these unreasonable and excessive markups, which prevented Investors from making an informed decision regarding the purchase of the Precious Metals Bullion.

70.     An Investor's ability to profit on the Precious Metals Bullion depended on the prevailing market price appreciating significantly—above historical all-time high prices prevailing at the time of their respective purchases.  Paying the undisclosed and excessive markups, however, meant the investors could never earn a profit, let alone recover their principal investments.

71.     Because the Investors paid the undisclosed and unconscionable markups—a component of the purchase price that did not represent value subject to resale—at the moment each consummated his or her sale transaction, Investors lost more than $47 million they had invested in the Precious Metals Bullion.

72.     At the time they sold the Precious Medals Bullion to the Investors, the Broker Defendants and each of them, knew, had notice of, or recklessly disregarded the truth about the value, purportedly conservative nature of, earning potential, and security of the investments they sold.

73.     Because each of the Broker Defendants knew, had notice of, or recklessly disregarded the truth about the  unconscionably inflated prices at which they sold the Precious Metals Bullion, the Broker Defendants knew, had notice of, or recklessly disregarded the fact that

at the time of purchase, each Investor lost the majority of or a large percentage of his or her investment.

74.     The Receivership Defendants and Broker Defendants, and each of them, also hid from Investors the markups, and thus their astronomical earnings, by misrepresenting the difference between what the  Receivership Defendants paid for the Precious Metals Bullion and what they charged Investors (the "Spread").

75.     For instance, in one form customer agreement related to purchase of the Precious Metals Bullion, Investors were told:

a.     "Spread on IRA Precious Metals transaction varies between two percent and thirty-three percent (2% to 33%). These numbers, however, are only general ranges and approximations, which are subject to change for a variety of reasons…"

b.     "At the time this Transaction Agreement was transmitted for Customer's signature, (i) Metals' Spread on bullion (i.e., coins and bars that generally move in tandem with the spot price for the relevant commodity) is generally between one percent and five percent (1 to 5%) …"

c.     "Metals is prohibited by law from guaranteeing to repurchase Precious Metals that it sells."

76.     In a later customer agreement used beginning in approximately June 2019 and continuing thereafter, the disclosed Spread was decreased to between 1% to 19.9%.

77.     Neither Spread stated in these customer agreements was accurate and none of the actual Spreads on Precious Metals Bullion fell within the range of Spread represented to Investors in the customer agreements.

78.     Instead, the Spread charged to the elderly or retirement-aged Investors exceeded 100% for Silver Royal Canadian Mint Polar Bear Bullion, 45% for Gold Royal Canadian Mint Polar Bear Bullion, and 50% for Gold British Standard Bullion.

79.     To support their false statements, however, the Broker Defendants and each of them provided Investors with fraudulent sales invoices showing exorbitant purchase prices that had no reasonable relation to the fair market value price or the price actually paid by the Receivership Defendants.

80.     Investors were also persuaded to purchase through false representations made by the Broker Defendants, and each of them, that the Precious Metals Bullion had numismatic value.

81.     Numismatic bullion, in turn, are rare, of limited availability, and have significant broad-based market demand and thus a substantially higher value than the fair market price of the precious metal contained in the Precious Metals Bullion. Semi-numismatic Precious Metals Bullion refers to bullion that are claimed to exhibit both bullion and numismatic traits, such that the value is derived from the precious metal content, limited circulation, and some recognized exclusive or collectible value.

82.     The Precious Metals Bullion, however, has no numismatic or semi- numismatic value. It is readily available to the public and not rare: i.e., more than 6 million units of Polar Bear bullion are in circulation.

83.     Each of the Broker Defendants knew, had notice of, or recklessly disregarded the truth about the absence of numismatic or semi-numismatic value in the Precious Metals Bullion they were selling.

84.     Investors most often learned the truth about the value of the Precious Metals Bullion when they received account statements from their SDIRA administrators showing an account value

based on the fair market value price for the bullion that was significantly lower than what the Broker Defendants represented.

85.     In response to the Investors' inquiries about the discrepancy on their SDIRA statements and what they had been told about their investment value, the Receivership Defendants and the Broker Defendants doubled down on their fraud.

86.     The Broker Defendants, and each of them, told Investors that the lower valuation on their SDIRA statements was an under-valuation that did not reflect the resale value of the Precious Metals Bullion ("Post-Purchase Misrepresentations").

87.     The Broker Defendants and the Metals Receivership Defendants referred to these Post-Purchase Misrepresentations as a "Tuck-In," intended to placate, calm, and lull Investors who were upset about the losses shown on their SDIRA statements. These Post-Purchase Misrepresentations and omissions were designed to conceal and perpetuate the fraudulent scheme.

88.     The Post-Purchase Misrepresentations also demonstrate the Broker Defendants' and each of their knowledge or notice that their earlier representations regarding the Precious Metals Bullion value were false.

**D.     Investigations, Cease and Desist Orders, and Regulatory Actions Begin**

89.     By at least the spring of 2019, State regulatory agencies began investigating complaints about the Receivership Defendants. Various enforcement actions, including complaints, emergency actions, disciplinary proceedings, and/or cease and desist orders ("State Regulatory Orders and Complaints") against the Receivership Defendants followed closely.  Those State Regulatory Orders and Complaints include, but are not limited to:

        a.     A May 1, 2019, Emergency Order and July 1, 2019, Agreed Order and
        Undertaking issued by the Texas State Securities Board;

b.      A May 16, 2019, Consent Cease and Desist Order issued by the Minnesota Department of Commerce Commissioner;

c.      A July 19, 2019, Consent Cease and Desist Order issued by the Colorado Securities Commissioner;

d.      A July 30, 2019, Emergency Cease and Desist Order issued by the Georgia Commissioner of Securities;

e.      An August 8, 2019, Cease and Desist Order issued by the Alabama Securities Commission;

f.      A September 6, 2019, Emergency Cease and Desist Order issued by the Kentucky Department of Financial Institutions;

g.      A November 1, 2019, Order to Cease and Desist and Order to Show Cause and May 26, 2020, Consent Order issued by the Missouri Securities Commissioner;

h.      A December 3, 2019, Administrative Complaint filed by the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth;

i.      A March 9, 2020, Cease and Desist Order issued by the Arkansas Securities Commissioner;

j.      A May 26, 2020, Complaint for Summary Order and Summary Order to Cease and Desist issued by the Nevada Securities Division of the Office of the Secretary of State;

k.      A June 4, 2020, Notice of Proposed Agency Action and Temporary Cease and Desist Order issued by the Montana State Auditor, Commissioner of Securities, and Insurance; and

l.      A June 20, 2020, Temporary Cease and Desist Order and Notice of Final

Order issued by the Alaska Director of Commerce, Community, and Economic

Development, Division of Banking and Securities.

90.    The Broker Defendants, and each of them, failed to disclose any of these State

Orders and Complaints to Investors and prospective investors.

**E.      Same Song, Second Verse**

91.    To avoid enforcement of the State Regulatory Orders and Complaints, on August

20, 2019, Batashvili incorporated Barrick Capital, Inc.  Primarily through Barrick Capital, the

Receivership Defendants, with the assistance of the Broker Defendants and each of them,

continued to engage in the same fraudulent scheme and conspiracy that they perpetrated through

the other Receivership Defendants.

92.    Barrick Capital and the other Receivership Defendants are a common enterprise

with little or no distinction between their ownership and operations.  Both Barrick and Metals were

owned and controlled by Asher and Batashvili, both operated out of the same office in Beverly

Hills, both used many of the same lies to investors to sell metals; and both used many of the same

Broker Defendants to sell metals to the Investors.

93.    Following entry of the State Regulatory Orders and Complaints, many of the sales

representatives and other employees and agents of the Metals Receivership Defendants, including

some or all of the Broker Defendants, started working for Barrick Capital.  The Broker Defendants

performed the same work for Barrick Capital that they had performed for the Metals Receivership

Defendants.

94.    Beginning in late August 2019, Barrick Capital, Asher, and Batashvili, directly and

by and through the Broker Defendants, engaged in the exact same practices described above,

regarding the same or similar Precious Metals Bullion.  The sales resulted in huge Investor Claims

owed by the Receivership Entities because the scam was the same—Barrick Capital Investors lost the majority of their investments, and thus hold claims for that lost amount, contemporaneously with their purchases.

**F.      The Fraudulent Transfers The Receiver Seeks to Recover**

95.      The Broker Defendants were paid commissions by the Receivership Entities in exchange for the fraudulent sales they made or substantially assisted.  They were paid either through payroll payments as a W-2 employee, or they, or entities they established, were paid directly from the Receivership Entities.

96.      The commissions or other value paid to the Broker Defendants are summarized on the schedule attached as **Exhibit "C,"**[5] which is incorporated by reference.  These summaries are based on the records currently available to the Receiver but are subject to amendment in the event additional payments to the Broker Defendants are revealed through discovery or otherwise.

97.      As shown in the attached schedules, the payments were made to each Broker Defendant by check, direct deposit, or wire transfer on the dates and in the amounts shown in the attached schedules.  Payments were made from the Receivership Entities' Beverly Hills office, by the specific Receivership Entity identified in the summary.

98.      In addition to the cash payments, at least one Broker Defendant, Deric Ned, was given use of an exotic automobile as a sales prize.  On information and belief, other sales prizes were given to some of the other Broker Defendants as well.  These prizes were awarded from the Receivership Entities' Beverly Hills office.

99.      By making these payments and awarding these prizes to the Broker Defendants, the Receivership Entities were unable to satisfy the claims held by the Investors.

---

[5] Schedules are identified as C-1 through C-20

100.     Payments made to the Broker Defendants also rendered the Receivership Entities unable to pay a myriad of additional creditors, including the various States who filed actions against the Receivership Defendants for restitution and penalties.

101.     Each of the Broker Defendants established corporate entities to receive commission payments from the Receivership Entities.

a.     Payments exchanged for the fraudulent transfers made to David Bleeden were paid, in part, to Bearhunter, LLC or Xan, LLC.  Upon information and belief, these entities are owned and controlled by Bleeden.  Further, upon information and belief, Bleeden is a subsequent transferee of any Transfer made first to Bearhunter or Xan, or alternatively, Transfers made first to Bearhunter or Xan were made for the benefit of Bleeden.

b.     Payments exchanged for the fraudulent transfers made to Daniel Isaac Halimi were paid, in part, to Halimi Group, LLC.  Upon information and belief, this entity is owned and controlled by Halimi.  Further, upon information and belief, Halimi is a subsequent transferee of any Transfer made first to Halimi Group, or alternatively, Transfers made first to Halimi Group were made for the benefit of Halimi.

c.     Payments exchanged for the fraudulent transfers made to Athena Hunter were paid, in part, to TPH Boss, LLC, an entity owned and controlled by Hunter.  Further, upon information and belief, Hunter is a subsequent transferee of any Transfer made first to TPH Boss, or alternatively, Transfers made first to TPH Boss were made for the benefit of Hunter.

d.     Payments exchanged for the fraudulent transfers made to Randall Kohl were paid, in part, to The Voice, Inc.  Upon information and belief, this entity is owned and

controlled by Kohl.  Further, upon information and belief, Kohl is a subsequent transferee of any Transfer made first to The Voice, or alternatively, Transfers made first to The Voice were made for the benefit of Kohl.

e.     Payments exchanged for the fraudulent transfers made to Benjamin Lee were paid, in part, to Mettabel, Inc. Upon information and belief, this entity is owned and controlled by Lee.  Further, upon information and belief, Lee is a subsequent transferee of any Transfer made first to Mettabel, or alternatively, Transfers made first to Mettabel were made for the benefit of Lee.

f.     Payments and prizes exchanged for the fraudulent transfers made to Deric Scott Ned were paid, in part, to Poor Trap, Inc. and/or Deep State Marketing, Inc.  Upon information and belief, these entities are owned and controlled by Deric Ned.  Further, upon information and belief, Ned is a subsequent transferee of any Transfer made first to Poor Trap or Deep State Marketing, or alternatively, Transfers made first to Poor Trap or Deep State Marketing were made for the benefit of Ned.

g.     Payments exchanged for the fraudulent transfers made to Michael Peralta were paid, in part, to MPERA Corporation.  Upon information and belief, this entity is owned and controlled solely by Peralta.  Further, upon information and belief, Peralta is a subsequent transferee of any Transfer made first to MPERA Corporation, or alternatively, Transfers made first to MPERA Corporation were made for the benefit of Peralta.

h.     Payments exchanged for the fraudulent transfers made to Sean Reza, also known as Thomas Reza, were paid, in part, to Amerigold, Inc.  Upon information and belief, this entity is owned and controlled by Reza.  Further, upon information and belief,

Reza is a subsequent transferee of any Transfer made first to Amerigold, or alternatively, Transfers made first to Amerigold were made for the benefit of Reza.

i.     Payments exchanged for the fraudulent transfers made to Kyle D. Sanna were paid to Hurricane Holdings, Inc. and LTK Marketing.  Upon information and belief, these entities are owned and controlled by Sanna.  Further, upon information and belief, Sanna is a subsequent transferee of any Transfer made first to LTK Marketing, or alternatively, Transfers made first to LTK Marketing were made for the benefit of Sanna.

j.     Payments exchanged for the fraudulent transfers made to Christopher Stephan were paid, in part, to Eco Blue, Inc.  Upon information and belief, this entity is owned and controlled by Stephan  Further, upon information and belief, Stephen is a subsequent transferee of any Transfer made first to Eco Blue, Inc. or alternatively, Transfers made first to Eco Blue were made for the benefit of Stephan.

k.     Payments exchanged for the fraudulent transfers made to Walter Vera were paid, in part, to Verastan Group, LLC. and/or Midwood Capital.  Upon information and belief these are entities owned and controlled by Vera.  Further, upon information and belief, Vera is a subsequent transferee of any Transfer made first to Verastan Group, LLC and/or Midwood Capital, or alternatively, Transfers made first to Verastan Group, LLC and/or Midwood Capital were made for the benefit of Vera.

l.     Payments exchanged for the fraudulent transfers made to Richard Joe Dougherty were paid in part to Rich Dough, Inc. Upon information and belief, this entity is owned and controlled by Dougherty.  Further, upon information and belief, Dougherty is a subsequent transferee of any Transfer made first to Rich Dough, or alternatively, Transfers made first to Rich Dough were made for the benefit of Dougherty.

m.      Payments exchanged for the fraudulent transfers made to Matthew Levitt were paid in part to Gooner Enterprises, Inc.  Upon information and belief, this entity is owned and controlled by Levitt. Further, upon information and belief, Levitt is a subsequent transferee of any Transfer made first to Gooner Enterprises, or alternatively, Transfers made first to Gooner Enterprises were made for the benefit of Levitt.

n.      Payments exchanged for the fraudulent transfers made to Joshua Ferdman were paid in part to Ferdman Corp, Inc. Upon information and belief, this entity is owned and controlled by Ferdman. Further, upon information and belief, Ferdman is a subsequent transferee of any Transfer made first to Ferdman Corp, Inc., or alternatively, Transfers made first to Ferdman Corp, Inc. were made for the benefit of Ferdman.

o.      Payments exchanged for the fraudulent transfers made to Andrew J. Eilers were paid, in part, to Andrew J. Eilers Consulting Inc. Upon information and belief, this entity is owned and controlled solely by Eilers.  Further, upon information and belief, Eilers is a subsequent transferee of any Transfer made first to Andrew J. Eilers Consulting Inc., or alternatively, Transfers made first to Andrew J. Eilers Consulting Inc., were made for the benefit of Eilers.

p.      Payments exchanged for fraudulent transfers made to Alexander Flamer were paid in part, to 9th Level Marketing, Inc. Upon information and belief, this entity is owned and controlled solely by Flamer.  Further, upon information and belief, Flamer is a subsequent transferee of any Transfer made first to 9th Level Marketing, Inc, or alternatively, Transfers made first to 9th Level Marketing, Inc.,  were made for the benefit of Flamer.

q.     Payments exchanged for the fraudulent transfers made to David Wolan were paid, in part, to Harper Metals. Upon information and belief, this entity is owned and controlled solely by Wolan.  Further, upon information and belief, Wolan is a subsequent transferee of any Transfer made first to Harper Metals, or alternatively, Transfers made first to Harper Metals,  were made for the benefit of Wolan.

## VII.
## CAUSES OF ACTION

### COUNT 1:     VOIDABLE/FRAUDULENT TRANSFER- ACTUAL FRAUD

102.   The Receiver alleges and hereby incorporates by reference each allegation made in the preceding paragraphs as if each were separately set forth below.

103.   On the dates, in the amounts, and in the manner described in Exhibit C, the Receivership Entities transferred the specific amounts to each of the Broker Defendants (collectively, "the Transfers") with intent to defraud the Receivership Entities' creditors, who include, but are not limited to, the Investors.

104.   As demonstrated by numerous badges of fraud, the Receivership Entities made the Transfers with actual fraudulent intent:

a.     As payments made to facilitate fraud and which resulted in claims held by Investors exceeding the value, if any, of the services provided by each of the Broker Defendants, the Transfers were not made in exchange for reasonably equivalent value. *See S.E.C. v. Resource Dev. Int'l, LLC,* 487 F.3d 295, 301 (5th Cir.2007) (citing *In re Agric. Res. & Tech. Group, Inc.,* 916 F.2d 528, 540 (9th Cir.1990) (Value is assessed in light of the statute's purpose "to protect the creditors"));

b.     The Transfers and their amounts were concealed from creditors;

c.      The Receivership Entities concealed assets, including by diverting monies received from Investors for the sale of metals to a myriad of shell entities, and bank accounts.

d.      The Transfers were made when the Receivership Entities were (a) engaged or about to engage in a business or a transaction for which the remaining assets of the Receivership Entities were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the Receivership Entities would incur, debts beyond their ability to pay as they became due;

e.      The Receivership Entities' debts—primarily claims held by defrauded Investors—greatly exceeded their assets;

f.      All Transfers made by Barrick Capital were made after the Receivership Defendants had been sued or disciplined as reflected by the State Regulatory Orders and Complaints;

g.      The Transfers were made shortly after substantial debts were incurred;

h.      The Receivership Defendants engaged in a pattern of sharp dealing, by among things, using the Broker Defendants to sell bullion through false and misleading statements and practices;

i.      At the time of each of the Transfers, the Receivership Entities had actual knowledge or notice that by making the Transfers, they would be unable to pay creditors, including claims held by defrauded Investors.  *See Hayes v. Palm Seedlings Partners–A (In re Agricultural Research and Tech. Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) (Holding knowledge that a transaction will operate to the detriment of creditors may be sufficient to establish actual fraudulent intent);

j.      At the time of each Transfer, each of the Receivership Entities was a fraudulent enterprise.  Thus, a presumption of fraudulent intent attached to each of the Transfers.  *See In re IFS Fin. Corp.,* 417 B.R. 419, 439 n.15 (Bankr. S.D. Tex. 2009), *affirmed,* 669 F.3d 255 (2012).

105.    Moreover, since the Broker Defendants were aware of complaints from Investors that the sales price of the Precious Metals Bullion far exceeded the fair market value of the Precious Metals Bullion as shown by the SDIRA custodians, and additionally were aware of the State Regulatory Orders and Complaints, the Broker Defendants were not acting in good faith with respect to the Transfers.

106.    Creditors, including, but not limited to Investors, exist whose claims arose before and/or within a reasonable time after the Transfers were made, and for whose benefit the Receiver is authorized to assert these claims.

107.    Because the Transfers from the Receivership Entities to the Broker Defendants were fraudulent under Cal. Civ. Code § 3439(a)(1) and/or any other applicable State's adoption of the Uniform Fraudulent Transfer Act (the "UFTA"), the Receiver may avoid the Transfers under Cal. Civ. Code § 3439.07 or any other applicable statutory enactment of the UFTA.

108.    The Receiver requests all available remedies provided by the UFTA, including, but not limited to, avoidance of all transfers of monies and property from the Receivership Entities to the Broker Defendants.

**COUNT 2:      VOIDABLE/FRAUDULENT TRANSFERS - CONSTRUCTIVE FRAUD**

109.    The Receiver alleges and hereby incorporates by reference each allegation made in the foregoing paragraphs as if each were separately set forth herein.

110.    The Transfers were made when the Receivership Defendants were (a) engaged or about to engage in a business or a transaction for which the remaining assets of the Receivership

Entities were unreasonably small in relation to the business or transaction; or (b) when the Receivership Entities intended to incur, or believed, or reasonably should have believed, that the Receivership Entities would incur, debts beyond their ability to pay as they became due.

111.    The solicitations made by the Broker Defendants and any "services" they allegedly provided to the Receivership Entities, provided no value to the Receivership Entities and instead simply enlarged the pool of defrauded investors who hold claims against the Receivership Entities. The Receivership Entities, accordingly, did not receive reasonably equivalent for the Transfers.

112.    The Transfers were accordingly fraudulent pursuant to Cal. Civ. Code § 3439(a)(2) et seq., and/or any other applicable State's adoption of the UFTA and the Receiver may avoid the Transfers under Cal. Civ. Code § 3439.07 or any other applicable statutory enactment of the UFTA.

113.    The Receiver requests all available remedies provided by the UFTA, including, but not limited to, avoidance of all transfers of monies and property from the Receivership Entities to the Broker Defendants.

<u>**COUNT 3:**</u>    **UNJUST ENRICHMENT - CONSTRUCTIVE TRUST**

114.    The Receiver alleges and hereby incorporates by reference each allegation made in the foregoing paragraphs as if each were separately set forth herein.

115.    The Broker Defendants have been unjustly enriched by the Transfers and property they received from the Receivership Entities.

116.    The Receivership Entities owe restitution to the Investors, and the Broker Defendants' retention of the Transfers and prizes is unjust and injures the Receivership Entities.

117.    Accordingly, the Receiver seeks to recover from the Broker Defendants such amounts for the benefit of creditors and defrauded Investors under the equitable doctrine of unjust

enrichment and requests the imposition of a constructive trust over all such funds, property and the proceeds thereof.

## COUNT 4:   MONEY HAD AND RECEIVED

118.   The Receiver alleges and hereby incorporates by reference each allegation made in foregoing paragraphs as if each were separately set forth below.

119.   The Broker Defendants received the Transfers and other property from the Receivership Entities, that in equity and good conscience belong to the Receivership Entities.  The Receiver seeks to recover the Transfers and other property for the benefit of the Investors and other creditors of the Receivership Entities.

120.   The Receiver sues for the recovery of all monies had and received by the Broker Defendants.

## COUNT 5:   ATTORNEY'S FEES

121.   The Receiver seeks the recovery of all reasonable attorney's fees and expenses incurred in obtaining judgment against the Broker Defendants, as allowed by law or in equity, and also any attorney's fees and expenses required to pursue or defend any appeals in this action.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Receiver, Kelly M. Crawford respectfully prays that this Court order disgorgement or alternatively award the Receiver judgment against the Broker Defendants in an amount to be determined through discovery, plus prejudgment and post judgment interest, attorney's fees, expenses, and court costs; and that the Court grant such other and further relief as prayer for herein, both at law and in equity, to which he may show himself justly entitled.

Respectfully submitted,

SCHEEF & STONE, LLC

  /s/ Peter Lewis
PETER LEWIS
State Bar No. 12302100
Peter.lewis@solidcounsel.com
500 North Akard, Suite 2700
Dallas, Texas 75201
(214) 706-4200  Telephone
(214) 706-4242 Facsimile

BROWN FOX PLLC

CHARLENE C. KOONCE
State Bar No. 11672850
charlene@brownfoxlaw.com
8111 Preston Road, Suite 300
Dallas, Texas 75225
(214) 327-5000 Telephone
(214) 327-5001 Facsimile

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

    Pursuant to Fed. R. Civ. P. 5(d)(1)(B), as amended, no certificate of service is necessary, because this document is being filed with the Court's electronic-filing system.

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, and<br><br>ALABAMA SECURITIES COMMISSION, STATE OF ALASKA, ARIZONA CORPORATION COMMISSION, CALIFORNIA COMMISSIONER OF BUSINESS OVERSIGHT, COLORADO SECURITIES COMMISSIONER, STATE OF DELAWARE, STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, OFFICE OF FINANCIAL REGULATION, OFFICE OF THE GEORGIA SECRETARY OF STATE, STATE OF HAWAII, SECURITIES ENFORCEMENT BRANCH, IDAHO DEPARTMENT OF FINANCE, INDIANA SECURITIES COMMISSIONER, IOWA INSURANCE COMMISSIONER DOUGLAS M. OMMEN, OFFICE OF THE KANSAS SECURITIES COMMISSIONER, KENTUCKY DEPARTMENT OF FINANCIAL INSTITUTIONS, MAINE SECURITIES ADMINISTRATOR, STATE OF MARYLAND EX REL MARYLAND SECURITIES COMMISSIONER, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN, MISSISSIPPI SECRETARY OF STATE, NEBRASKA DEPARTMENT OF BANKING & FINANCE, OFFICE OF THE NEVADA SECRETARY OF STATE, NEW MEXICO SECURITIES DIVISION, THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, OKLAHOMA DEPARTMENT OF SECURITIES, SOUTH CAROLINA ATTORNEY GENERAL, SOUTH CAROLINA SECRETARY OF STATE, SOUTH DAKOTA DEPARTMENT OF LABOR & REGULATION, DIVISION OF | ORDER GRANTING PLAINTIFFS' EMERGENCY *EX PARTE* MOTION FOR STATUTORY RESTRAINING ORDER, APPOINTMENT OF RECEIVER, AND OTHER EQUITABLE RELIEF<br><br><br>Case No.: 3:20-CV-2910-L<br><br>Judge: Honorable Sam A. Lindsay |



Case 3:20-cv-02910-L   Document 16-2   Filed 09/22/20   Page 2 of 23   PageID 1677

| | |
|---|---|
| INSURANCE, COMMISSIONER OF THE TENNESSEE DEPARTMENT OF COMMERCE AND INSURANCE, STATE OF TEXAS, WASHINGTON STATE DEPARTMENT OF FINANCIAL INSTITUTIONS, WEST VIRGINIA SECURITIES COMMISSION, AND STATE OF WISCONSIN. | |
| Plaintiffs, | |
| v. | |
| TMTE, INC. a/k/a METALS.COM, CHASE METALS, INC., CHASE METALS, LLC, BARRICK CAPITAL, INC., LUCAS THOMAS ERB a/k/a LUCAS ASHER a/k/a LUKE ASHER, and SIMON BATASHVILI, | |
| Defendants; | |
| and | |
| TOWER EQUITY, LLC, | |
| Relief Defendant. | |

Plaintiffs Commodity Futures Trading Commission ("CFTC"), Alabama Securities

Commission ("State of Alabama"), State of Alaska ("State of Alaska"), Arizona Corporation

Commission ("State of Arizona"), California Department of Business Oversight ("State of

California"), Colorado Securities Commissioner ("State of Colorado"), Delaware Department of

Justice ("State of Delaware"), Florida Office of Financial Regulation ("State of Florida"), Office

of the Georgia Secretary of State ("State of Georgia"), Hawaii Office of the Securities

Commissioner (State of Hawaii"), Idaho Department of Finance ("State of Idaho"), Indiana

Securities Commissioner ("State of Indiana"), Iowa Insurance Commissioner, Douglas M.

Ommen ("State of Iowa"), Office of the Kansas Securities Commissioner ("State of Kansas"),

2

Kentucky Department of Financial Institutions ("Commonwealth of Kentucky"), Maine Office

of Securities ("State of Maine"), Maryland Securities Commissioner ("State of Maryland"),

Massachusetts Securities Division ("Commonwealth of Massachusetts"), Michigan Department

of Attorney General ("State of Michigan"), Mississippi Secretary of State ("State of

Mississippi"), Nebraska Department of Banking & Finance ("State of Nebraska"), Nevada

Office of Secretary of State ("State of Nevada"), New Hampshire Bureau of Securities

Regulation ("State of New Hampshire"), New Mexico Securities Division ("State of New

Mexico"), New York Attorney General ("State of New York"), North Dakota Securities

Department ("State of North Dakota"), Oklahoma Department of Securities ("State of

Oklahoma"), Oregon Department of Consumer and Business Services ("State of Oregon"),

Pennsylvania Department of Banking and Securities ("Commonwealth of Pennsylvania"), South

Carolina Attorney General and South Carolina Secretary of State ("State of South Carolina")

South Dakota Department of Labor & Regulation ("State of South Dakota"), Tennessee

Department of Commerce and Insurance ("State of Tennessee"), State of Texas ("State of

Texas"), Washington State Department of Financial Institutions ("State of Washington"), and

Wisconsin Department of Financial Institutions ("State of Wisconsin") (collectively "the

States"), have filed a Complaint for Injunctive Relief, Civil Monetary Penalties, and other

Ancillary Equitable Relief.

Along with the filing of the Complaint, the CFTC and the States moved the Court on an

emergency, *ex parte* basis, for an order, pursuant to Section 6c(a) of the Commodity Exchange

Act ("CEA"), 7 U.S.C. § 13a-1(a) (2012), and in accordance with Federal Rule of Civil

Procedure ("Fed. R. Civ. P.") 65, that: (1) freezes the assets of Defendants and Relief Defendant,

(2) grants the CFTC and the States immediate access to the books, records, and other documents

Case 3:21-cv-02181-S   Document 1-2   Filed 09/13/21   Page 5 of 25   PageID 39

of Defendants and Relief Defendant, and (3) appoints a temporary receiver (the "Proposed

SRO"). Plaintiffs request this emergency relief in order to preserve the status quo; to prevent the

dissipation of any assets and ensure that any future equitable relief obtained by Plaintiffs,

including any restitution to the victims of Defendants' fraudulent scheme, can be effective; and

to determine the full scope of the fraudulent scheme, identify the victims of the scheme, and

locate the remaining assets of Defendants and Relief Defendant. Additionally, Plaintiff requests

expedited discovery in accordance with FRCP 26(d).

The Court has considered the pleadings, declarations, exhibits, and memorandum filed in

support of the CFTC and the States' motion, and finds that:

1.      This Court has jurisdiction over the parties and over the subject matter of this action

pursuant to 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018)

(district courts have original jurisdiction over civil actions commenced by the United States or by

any agency expressly authorized to sue by Act of Congress), as well as 28 U.S.C. § 1367(a)

(supplemental jurisdiction over claims under the laws of the States).

2.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (2018)

(federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original

jurisdiction over civil actions commenced by the United States or by any agency expressly

authorized to sue by Act of Congress).

3.      Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a) (2018), authorizes the CFTC to seek

injunctive and other relief against any person whenever it appears to the CFTC that such person

has engaged, is engaging, or is about to engage in any act or practice constituting a violation of

any provision of the CEA or any rule, regulation, or order thereunder.

4.      Section 6d(1) of the CEA, 7 U.S.C. § 13a-2(1) (2018), authorizes the States to bring a

4

Case 3:21-cv-02181-S   Document 4-2   Filed 09/13/21   Page 7 of 25   PageID 840

suit in the district courts of the United States to seek injunctive and other relief against any person whenever it appears to the Attorney General and/or Securities Administrator of a State, or such other official that a State may designate, that the interests of the residents of the State have been, are being, or may be threatened or adversely affected because of violations of the CEA or CFTC Regulations.

5.     Venue lies properly in this District pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e) (2018), because Defendants transacted business in this District, and certain of the acts and practices in violation of the CEA, the CFTC Regulations, and State laws occurred, are occurring, or are about to occur within this District, among other places. Venue also lies properly in this District pursuant to 17 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

6.     The CFTC and the States have made a proper *prima facie* showing that from at least September 1, 2017 through the present ("Relevant Period"), Defendants TMTE, Inc., d/b/a Metals.com, Chase Metals, LLC, Chase Metals, Inc., (collectively "Metals"), Barrick Capital, Inc. ("Barrick") and their principals, Lucas Asher *a/k/a* Lucas Thomas Erb *a/k/a* Luke Asher ("Asher"), and Simon Batashvili ("Batashvili") (collectively "Defendants") have engaged and continue to engage in a fraudulent scheme to defraud at least 1,600 persons throughout the United States into purchasing gold and silver bullion ("Precious Metals Bullion"). Metals and Barrick are a common enterprise. Batashvili and Asher were controlling persons of Metals and Barrick and used both Metals and Barrick to perpetuate the fraudulent scheme. Defendants targeted a vulnerable population of mostly elderly or retirement-aged persons with little experience in Precious Metals Bullion. By making material misrepresentations and omissions, Defendants deceived investors into purchasing Precious Metals Bullion at prices averaging from

100% to over 200% over the base melt value or spot price of the Precious Metals Bullion ("Prevailing Market Price"). Defendants directed investors to purchase specific Precious Metals Bullion at grossly inflated prices that bore no relationship to the Prevailing Market Price. Defendants did not disclose the actual value of the Fraudulently Priced Precious Metals Bullion and instead provided investors with invoices showing exorbitant and unreasonable prices. Defendants falsely represented that Fraudulently Priced Precious Metals Bullion were a safe and conservative investment and that investors would not lose their funds. Contrary to these representations, Defendants failed to disclose to investors that the undisclosed, excessive, and unreasonable charges of Fraudulently Priced Precious Metals Bullion resulted in investors sustaining substantial losses on the purchase of Precious Metals Bullion from Defendants.

7.      Therefore, there is good cause to believe that Defendants have engaged in, are engaging in, or are about to engage in a scheme to defraud investors in violation of Section 6(c) of the Act, 7 U.S.C. § 9(1) (2018), Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019) and the laws of the States.  Defendants also have engaged in, are engaging in, or are about the engage in violations of the laws of Plaintiffs State of Alabama, State of Alaska, State of California, State of Colorado, State of Florida, State of Georgia, Commonwealth of Kentucky, State of Maryland, State of South Carolina, and State of Texas as specifically alleged in the Complaint.

8.      There is also good cause to believe that Relief Defendant Tower Equity, LLC, ("Tower") has received, is receiving, or is about to receive funds, assets or other property as a result of Defendants' violative acts and practices and has been unjustifiably enriched thereby.  The Relief Defendant does not have any legitimate interest or entitlement to these funds, assets or other property ("assets") received as a result of Defendants' violative conduct.

9.      There is also good cause to believe that immediate and irreparable damage to the Court's

ability to grant effective final relief for investors in the Fraudulently Priced Precious Metals Bullion in the form of monetary redress will occur from the withdrawal, transfer, removal, dissipation, or other disposition of assets, and/or the destruction, alteration, or disposition of books and records and other documents pertaining to the business activities and business and personal finances by Defendants and Relief Defendant, unless Defendants and Relief Defendant are immediately restrained and enjoined by Order of the Court.

10.     Therefore, there is good cause for the Court to freeze assets owned, controlled, managed or held by Defendants and Relief Defendant, or in which they have any beneficial interest.

11.     There is also good cause for the Court to prohibit Defendants and Relief Defendant from destroying, altering or disposing of records, and/or denying representatives of the CFTC and the States access to inspect records, when and as requested, to ensure that CFTC and State representatives have immediate and complete access to those records.

12.     There is also good cause for the appointment of a Temporary Receiver to take control of all assets owned, controlled, managed, or held by Defendants and Relief Defendant or in which they have any beneficial interest ("Defendants' Assets" and "Relief Defendants' Assets"), so that the Temporary Receiver may preserve assets, investigate and determine investor claims, determine unlawful proceeds retained by Defendants and Relief Defendant and amounts due to investors as a result of Defendants' alleged violations, and distribute funds to investors harmed by Defendants' alleged misconduct under the Court's supervision.

13.     There is also good cause to order Defendants to repatriate funds, assets or other property controlled by Defendants so that such assets can be controlled by the Temporary Receiver and to assure payment of restitution and disgorgement as authorized by the Court.

14.     In summary, this is a proper case for granting a restraining order *ex parte*: (1) prohibiting

Defendants and Relief Defendant from transferring, removing, dissipating assets, or otherwise disposing of any asset, (2) allowing inspection and copying of records by the CFTC and States, and (3) appointing a temporary receiver because the CFTC and the States are likely to succeed on the merits of their claims against Defendants. Moreover, there is reasonable likelihood that Defendant(s) may transfer or dissipate assets or destroy or alter records. Therefore, the Court orders the following.

## DEFINITIONS

For purposes of this Order, the following definitions apply:

15.     The term "assets" encompasses any legal or equitable interest in, right to, or claim to, any real or personal property, whether individually or jointly, directly or indirectly controlled, and wherever located, including but not limited to: chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds mail or other deliveries, inventory, checks, notes, accounts (including, but not limited to, bank accounts and accounts at other financial institutions), credits, receivables, lines of credit, contracts (including spot, futures, options, or swaps contracts), insurance policies, and all funds, wherever located, whether in the United States or outside the United States.

16.     The term "record" encompasses the terms "document" and "electronically stored information" as those terms are used in Fed. R. Civ. P. 34(a), and includes, but are not limited to, all writings, graphs, charts, photographs, sound recordings, images, and other data or other data compilations–stored in any medium from which information can be obtained or translated, if necessary, into reasonable usable form. The term "record" also refers to each and every such item in Defendants' and Relief Defendants' actual or constructive possession, including but not limited to: (i) all such items within the custody or control of any agents, employers, employees,

8

Case 3:21-cv-02181-L-S   Document 16-2   Filed 09/13/21   Page 9 of 25   PageID 45

or partners of the Defendants and Relief Defendant; and (ii) all items which Defendants and Relief Defendant have a legal or equitable right to obtain from another person.  A draft or non-identical copy is a separate item within the meaning of the term.  Records also include the file and folder tabs associated with each original and copy.

17.     The term "Defendants" refers to TMTE, Inc., d/b/a Metals.com, Chase Metals, LLC, Chase Metals, Inc., Barrick Capital, Inc. and their principals, Lucas Asher *a/k/a* Lucas Thomas Erb *a/k/a* Luke Asher, and Simon Batashvili.

18.     "Relief Defendant" refers to Tower Equity, LLC.

## RELIEF GRANTED

### IT IS HEREBY ORDERED that:

### I.     Asset Freeze Order Prohibiting the Withdrawal, Transfer, Removal, Dissipation, and Disposal of Assets

19.     Defendants and Relief Defendant are immediately restrained and enjoined, except as otherwise ordered by this Court, from directly or indirectly withdrawing, transferring, removing, dissipating, or otherwise disposing of any assets, wherever located, including Defendants' and Relief Defendant's assets held outside the United States, except as provided otherwise in Sections IV, V, and VI of this Order, or as otherwise ordered by the Court;

20.     Notwithstanding the provisions of this Section I, at the request of the Temporary Receiver, Defendants and Relief Defendant and any other person who has possession, custody, or control of any of Defendants' or Relief Defendant's assets shall transfer possession of all funds, assets or other property subject to this Order to the Temporary Receiver in accordance with Section IV, V and VI of this Order.

21.     The assets affected by this Order shall include existing assets as well as assets acquired after the effective date of this Order.

## II.   Maintenance of and Access to All Records That Relate to the Business Activities and Business and Personal Finances

22.     Defendants and Relief Defendant are restrained from directly or indirectly destroying, altering, or disposing of, in any manner, any records that relate or refer to the business activities or business or personal finances of any Defendant or Relief Defendant.

23.     Representatives of the CFTC and the States shall be immediately allowed to inspect any records relating or referring to the business activities or business or personal finances of the Defendants and Relief Defendant, including, but not limited to, both hard-copy documents and electronically stored information, wherever they may be situated and whether they are in the possession of the Defendants, or Relief Defendant, or others. To ensure preservation and facilitate meaningful inspection and review of records, Defendants and Relief Defendant shall allow representatives of the CFTC and the States to make copies of any records, and if on-site copying of records is not practicable, representatives may make such copies off-site. The CFTC and the States shall promptly return the original records after any such off-site copying.

24.     To further facilitate meaningful inspection and review, Defendants and Relief Defendant shall, absent a valid assertion of their rights against self-incrimination under the Fifth Amendment, promptly provide CFTC and States staff with:

   a.   the location of all records relating or referring to the business activities and business and personal finances of Defendants and Relief Defendant; and

   b.   all identification numbers and other identifying information for websites, cloud storage services, email and smartphone accounts, and all accounts at any bank, financial institution, or brokerage firm (including any introducing broker or futures commission merchant) owned, controlled or operated by Defendants or Relief Defendant, or to which Defendants and Relief Defendant have access; and

  c. all passwords to, and the location, make and model of, all computers and/or

    mobile electronic devices owned and/or used by Defendants or Relief Defendant

    in connection with their business activities and business and personal finances.

25. When inspecting records that are subject to this Order, including those contained on computers and/or other electronic devices, the CFTC and the States should undertake reasonable measures to prevent review of the Defendants' or Relief Defendant's privileged communications and/or other nonbusiness, nonfinancial materials by the CFTC's and the States' attorneys and other staff who are part of the litigation team in this matter.  Moreover, Defendants and Relief Defendant (or their counsel) shall promptly contact counsel for the CFTC or the States to assert any claims of privilege (or other legal objections) relating to the contents of any records that are subject to this Order and promptly cooperate with counsel for the CFTC or the States to develop reasonable protocols to isolate and prevent disclosure of claimed privileged and/or other nonbusiness, nonfinancial materials to the CFTC's or the States' attorneys and other staff who are part of the litigation team in this matter.  However, nothing herein shall excuse Defendants or Relief Defendant from full and immediate compliance with this Court's Order permitting the CFTC and the States to inspect the records which relate to Defendants' or Relief Defendant's business activities and their business and personal finances.

## III. Notice to Financial Institutions and Others that Hold or Control Assets or Records of Defendants and Relief Defendants

26. To ensure the effectiveness of the asset freeze and pending further Order of this Court, any financial or brokerage institution, business entity, or person that receives actual notice of this Order and holds, controls, or maintains custody of any assets of Defendants or Relief Defendant shall not, in active concert or participation with Defendants or Relief Defendant, permit Defendants or Relief Defendant or other persons to withdraw, transfer, remove, dissipate, or

otherwise dispose of any of Defendants' or Relief Defendant's assets, except as directed by further order of the Court; and

27.     Any financial or brokerage institution, business entity, or person that receives notice of this Order by personal service or otherwise shall not, in active concert or participation with any Defendants or Relief Defendant directly or indirectly destroy, alter, or dispose of, in any manner, any Records relating to the business activities and business and personal finances of any Defendant or Relief Defendant.

28.     Furthermore, any such financial or brokerage institution, business entity, or person that receives actual notice of this Order and holds, controls, or maintains custody of any account or assets, titled in the name of, held for the benefit of, or otherwise under the control of any Defendants or Relief Defendant, or has held, controlled, or maintained custody of any such asset, of any Defendants or Relief Defendant at any time since September 1, 2017, shall not, in active concert or participation with Defendants or Relief Defendant, deny a request by the CFTC or the States to inspect all records pertaining to any account or asset owned, controlled, managed, or held by, on behalf of, or for the benefit of Defendants or Relief Defendant, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.  As an alternative to allowing inspection of records, a financial or brokerage institution, business entity or other person may provide copies of records requested by the CFTC or the States.

29.     Furthermore, any such financial or brokerage institution, business entity, or person that receives actual notice of this Order shall:

Case 3:20-cv-02101-S   Document 16-4   Filed 09/22/20   Page 15 of 25   PageID 1888

a.   Within ten business days of a request by the Temporary Receiver, or such longer period specified by the Temporary Receiver, provide the Temporary Receiver with copies of all records pertaining to any account or asset owned, controlled, managed, or held by, on behalf of, or for the benefit of Defendants or Relief Defendant, either individually or jointly, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs; and

b.   Cooperate with all reasonable requests of the Temporary Receiver relating to implementation of this Order, including transferring Defendants' or Relief Defendant's assets, at the Temporary Receiver's direction, and producing Records related to business activities or business or personal finances of Defendants or Relief Defendant to the Temporary Receiver.

## IV.   Order Appointing Temporary Receiver

30.   Kelly Crawford is appointed Temporary Receiver with the full powers of an equity receiver for Defendants and Relief Defendant and their affiliates or subsidiaries owned or controlled by Defendants or Relief Defendant (hereinafter referred to as the "Receivership Defendants"), and of all records, and all funds, properties, premises, accounts, income, now or hereafter due or owing to the Receivership Defendants, and other assets directly or indirectly owned, beneficially or otherwise, by the Receivership Defendants, (hereinafter, the "Receivership Estate").  The Temporary Receiver shall be the agent of this Court in acting as Temporary Receiver under this Order.

13

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 44 of 194   PageID 2278

Case 3:20-cv-02910-L   Document 16   Filed 09/22/20   Page 44 of 25   PageID 1889
Case 3:21-cv-02181-S   Document 4-2   Filed 09/13/21   Page 16 of 25   PageID 59

31.   The Temporary Receiver is directed and authorized to accomplish the following:

    a.   Assume full control of the Receivership Defendants by removing Asher or Batashvili, and any officer, independent contractor, employee, or agent of the Receivership Defendants, from control and management of the affairs of the Receivership Defendants as the Temporary Receiver deems appropriate;

    b.   Take exclusive custody, control, and possession of the Receivership Estate, which includes but is not limited to complete authority to sue for, collect, receive, and take possession of all goods, chattels, rights, credits, money, effects, land, leases, books, records, work papers, and records of accounts, including electronically-stored information, contracts, financial records, funds on hand in banks and other financial institutions, and other papers and records of the Receivership Defendants and customers or clients of any of Receivership Defendants' business activities whose interests are now held by, or under the direction, possession, custody, or control of, the Receivership Defendants;

    c.   Take exclusive custody, control, and possession of all websites, cloud storage services, email, and smartphone accounts, and all accounts at any bank, financial institution, or brokerage firm (including any introducing broker or futures commission merchant) controlled or operated by or to which any of the Defendants or Relief Defendant have access in connection with their business activities and business and personal finances.

    d.   Take all steps necessary to secure the business and other premises under the control of the Receivership Defendants, including but not limited to the premises of the Defendants.

e.  Perform all acts necessary, including the suspension of operations, to conserve, hold, manage, and preserve the value of the Receivership Estate in order to prevent irreparable loss, damage, or injury to investors in any investment opportunity operated by any Receivership Defendants.

f.  Prevent the withdrawal or misapplication of the assets of the Receivership Estate and otherwise protect the interests of investors in any investment opportunity operated by any Receivership Defendant;

g.  Manage and administer the Receivership Defendants and the Receivership Estate by performing all acts incidental thereto that the Temporary Receiver deems appropriate, including hiring or dismissing any and all personnel, suspending operations, and/or entering into agreements, including but not limited to: (1) the retention and employment of investigators, attorneys, or accountants, appraisers, and other independent contractors and technical specialists of the Temporary Receiver's choice, including without limitation members and employees of the Temporary Receiver's firm, to assist, advise, and represent the Temporary Receiver; and (2) the movement and storage of any equipment, furniture, records, files, or other physical property of the Receivership Defendants;

h.  Collect all funds owed to the Receivership Defendants;

i.  Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings in state, federal, or foreign court that the Temporary Receiver deems necessary and advisable to preserve or increase the value of the assets of the Receivership Estate or that the Temporary Receiver deems necessary and advisable to carry out the Temporary Receiver's mandate under this Order;

15

j.  Issue subpoenas to obtain records pertaining to the Receivership and conduct discovery in this action on behalf of the Receivership Estate;

k.  Open one or more bank accounts and deposit all funds of the Receivership Estate in such designated accounts and make all payments and disbursements from the Receivership Estate from such accounts;

l.  Make payments and disbursements from the Receivership Estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order, provided that the Temporary Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Defendants prior to the date of entry of this Order, except for payments that the Temporary Receiver deems necessary or advisable to secure the Receivership Estate from immediate and irreparable loss; and

m.  Maintain written accounts itemizing receipts and expenditures, describing properties held or managed, and naming the depositories holding funds or other assets of the Receivership Estate; make such written accounts and supporting documentation available to the CFTC and the States for inspection; and, within sixty days of being appointed and periodically thereafter, as directed by the Court, file with the Court and serve on the parties a report summarizing efforts to marshal and collect assets, administer the Receivership Estate, and otherwise perform the duties mandated by this Order.

n.  Provide the CFTC and the States with a full accounting of all Defendants' and Relief Defendant's funds, documents, and assets, including those outside of the United States from September 1, 2017 to the date of the Order.

## V.   Transfer of Funds and Records to the Temporary Receiver

32.     Absent a valid assertion by Defendants or Relief Defendant of their respective rights against self-incrimination under the Fifth Amendment, each Defendant and Relief Defendant shall, within five business days following the service of this Order:

     a.   Transfer to the territory of the United States and deliver to possession, custody, and control of the Temporary Receiver, all assets of the Receivership Estate (other than real property) and books and records of the Receivership Estate, located outside of the United States that are held by each and every Defendant and Relief Defendant, for their benefit, or under their direct or indirect control, whether jointly or singly.

     b.   Provide the Temporary Receiver access to all records of the Receivership Estate and all assets of the Receivership Estate held by any financial or brokerage institution, business entity, or other person that receives actual notice of this Order by personal service or otherwise, located within or outside the territorial United States by signing any necessary consent forms.

## VI.   Turning Over Assets and Records to the Temporary Receiver

33.     Upon service of this Order, and absent a valid assertion by Defendants and Relief Defendant of their respective rights against self-incrimination under the Fifth Amendment, Defendants and Relief Defendant, and any agents, employees, or partners of the Defendants and Relief Defendant who are served with a copy of this Order, shall immediately or within such time as permitted by the Temporary Receiver in writing, deliver over to the Temporary Receiver:

     a.   Possession and custody of all assets of the Receivership Estate, owned beneficially or otherwise, wherever situated;

     b.   Possession and custody of all records of the Receivership Estate in connection with

their business activities and business and personal finances, including but not limited to, all records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers); investor lists, title documents, and other records of the Receivership Defendants;

c.   Possession and custody of all assets belonging to members of the public now held by the Receivership Defendants;

d.   All keys, passwords, entry codes, and combinations to locks necessary to gain or to secure access to any of the assets or records of the Receivership Defendants related to their business activities and business and personal finances, including, but not limited to, access to the Receivership Defendants' business premises, means of communication, accounts, computer systems, mobile electronic devices, or other property; and

e.   Information identifying the accounts, employees, properties, or other assets or obligations of the Receivership Defendants.

## VII.   Directive to Cooperate with Temporary Receiver

34.   Absent a valid assertion of their respective rights against self-incrimination under the Fifth Amendment, Defendants, Relief Defendant, and all other persons or entities served with a copy of this order shall cooperate fully with and assist the Temporary Receiver.  This cooperation and assistance shall include, but not be limited to, providing any information to the Temporary Receiver that the Temporary Receiver deems necessary to exercising the authority as provided in this Order; providing any password required to access any computer or electronic files in any medium; and discharging the responsibilities of the Temporary Receiver under this

18

Order, and advising all persons who owe debts to the Receivership Defendants that all debts should be paid directly to the Temporary Receiver.

**VIII.    Stay on Actions against the Receivership Defendants**

        **IT IS FURTHER ORDERED THAT:**

35.      Except by leave of the Court, during the pendency of the receivership ordered herein, Defendants, Relief Defendant, and all other persons and entities shall be and hereby are stayed from taking any action to establish or enforce any claim, right, or interest for, against, on behalf of, in, or in the name of, the Receivership Defendants, the Temporary Receiver, assets of the Receivership Estate, or the Receiver's duly authorized agents acting in their capacities as such, including but not limited to, the following actions:

      a.    Petitioning, or assisting in the filing of a petition, that would cause the Receivership Defendants to be placed in bankruptcy;

      b.    Commencing, prosecuting, litigating or enforcing any suit or proceeding against any of the Receivership Defendants, or any of their subsidiaries or affiliates, except that such actions may be filed to toll any applicable statute of limitations;

      c.    Commencing, prosecuting, continuing, or entering any suit or proceeding in the name or on behalf of any of the Receivership Defendants, or any of their subsidiaries or affiliates;

      d.    Accelerating the due date of any obligation or claimed obligation, enforcing any lien upon, or taking or attempting to take possession of, or retaining possession of, property of the Receivership Defendants, or any of their subsidiaries or affiliates, or any property claimed by any of them, or attempting to foreclose, forfeit, alter, or terminate any of the Receivership Defendants' interests in property, including

19

Case 3:21-cv-02181-S   Document 16-1   Filed 09/22/20   Page 20 of 25   PageID 56

without limitation, the establishment, granting, or perfection of any security interest, whether such acts are part of a judicial proceeding or otherwise;

e.  Using self-help or executing or issuing, or causing the execution or issuance of any court attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with, or creating or enforcing a lien upon any property, wherever located, owned by or in the possession of the Receivership Defendants, or any of their subsidiaries or affiliates, or the Temporary Receiver, or any agent of the Temporary Receiver; and

f.  Doing any act or thing to interfere with the Temporary Receiver taking control, possession, or management of the property subject to the receivership, or to in any way interfere with the Temporary Receiver or to harass or interfere with the duties of the Temporary Receiver, or to interfere in any manner with the exclusive jurisdiction of this Court over the property and assets of the Receivership Defendants, or their subsidiaries or affiliates.

Provided, however, that nothing in this section shall prohibit any federal or state law enforcement or regulatory authority from commencing or prosecuting an action against the Receivership Defendants.

## IX.   Compensation for Temporary Receiver and Personnel Hired by the Temporary Receiver

36.   The Temporary Receiver and all personnel hired by the Temporary Receiver as herein authorized, including counsel to the Temporary Receiver, are entitled to reasonable compensation, to be paid solely from the assets of the Receivership estate, for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them for those services authorized by this Order that when rendered were (1) reasonably likely to

Case 3:20-cv-02910-L   Document 16-2   Filed 09/22/20   Page 23 of 25   PageID 556

benefit the receivership estate or (2) necessary to the administration of the estate.  The
Temporary Receiver and all personnel hired by the Temporary Receiver shall not be
compensated or reimbursed by, or otherwise entitled to, any funds from the Court, the CFTC, or
the States.  The Temporary Receiver shall file with the Court and serve on the parties periodic
requests for the payment of such reasonable compensation, with the first such request filed no
more than sixty (60) days after the date of this Order and subsequent requests filed quarterly
thereafter.  The requests for compensation shall itemize the time and nature of services rendered
by the Temporary Receiver and all personnel hired by the Temporary Receiver.

**X.**     **Persons Bound by This Order**

37.     This Order is binding on any person who receives actual notice of this Order by personal
service or otherwise and is acting in the capacity of an officer, agent, servant, employee, or
attorney of Defendants or Relief Defendant, or is in active concert or participation with the
Defendants or Relief Defendant.

**XI.**     **Bond Not Required of Plaintiffs or the Temporary Receiver**

38.     As Plaintiffs CFTC and the States have made a proper showing under 7 U.S.C. §13a-1(b)
and they are not required to post any bond in connection with this Order.  The Temporary
Receiver similarly is not required to post bond.

**XII.**     **Service of Order and Assistance of U.S. Marshals Service and/or Other Law
              Enforcement Personnel**

39.     Copies of this Order may be served by any means, including via email or facsimile
transmission, upon any financial institution or other entity or person that may have possession,
custody, or control of any records or assets of any Defendant or Relief Defendant, or that may be
subject to any provision of this Order.

XIII.   **Staff of the CFTC and the States and Representatives of the United States Marshals Service are specially appointed by the Court to effect service.**

40.     The United States Marshals Service is authorized to: a) accompany and assist representatives of the CFTC and the States in the service and execution of the Summons, Complaint, and this Order on the Defendants and Relief Defendants, and b) help maintain lawful order while representatives of the CFTC and States inspect records as provided in this Order.

XIV.    **Service on the CFTC and the States**

41.     Defendants and Relief Defendants shall comply with all electronic filing rules and requirements of the U.S. District Court for the Northern District of Texas and shall serve all pleadings, correspondence, notices required by this Order, and other materials on the CFTC by delivering a copy to Richard Foelber, Chief,  Office of Cooperative Enforcement, and JonMarc Buffa, Deputy Chief, Office of Cooperative Enforcement, Commodity Futures Trading Commission, 1155 21st Street, NW, Washington, DC 20581, by electronic filing, e-mail, personal delivery or courier service (such as Federal Express or United Parcel Service) and not by regular mail due to potential delay resulting from heightened security and decontamination procedures applicable to the CFTC's regular mail.

42.     Defendants and Relief Defendants shall comply with all electronic filing rules and requirements of the U.S. District Court for the Northern District of Texas and shall serve all pleadings, correspondence, notices required by this Order, and other materials on the States by delivering a copy to the State attorneys identified in the Complaint by electronic filing, e-mail, personal delivery or courier service (such as Federal Express or United Parcel Service).

XV.     **Hearing on Preliminary Injunction and Granting of Expedited Discovery**

43.     Plaintiffs' motion for a preliminary injunction and extending the appointment of the

22

Case 3:21-cv-02181-S   Document 16-1   Filed 09/22/20   Page 25 of 25   PageID 858

Temporary Receiver is set for hearing on the 6th day of October, 2020, at 10:00 a.m. before the Honorable Sam A. Lindsay, Courtroom 1546, at the United States Courthouse for the Northern District of Texas located at 1100 Commerce Street, Dallas Texas 75242. Should any party wish to file a memorandum of law or other papers concerning the issuance of a preliminary injunction against Defendants and Relief Defendant, such materials shall be filed, served and received by all parties at least two business days before the hearing ordered above.

44.     Plaintiffs' additional Motion for Expedited Discovery is granted and in advance of this preliminary injunction hearing, the parties may conduct expedited discovery, and the prohibition upon discovery before the early meeting of counsel pursuant to FRCP 26(f), in accordance with FRCP 26(d), is removed. Depositions of parties and non-parties may be taken subject to two calendar days' notice pursuant to FRCP 30(a) and 45, that notice may be given personally, by facsimile, or by electronic mail, and, if necessary, any deposition may last more than seven hours.

**XVI.    Force and Effect**

45.     This Order shall remain in full force and effect until October 6, 2020 at 5:00 p.m., unless extended further by order of this Court pursuant to Fed. R. Civ. P. 65(b)(2), and this Court retains jurisdiction of this matter for all purposes.

SIGNED on this 22nd day of September, 2020.

DAVID C. GODBEY
UNITED STATES DISTRICT JUDGE

23

# EXHIBIT B

SEALED   ORIGINAL

2020 SEP 21   $22 \, 9:30 \, \text{—}$

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, and | COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF |
| ALABAMA SECURITIES COMMISSION, STATE OF ALASKA, ARIZONA CORPORATION COMMISSION, CALIFORNIA COMMISSIONER OF BUSINESS OVERSIGHT, COLORADO SECURITIES COMMISSIONER, STATE OF DELAWARE, STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, OFFICE OF FINANCIAL REGULATION, OFFICE OF THE GEORGIA SECRETARY OF STATE, STATE OF HAWAII, SECURITIES ENFORCEMENT BRANCH, IDAHO DEPARTMENT OF FINANCE, INDIANA SECURITIES COMMISSIONER, IOWA INSURANCE COMMISSIONER DOUGLAS M. OMMEN, OFFICE OF THE KANSAS SECURITIES COMMISSIONER, KENTUCKY DEPARTMENT OF FINANCIAL INSTITUTIONS, MAINE SECURITIES ADMINISTRATOR, STATE OF MARYLAND EX REL MARYLAND SECURITIES COMMISSIONER, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN, MISSISSIPPI SECRETARY OF STATE, NEBRASKA DEPARTMENT OF BANKING & FINANCE, OFFICE OF THE NEVADA SECRETARY OF STATE, NEW MEXICO SECURITIES DIVISION, THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, OKLAHOMA DEPARTMENT OF SECURITIES, SOUTH CAROLINA ATTORNEY GENERAL, SOUTH CAROLINA SECRETARY OF STATE, | Case No.:   **8 - 2 0 C V 2 9 1 0 - L**<br><br>Judge: |



|  |  |
|---|---|
| SOUTH DAKOTA DEPARTMENT OF LABOR & REGULATION, DIVISION OF INSURANCE, COMMISSIONER OF THE TENNESSEE DEPARTMENT OF COMMERCE AND INSURANCE, STATE OF TEXAS, WASHINGTON STATE DEPARTMENT OF FINANCIAL INSTITUTIONS, WEST VIRGINIA SECURITIES COMMISSION, AND STATE OF WISCONSIN.<br><br>Plaintiffs,<br><br>v.<br><br>TMTE, INC. a/k/a METALS.COM, CHASE METALS, INC., CHASE METALS, LLC, BARRICK CAPITAL, INC., LUCAS THOMAS ERB a/k/a LUCAS ASHER a/k/a LUKE ASHER, and SIMON BATASHVILI,<br><br>Defendants;<br><br>and<br><br>TOWER EQUITY, LLC,<br><br>Relief Defendant. |  |

Plaintiffs Commodity Futures Trading Commission ("CFTC" or "Commission"), Alabama Securities Commission ("State of Alabama"), State of Alaska ("State of Alaska"), Arizona Corporation Commission ("State of Arizona"), California Commissioner of Business Oversight ("State of California"), Colorado Securities Commissioner ("State of Colorado"), State of Delaware ("State of Delaware"), State of Florida, Office of the Attorney General and State of Florida, Office of Financial Regulation (collectively "State of Florida"), Office of the Georgia Secretary of State ("State of Georgia"), State of Hawaii, Securities Enforcement Branch (State of

2

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 57 of 194   PageID 2291

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 4 of 109   PageID 63
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 3 of 108   PageID 5

Hawaii"), Idaho Department of Finance ("State of Idaho"), Indiana Securities Commissioner

("State of Indiana"), Iowa Insurance Commissioner Douglas M. Ommen ("State of Iowa"),

Office of the Kansas Securities Commissioner ("State of Kansas"), Kentucky Department of

Financial Institutions ("Commonwealth of Kentucky"), Maine Securities Administrator ("State

of Maine"), State of Maryland Ex Rel the Maryland Securities Commissioner ("State of

Maryland"), Attorney General Dana Nessel on Behalf of the People of Michigan ("People of

Michigan"), Mississippi Secretary of State ("State of Mississippi"), Nebraska Department of

Banking & Finance ("State of Nebraska"), Office of the Nevada Secretary of State ("State of

Nevada"), New Mexico Securities Division ("State of New Mexico"), The People of the State of

New York by Letitia James, Attorney General of the State of New York ("State of New York"),

Oklahoma Department of Securities ("State of Oklahoma"), South Carolina Attorney General

and South Carolina Secretary of State ("State of South Carolina") South Dakota Department of

Labor & Regulation, Division of Insurance ("State of South Dakota"), Commissioner of the

Tennessee Department of Commerce and Insurance ("State of Tennessee"), State of Texas

("State of Texas"), Washington State Department of Financial Institutions ("State of

Washington"), West Virginia Securities Commission ("State of West Virginia"), and State of

Wisconsin ("State of Wisconsin") (collectively "the States"), by and through their undersigned

attorneys, hereby allege as follows:

## I.   SUMMARY

1.      From at least September 1, 2017 through the present ("Relevant Period"),

Defendants TMTE, Inc., d/b/a Metals.com, Chase Metals, LLC, Chase Metals, Inc., (collectively

"Metals"), Barrick Capital, Inc. ("Barrick") and their principals, Lucas Asher a/k/a Lucas

3

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 58 of 194   PageID 2292

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 5 of 109   PageID 64
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 4 of 108   PageID 6

Thomas Erb a/k/a Luke Asher ("Asher"), and Simon Batashvili ("Batashvili") (collectively "Defendants") have engaged and continue to engage in a fraudulent scheme to defraud at least 1,600 persons throughout the United States into purchasing gold and silver bullion ("Precious Metals Bullion").

2.      Metals and Barrick are a common enterprise. Batashvili and Asher used both Metals and Barrick to perpetuate the fraudulent scheme.

3.      Defendants targeted a vulnerable population of mostly elderly or retirement-aged persons with little experience in Precious Metals Bullion. By making material misrepresentations and omissions, Defendants deceived investors into purchasing Precious Metals Bullion at prices averaging from 100% to over 300% over the base melt value or spot price of the Precious Metals Bullion ("Prevailing Market Price").

4.      Defendants' scam is particularly egregious because they preyed on persons between 60 and 90 years of age and swindled them out of their retirement funds by charging them fraudulent prices to purchase Precious Metals Bullion.

5.      Defendants deceived at least 1,300 elderly investors into transferring funds from their retirement savings, including funds from liquidating securities, to self-directed individual retirement accounts ("SDIRAs") to purchase Precious Metals Bullion. Defendants deceived elderly investors into investing in Precious Metals Bullion by misrepresenting the operation, risks, and safety of investors' retirement savings. Defendants also fraudulently induced by telephone over 300 elderly and retirement-aged investors to purchase Precious Metals Bullion with cash or credit ("Cash Account").

6.      Defendants directed SDIRA and Cash Account investors to purchase specific

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 59 of 194   PageID 2293

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 6 of 109   PageID 65
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 5 of 108   PageID 7

Precious Metals Bullion at grossly inflated prices that bore no relationship to the Prevailing
Market Price. Defendants did not disclose the actual value of the Precious Metals Bullion and
instead provided investors with invoices showing exorbitant and unreasonable prices.

7.      Metals provided investors with customer agreements and failed to disclose that
what it charged investors vastly exceeded what Metals represented to investors. In fact, none of
the actual charges on Metals' fraudulently overpriced Precious Metals Bullion fell within the
substantially lower range of charges represented to investors.

8.      Defendants falsely represented that Precious Metals Bullion were a safe and
conservative investment and that investors would not lose their funds. Contrary to these
representations, Defendants failed to disclose to SDIRA and Cash Account investors that their
undisclosed, excessive, and unreasonable charges resulted in investors suffering substantial
losses on the purchase of Precious Metals Bullion from Defendants.

9.      Contrary to Defendants' material misrepresentations and omissions, Defendants
knew or had a reckless disregard for the truth that virtually every one of their SDIRA and Cash
Account investors during the Relevant Period lost the majority of the funds invested in
fraudulently overpriced Precious Metals Bullion.

10.     Defendants perpetuated their fraudulent scheme by making additional
misrepresentations and omissions to SDIRA and Cash Account investors who purchased
Precious Metals Bullion. Defendants falsely told investors who questioned the grossly inflated
cost of the Precious Metals Bullion after purchase that the Precious Metals Bullion were
exclusive and collectible numismatic or semi-numismatic precious metals that carried a premium
far above the base melt value of the Precious Metals Bullion. These statements were false

5

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 60 of 194   PageID 2294

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 7 of 109   PageID 66
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 6 of 108   PageID 8

because the Precious Metals Bullion were not numismatic or semi-numismatic precious metals. The Precious Metals Bullion were worth significantly less than the value Defendants misrepresented to investors because it carried no additional premium over the Prevailing Market Price.

11.   As a result of their fraudulent scheme, Defendants have solicited and received over $140 million in retirement savings, and over $45 million in Cash Accounts. All of the investors' funds were deposited into bank accounts owned and controlled by the Defendants. Defendants defrauded investors into using over ninety percent of the received funds to purchase fraudulently overpriced Precious Metals Bullion.

12.   During the Relevant Period, Asher and Batashvili committed the acts and/or omissions alleged herein both in their individual capacity, and also within the course and scope of their employment, agency, or office with Metals and Barrick. Metals and Barrick are therefore liable under Section 2(a)(1)(B) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 2(a)(1)(B) (2018), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2019), as principals for Asher's and Batashvili's violations of the CEA, CFTC Regulations, and the laws of the various States as alleged herein.

13.   Accordingly, pursuant to Sections 6c and 6d(1) of the CEA, 7 U.S.C. § 13a-1 (2018) and 7 U.S.C. § 13a-2(1) (2018), the CFTC and States bring this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the CEA, CFTC Regulations, and State law, and to enjoin them from engaging in any commodity-related activity, as set forth below. In addition, Plaintiffs seek civil monetary penalties for each violation of the CEA, CFTC Regulations, and State law and remedial ancillary relief, including, but not limited

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 61 of 194   PageID 2295

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 8 of 109   PageID 67
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 7 of 108   PageID 9

to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate. Plaintiffs also request that the Court order Relief Defendant Tower Equity, LLC to disgorge funds that it received from Defendant's illegal activities and in which it has no legitimate interest.

14.      By virtue of this conduct, and as more fully set forth below, Defendants have engaged, are engaging, and/or are about to engage in violations of the anti-fraud provisions of the CEA, Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (2018), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019), and the laws of the States.

15.      Unless restrained and enjoined by the Court, Defendants are likely to continue engaging in the acts and practices alleged in this Complaint or in similar acts and practices, and funds they have obtained fraudulently may be misappropriated or otherwise dissipated.

## II.   JURISDICTION AND VENUE

16.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a) (2018), authorizes the CFTC to seek injunctive and other relief against any person whenever it appears to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

17.      Section 6d(1) of the CEA, 7 U.S.C. § 13a-2(1) (2018), authorizes the States to bring a suit in the district courts of the United States to seek injunctive and other relief against any person whenever it appears to the Attorney General and/or Securities Administrator of a

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 62 of 194   PageID 2296

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 9 of 109   PageID 68
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 8 of 108   PageID 10

State, or such other official that a State may designate, that the interests of the residents of the State have been, are being, or may be threatened or adversely affected because of violations of the CEA or CFTC Regulations. The acts and omissions in violation of the CEA occurred within each and every one of the States. Investors from each and every one of the States were materially and substantially harmed by Defendants' violations of the CEA.

18.     This Court has supplemental and pendant jurisdiction over the State-law claims of the States pursuant to 28 U.S.C. § 1367(a) (2018).

19.     Defendants engaged in the acts and practices described in this Complaint using instrumentalities of interstate commerce, including but not limited to: the use of interstate wires for transfer of funds, U.S. mail, checks, websites, and other interstate electronic communication devices.

20.     Venue lies properly in this District pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e) (2018), because Defendants transacted business in this District, and certain of the acts and practices in violation of the CEA, the CFTC Regulations, and State laws occurred, are occurring, or are about to occur within this District, among other places. Venue also lies properly in this District pursuant to 17 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

### III.  PARTIES

21.     Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the CEA and the CFTC Regulations promulgated thereunder.

22.     Plaintiff States are authorized under Section 6d(1) of the CEA, 7 U.S.C. § 13a-

8

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 63 of 194   PageID 2297

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 10 of 109   PageID 69
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 9 of 108   PageID 11

2(1) (2018), and their respective State laws, to bring this action on behalf of their State and their citizens to enforce the CEA and CFTC Regulations.

23.     Plaintiffs State of Alabama, State of Alaska, State of California, State of Colorado, State of Florida, State of Georgia, Commonwealth of Kentucky, State of Maryland, State of South Carolina, and State of Texas are authorized under their respective State laws, to bring their State law claims on behalf of their State and their citizens to enforce State laws.

24.     Defendant TMTE, Inc., d/b/a Metals.com is a Wyoming corporation with its headquarters at 1712 Pioneer Avenue, Suite 2145, Cheyenne, Wyoming. TMTE, Inc. uses or has used the business names Metals.com, Chase Metals, LLC, and Chase Metals, Inc. TMTE has a place of business at 433 N. Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd Suite 700 Beverly Hills, California. TMTE was originally organized as a Wyoming limited liability corporation on April 30, 2008. It converted to a corporation on March 8, 2017, under the name Chase Metals, Inc.

25.     Defendant Chase Metals, Inc. is a Wyoming corporation now known as TMTE, Inc. Its headquarters are located at 1712 Pioneer Avenue, Suite 2145, Cheyenne, Wyoming, and it has a place of business at 433 N. Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd, Suite 700, Beverly Hills, California.

26.     Defendant Chase Metals, LLC, is a Wyoming limited liability company converted to a Wyoming corporation now known as TMTE, Inc. Its headquarters are located at 1712 Pioneer Avenue, Suite 2145, Cheyenne, Wyoming, and it has a place of business at 433 N. Camden Drive, Suite 970, Beverly Hills, California and 8383 Wilshire Blvd, Suite 700, Beverly Hills, California.

9

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 64 of 194   PageID 2298

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 11 of 109   PageID 70
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 10 of 108   PageID 12

27.     Defendant Barrick Capital, Inc. is a Delaware corporation incorporated on August 20, 2019. It has a place of business at 8383 Wilshire Blvd., Suite 700, Beverly Hills, California. Barrick shares common ownership, operations, employees, office space, and overnight mail account with Metals.

28.     Defendant Simon Batashvili holds himself out as a Founder, Chief Executive Officer, and Principal of Metals. Batashvili is a signatory on Metals' bank accounts, supervises employees, and has authority to hire and fire Metals employees. Batashvili is also a Founder, Owner, Chief Executive Officer, and Principal of Barrick. Batashvili is a signatory on Barrick's bank accounts, supervises employees, and has authority to hire and fire Barrick employees.

29.     Defendant Lucas Asher a/k/a Lucas Thomas Erb a/k/a Luke Asher holds himself out as a Founder, Owner, and Principal of Metals. Asher hires employees and supervises Metals' sales representatives or other agents and their solicitation of current and prospective investors. Asher controls the marketing at Metals, including having a website domain for Metals in his name. Asher holds himself out as a Founder, Owner, and Principal of Barrick. Asher controls the marketing at Barrick, including having a website domain for Barrick. Asher hires employees and supervises Barrick's sales representatives or other agents and their solicitation of current and prospective investors.

30.     Relief Defendant Tower Equity, LLC ("Tower Equity") is a Wyoming limited liability company formed in June 2013. It has a place of business at 8383 Wilshire Blvd., Beverly Hills, CA 90211. Tower Equity received funds from defrauded investors to which it has no legitimate claim or interest.

10

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 65 of 194   PageID 2299

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 12 of 109   PageID 71
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 11 of 108   PageID 13

## IV.   GENERAL ALLEGATIONS

### A.  Defendants Defrauded Elderly Investors into Establishing SDIRAs to Purchase Precious Metals Bullion

31.     Defendants, directly and by and through their sales representatives or other agents, targeted a vulnerable population of mostly elderly or retirement-aged persons with little experience in Precious Metals Bullion to open SDIRAs to purchase Precious Metals Bullion. Defendants' solicitations targeted politically conservative and Christian investors. Defendants instructed their sales representatives or other agents to concentrate their solicitations on these persons to gain access to their retirement savings.

32.     Defendants, directly and by and through their sales representatives or other agents, instructed their sales representatives or other agents to concentrate their solicitations on elderly or retirement-aged persons to gain access to their retirement savings, including but not limited to, retirement savings held in tax advantaged accounts such as Individual Retirement Accounts; employer sponsored 401(k) and 457(b) plans; Thrift Savings Plans; life insurance; annuities; money market accounts; and other long-term retirement savings vehicles ("Qualified Retirement Savings").

33.     Asher and Batashvili each directed the sales representatives or other agents to employ solicitations designed to instill fear in elderly and retirement aged investors and build trust with investors based on representations of political and religious affinity.

34.     Defendants placed their advertisements on conservative media and websites.

35.     Asher and Batashvili falsely claimed they were friends with a conservative television and radio personality and that the personality recommended buying Precious Metals

11

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 66 of 194   PageID 2300

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 13 of 109   PageID 72
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 12 of 108   PageID 14

Bullion, despite receiving a cease and desist demand from this media personality to stop touting this purported affiliation.

36.     Defendants, directly and by and through their sales representatives or other agents, directed investors to open SDIRAs and to transfer funds from their Qualified Retirement Savings to the newly established SDIRAs.

37.     Defendants, directly and by and through their sales representatives or other agents, engaged in the business of advising investors to liquidate preexisting Qualified Retirement Savings, including liquidating securities, and transferring those funds to a SDIRA in order to purchase Precious Metals Bullion.

38.     Defendants, directly and by and through their sales representatives or other agents, solicited investors through telephonic solicitations, social media solicitations, and through their websites, http://www.metals.com and http://barrickcapital.com.

39.     During the Relevant Period, Defendants, directly and by and through their sales representatives or other agents, directed at least 1,300 investors to open SDIRAs. These SDIRAs were mostly opened by persons between the ages of sixty and ninety.

40.     Metals, directly and by and through its sales representatives or other agents, defrauded persons into opening SDIRAs and transferring Qualified Retirement Savings to those accounts by making material misrepresentations and omissions intended to instill fear in the investors including, but not limited to:

        a.  Misrepresenting that the United States government was going to take Qualified Retirement Savings funds in a "Bail-in" to help banks and government programs;

        b.  Misrepresenting that IRA custodians are in financial trouble and are likely

12

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 67 of 194   PageID 2301

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 14 of 109   PageID 73
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 13 of 108   PageID 15

to collapse;

   c.  Misrepresenting that it is unclear who actually owns the underlying securities in IRA accounts; and

   d.  Misrepresenting that the government could seize funds held in Qualified Retirement Savings but could not seize Precious Metals Bullion held in SDIRAs.

41.     A large majority of the funds in the SDIRAs were transfers of funds from preexisting Qualified Retirement Savings. During the Relevant Period, Defendants directed investors to use over $140 million from SDIRAs to purchase fraudulently overpriced Precious Metals Bullion.

42.     During the Relevant Period, Defendants instructed investors to send approximately $5 million to Relief Defendant Tower Equity. Between November 2018 and July 2019, Metals sales representatives or other agents directed at least 11 investors to send funds, by check or wire transfer, to the Tower Equity bank account at Bank of America to purchase Precious Metals Bullion from Metals. Tower Equity has no legitimate claim or interest to the funds that it received as a result of the Defendants' fraudulent conduct.

**B. Metals Defrauded Elderly Investors to Buy Overpriced Polar Bear Bullion That Bore No Relationship to The Prevailing Market Price**

43.     Metals, Asher, and Batashvili, directly and by and through their sales representatives or other agents, solicited investors and sold them gold and silver Precious Metals Bullion at fraudulently inflated prices over the Prevailing Market Price.

44.     Silver and gold precious metals are statutorily-defined commodities under Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2018).

45.     The term "bullion" refers to precious metals in the form of bars, ingots, or coins

13

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 68 of 194   PageID 2302

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 15 of 109   PageID 74
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 14 of 108   PageID 16

in which the value is typically determined by the value of the precious metal content.

46.     Metals, Asher, and Batashvili, directly and by and through their sales representatives or other agents, fraudulently solicited and sold Precious Metals Bullion in the form of the following three gold and silver bullion coins (collectively "Polar Bear Bullion"):

       a.  The 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion;

       b.  The 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion; and

       c.  The 1/4 ounce Gold British Standard Bullion.

47.     The actual value of Polar Bear Bullion is the Prevailing Market Price of the gold and silver precious metal contained in the Precious Metals Bullion coins.

48.     Metals, directly and by and through their sales representatives or other agents, failed to disclose the markup charged to customers over the Prevailing Market Price ("Markups").

49.     Metals, directly and by and through their sales representatives or other agents, charged investors undisclosed excessive Markups on Polar Bear Bullion that bore no reasonable relation to the Prevailing Market Price.

50.     Metals, directly and by and through their sales representatives or other agents, failure to disclose unreasonable and excessive Markups on Polar Bear Bullion is a material undisclosed fact which prevented investors from making an informed decision on purchasing Polar Bear Bullion.

51.     Metals, directly and by and through their sales representatives or other agents, failed to disclose to SDIRA and Cash Account investors that the fraudulently over-priced Polar Bear Bullion at the time of purchase averaged:

14

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 69 of 194   PageID 2303

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 16 of 109   PageID 75
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 15 of 108   PageID 17

    a.  213% for 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion over the Prevailing Market Price of silver bullion;

    b.  120% for 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion over the Prevailing Market Price of gold bullion;

    c.  116% for 1/4 ounce Gold British Standard Bullion over the Prevailing Market Price of gold bullion; and

    d.  21% for all other Precious Metals Bullion over the Prevailing Market Price of the bullion.

52.    During the Relevant Period, Metals fraudulently sold to SDIRA and Cash Account investors:

    a.  At least 4.1 million units of 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion for over $102.4 million;

    b.  At least 106,123 units of 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion for over $31.2 million; and

    c.  At least 34,120 units of 1/4 ounce Gold British Standard Bullion for over $24 million.

53.    During the Relevant Period, the percentages of Precious Metals Bullion sold to SDIRA and Cash Account investors by telephone by Metals were approximately:

    a.  58% of sales were 1/2 ounce Silver Royal Canadian Mint Polar Bear Bullion;

    b.  17% of sales were 1/10 Gold Royal Canadian Mint Polar Bear Bullion;

    c.  13% of sales were 1/4 ounce Gold British Standard Bullion; and

    d.  10% of sales were every other type of bullion sold by Metals to investors.

54.    During the Relevant Period, Metals, directly and by and through its sales representatives or other agents, specifically selected and directed elderly and/or retirement-aged SDIRA and Cash Account investors to purchase fraudulently priced Polar Bear Bullion.

55.    As part of the scheme to defraud, Metals, directly and by and through its sales

15

Case 3:21-cv-02181-X    Document 209    Filed 08/04/23    Page 70 of 194    PageID 2304

Case 3:21-cv-02181-S    Document 1-3    Filed 09/13/21    Page 17 of 109    PageID 76
Case 3:20-cv-02910-L    Document 2    Filed 09/22/20    Page 16 of 108    PageID 18

representatives or other agents, directed investors to use Qualified Retirement Savings in their

SDIRAs and funds in their Cash Accounts to purchase fraudulently priced Polar Bear Bullion.

56.       During the Relevant Period, over 90% of the total amount of investors' funds

solicited and received by Metals from investors was used to buy Polar Bear Bullion.

### C. Metals Made Material Misrepresentations and Omissions Resulting in Substantial Investor Losses

57.       Metals, directly and by and through its sales representatives or other agents, failed

to disclose to SDIRA and Cash Account investors that the undisclosed, excessive, and

unreasonable Markups over the Prevailing Market Price on Polar Bear Bullion resulted in

substantial investor losses.

58.       Metals, directly and by and through its sales representatives or other agents,

misrepresented that Precious Metals Bullion were safe and conservative investments and that

investors would not lose their funds. For example, Metals, directly and by and through its sales

representatives or other agents:

    a.  Misrepresented to Alaska Investor #1, Alabama Investor #1, Alabama
        Investor #2, California Investor #3, California Investor #5, Colorado Investor
        #7, Georgia Investor #1, Maryland Investor #1, South Carolina Investor #1,
        Texas Investor #1, and Texas Investor #4 that Precious Metals Bullion were
        safe and secure investments, and safer than Qualified Retirement Savings.

    b.  Misrepresented to Alaska Investor #1, Alabama Investor #1, California
        Investor #1, Georgia Investor #2, Kentucky Investor #1, Maryland Investor
        #6, South Carolina Investor #2, and Texas Investor #2 that investors would
        not lose their funds invested in Precious Metals Bullion; and

    c.  Misrepresented to Alaska Investor #1, Alabama Investor #1, Alabama
        Investor #2, California Investor #1, Colorado Investor #2, Georgia Investor
        #1, Maryland Investor #3, South Carolina Investor #1, and Texas Investor #4
        that Precious Metals Bullion were a low risk investment.

59.       Contrary to Metals' misrepresentations and omissions, Metals knew or had a

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 71 of 194   PageID 2305

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 18 of 109   PageID 77
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 17 of 108   PageID 19

reckless disregard for the truth that virtually all of its SDIRA and Cash Account investors lost the majority of their funds invested in Polar Bear Bullion.

60.     Metals knew or had a reckless disregard for the truth that investors suffered large losses on Polar Bear Bullion. Instead, Metals continued to misrepresent to prospective and current SDIRA and Cash Account investors that Precious Metals Bullion were a safe and conservative investment and that investors would not lose their funds.

61.     Metals failed to disclose to its SDIRA and Cash Account investors that the fraudulently overpriced Polar Bear Bullion materially impacted their ability to profit and the risk of loss.

62.     Metals failed to disclose to its SDIRA and Cash Account investors that an investor's ability to profit and not sustain a loss on the fraudulently overpriced Polar Bear Bullion was dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and selling their Precious Metals Bullion could incur additional transaction costs.

63.     Metals knew or had a reckless disregard for the truth that because of Metals' undisclosed, fraudulent, and exorbitant Markups on Polar Bear Bullion, most investors lost the majority of their investment funds immediately upon consummating the transaction. It is a material fact to an investor who is making an investment decision that he or she will lose the majority of their funds immediately upon consummating a transaction.

**D. Metals Fraudulently Charged Undisclosed Spreads on Polar Bear Bullion That Vastly Exceeded the Spread Represented in Customer Agreements**

64.     During the relevant period, Metals executed with investors a shipping and

17

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 72 of 194   PageID 2306

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 19 of 109   PageID 78
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 18 of 108   PageID 20

transaction agreement ("Customer Agreement #1") for the purchase of Precious Metals Bullion.

65.     Customer Agreement #1 contains terms and conditions of the sale of Precious

Metals Bullion. Customer Agreement #1 states, in pertinent part, that:

> a.   "Spread on IRA Precious Metals transaction varies between two percent and thirty-three percent (2% to 33%). These numbers, however, are only general ranges and approximations, which are subject to change for a variety of reasons . . ."
>
> b.   "At the time this Transaction Agreement was transmitted for Customer's signature, (i) metals Spread on bullion (i.e., coins and bars that generally move in tandem with the spot price for the relevant commodity) is generally between one percent and five percent (1 to 5%) ..."
>
> c.   "Metals is prohibited by law from guaranteeing to repurchase Precious Metals that it sells."

66.     Beginning on or about June 2019 and continuing thereafter, Metals executed with

at least 190 investors a new shipping and transaction agreement ("Customer Agreement #2") for

the purchase of Precious Metals Bullion.

67.     Section 3(a) of both Customer Agreement #1 and Customer Agreement #2 states:

"Within the Precious Metals industry, the difference between [M]etals cost on the day of the

purchase (for the Precious Metals Customer has agreed to buy) and the retail price quoted to

Customer is known as the 'Spread'" (herein: "Spread").

68.     Customer Agreement #2 was substantially similar to Customer Agreement #1,

except that it represented that the Spread Metals charged on IRA Precious Metals Bullion

transactions was significantly smaller. Customer Agreement #2 represented that the Spread on

IRA Precious Metals Bullion transaction only varies between 1% to 19.9%, rather than 2% to

33%. This is a material purported reduction in the Spread.

69.     Though the Spread in Section 3(a) subpart (i) of Customer Agreement #2 remains

18

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 73 of 194   PageID 2307

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 20 of 109   PageID 79
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 19 of 108   PageID 21

1% to 5%, Customer Agreement #2 materially changes Section 3(a) subpart (ii) to read: "that [M]etals's Spread on exclusive products from the Government mint is generally between one percent and nineteen point nine percent (1% to 19.9%). Spreads for exclusive gold and silver products and Numismatic coins and bars are often in the range of approximately one percent and nineteen point nine (1% to 19.9%)."

70.     The Spread charged to investors pursuant to Customer Agreement #1 and Customer Agreement #2 represents the difference between what Metals paid for the Precious Metals Bullion and what they charged investors.

71.     As part of the scheme to defraud, the Spreads on Polar Bear Bullion were materially and exorbitantly higher than those represented in Customer Agreement #1 and Customer Agreement #2.

72.     Metals knew or had a reckless disregard for the truth when they represented in Customer Agreement #1 and Customer Agreement #2 that the Spread on IRA Precious Metals Bullion transactions varied between 2% and 33% or 1% and 19.9%. Metals knew or had a reckless disregard for the truth that the Spreads they were charging investors on Polar Bear Bullion vastly exceeded this range.

73.     For Customer Agreement #1, Metals knew or had a reckless disregard for the truth when they represented the Spread on Cash Account transactions was 1% to 5%. Metals knew or had a reckless disregard for the truth that the Spreads that they were charging investors on Polar Bear Bullion vastly exceeded this range.

74.     For Customer Agreement #2, Metals knew or had a reckless disregard for the truth when they represented the Spread on Cash Account transactions varied between 1% and

19

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 74 of 194   PageID 2308

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 21 of 109   PageID 80
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 20 of 108   PageID 22

19.9%. Metals knew or had a reckless disregard for the truth that the Spreads that they were charging investors on Polar Bear Bullion vastly exceeded this range.

75.     Metals, directly and by and through its sales representatives or other agents, failed to disclose to their SDIRA and Cash Account investors the true Spread and excessive Markups on Polar Bear Bullion that they were charging them. Instead, Metals instructed its sales representatives and other agents to represent to investors inflated prices for Polar Bear Bullion and provide investors with sales invoices showing exorbitant prices that had no reasonable relation to the Prevailing Market Price.

76.     Metals knew or had a reckless disregard for the truth that the Spread charged by Metals to their elderly or retirement-aged SDIRA and Cash Account investors for the Polar Bear Bullion averaged:

      a.   128% for Silver Royal Canadian Mint Polar Bear Bullion;

      b.   91% for Gold Royal Canadian Mint Polar Bear Bullion; and

      c.   108% for Gold British Standard Bullion.

77.     Metals deceptively failed to disclose to investors the material fact that none of the actual Spreads on Polar Bear Bullion fell within the range of Spreads represented to investors in Customer Agreement #1 and Customer Agreement #2.

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 75 of 194   PageID 2309

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 22 of 109   PageID 81
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 21 of 108   PageID 23

**E. Metals Misrepresented That Polar Bear Bullion Have Numismatic or Semi-Numismatic Value to Deceive Investors and Conceal Defendants' Fraud**

78.     As part of the scheme to defraud, Metals, directly and by and through their sales representatives or other agents, fraudulently misrepresented that Polar Bear Bullion were numismatic or semi-numismatic Precious Metals Bullion.

79.     Numismatic Precious Metals Bullion are rare, of limited availability, and have significant broad-based market demand and so have a value substantially more than the Prevailing Market Price of the precious metal contained in the bullion. Semi-numismatic Precious Metals Bullion refers to bullion that are claimed to exhibit both bullion and numismatic traits, such that the value is derived from the precious metal content, limited circulation, and some recognized exclusive or collectible value.

80.     Contrary to Metals' false claims, Polar Bear Bullion have no numismatic or semi-numismatic value. Polar Bear Bullion are readily available to the public and are not rare. In fact, there are over 6 million units of Polar Bear Bullion in circulation.

81.     Metals knew or had a reckless disregard for the truth when they falsely represented to investors that Polar Bear Bullion had numismatic or semi-numismatic value.

82.     Investors received account statements from their SDIRA administrators showing an account value that was significantly smaller than what Metals misrepresented to investors. The SDIRA statements showed the accurate value of the Polar Bear Bullion based on the Prevailing Market Price of the bullion.

83.     Metals, directly and by and through its sales representatives or other agents, fraudulently represented to investors that Polar Bear Bullion were worth significantly more than

Case 3:21-cv-02181-X    Document 209    Filed 08/04/23    Page 76 of 194    PageID 2310

Case 3:21-cv-02181-S    Document 1-3    Filed 09/13/21    Page 23 of 109    PageID 82
Case 3:20-cv-02910-L    Document 2    Filed 09/22/20    Page 22 of 108    PageID 24

the Prevailing Market Price.

84.    Metals, directly and by and through its sales representatives or other agents,

fraudulently represented to investors that the lower valuation on their SDIRA statements was an

under valuation that did not reflect the resale value of the Polar Bear Bullion ("Post-Purchase

Misrepresentations"). For example, Metals, directly and by and through its sales representatives

or other agents:

   a. Misrepresented to Alabama Investor #1 and South Carolina Investor #2 that
      Polar Bear Bullion were exclusive coins and worth more than other Precious
      Metals Bullion;

   b. Misrepresented to Alabama Investor #2, Colorado Investor #7, and Colorado
      Investor #13, that Polar Bear Bullion were the hottest item on the market and
      investors would make more money on Polar Bear Bullion than on other
      Precious Metals Bullion;

   c. Misrepresented to Alabama Investor #1, Alabama Investor #2, Colorado
      Investor #4, Colorado Investor #9, Kentucky Investor #2, Maryland Investor
      #6, South Carolina Investor #1, and South Carolina Investor #2 that the actual
      value of Polar Bear Bullion was higher than what the SDIRA statement
      showed;

   d. Misrepresented to Alabama Investor #1, Alabama Investor #2, Colorado
      Investor #4, Colorado Investor #9, Kentucky Investor #2, Maryland Investor
      #1, Maryland Investor #4, South Carolina Investor #1, and South Carolina
      Investor #2 that the SDIRA statements only report the melt value of the Polar
      Bear Bullion and the melt value does not reflect the fact that Polar Bear
      Bullion carried a premium above the base melt value of the Precious Metals
      Bullion contained therein; and

   e. Misrepresented to Alabama Investor #1, Colorado Investor #2, South Carolina
      Investor #1, and Maryland Investor #1 that the SDIRA statements displayed
      the Precious Metals Bullion melt value because it provided a tax break to the
      investor.

85.    Metals, directly and by and through its sales representatives or other agents,

materially omitted to inform investors that the value of Polar Bear Bullion listed on SIDRA

22

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 77 of 194   PageID 2311

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 24 of 109   PageID 83
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 23 of 108   PageID 25

statements was based on the Prevailing Market Price. Metals also materially omitted to disclose to investors that Polar Bear Bullion were worth significantly less than the value Metals misrepresented to investors because they carry no premium over the Prevailing Market Price of Precious Metals Bullion.

86.     Metals, directly and by and through its sales representatives or other agents, referred to the deception or artifice to defraud in the Post-Purchase Misrepresentations as a "Tuck-In." Metals, directly and by and through its sales representatives or other agents, made the Post-Purchase Misrepresentations to placate and calm investors who were upset about the losses shown on their SDIRA statements. In fact, Metals, knowingly or with reckless disregard for the truth, made these misrepresentations and omissions designed to conceal their fraudulent scheme.

### F. Metals Failed to Disclose State Enforcement Actions

87.     During the Relevant Period, Metals was subject to State enforcement actions, including complaints, emergency actions, disciplinary proceedings, and/or cease and desist orders ("State Orders and Complaints") taken against Metals and various officers, employees, or other agents by State Securities Regulators, including:

    a. The Emergency Order issued May 1, 2019 and Agreed Order and Undertaking entered July 1, 2019 by the Texas State Securities Board;

    b. A Consent Cease and Desist Order entered May 16, 2019 by the Minnesota Department of Commerce Commissioner

    c. A Consent Cease and Desist Order issued July 12, 2019 by the Colorado Securities Commissioner;

    d. An Emergency Cease and Desist Order issued July 30, 2019 by the Georgia Commissioner of Securities;

    e. A Cease and Desist Order issued August 8, 2019 by the Alabama Securities Commission;

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 78 of 194   PageID 2312

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 25 of 109   PageID 84
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 24 of 108   PageID 26

    f.   An Emergency Cease and Desist Order entered September 6, 2019 by the Kentucky Department of Financial Institutions;

    g.   An Order to Cease and Desist and Order to Show Cause issued November 1, 2019 and Consent Order entered May 26, 2020 by the Missouri Securities Commissioner;

    h.   An Administrative Complaint filed December 3, 2019 by the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth;

    i.   A Cease and Desist Order entered March 9, 2020 by the Arkansas Securities Commissioner;

    j.   A Complaint for Summary Order filed May 26, 2020 and Summary Order to Cease and Desist issued May 26, 2020 by the Nevada Securities Division of the Office of the Secretary of State;

    k.   A Notice of Proposed Agency Action filed June 4, 2020 and Temporary Cease and Desist Order entered June 4, 2020 by the Montana State Auditor, Commissioner of Securities and Insurance; and

    l.   A Temporary Cease and Desist Order and Notice of Final Order issued July 20, 2020 by the Alaska Director of Commerce, Community, and Economic Development, Division of Banking and Securities.

88.     Metals failed to disclose to investors or prospective investors of the State Orders and Complaints. This was a material fact to investors who were determining or agreed to do business with Metals.

**G. Barrick and Metals are a Common Enterprise**

89.     On August 20, 2019, after States began issuing the State Orders and Complaints in Allegation #87, Batashvili incorporated Barrick and Batashvili and Asher continued to engage in the same fraudulent scheme that they perpetrated at Metals.

90.     Barrick and Metals are a common enterprise with little to no distinction between the ownership and operations of Barrick and Metals. Barrick and Metals have common ownership and control by Asher and Batashvili. Further, many of the sales representatives and

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 79 of 194   PageID 2313

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 26 of 109   PageID 85
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 25 of 108   PageID 27

other employees and agents of Metals moved to Barrick and have performed the same work for Barrick as they did at Metals. Further, Metals and Barrick operate out of the same office and share the same overnight delivery service account.

91.     As part of this common enterprise, Barrick paid bills and expenses on behalf of Metals, including but not limited to, over $56,000 to pay down Metals' March 2020 corporate credit card bill.

**H. Barrick Made Material Misrepresentations and Omissions Resulting in Substantial Investor Losses on Fraudulently Overpriced Barrick Bullion**

92.     As part of the scheme to defraud, Barrick, Asher, and Batashvili, directly and by and through their sales representatives or other agents, directed elderly SDIRA investors to purchase the following Precious Metals Bullion in the form of the following three Precious Metals Bullion coins at fraudulently inflated prices over the Prevailing Market Price ("collectively "Barrick Bullion"):

          a.   1/10 ounce Silver Spade Guinea;

          b.   1/10 ounce Silver Britannia; and

          c.   1/10 ounce Gold Royal Canadian Wildlife Series.

93.     During the Relevant Period, Barrick, directly and by and through their sales representatives or other agents, directed elderly SDIRA investors to purchase Barrick Bullion.

94.     As part of Barrick's scheme to defraud and Barrick's and Metals' common enterprise, Barrick failed to disclose to investors that the 1/10 ounce Gold Royal Canadian Wildlife Series was the same item sold by Metals as the 1/10 ounce Gold Royal Canadian Mint Polar Bear Bullion.

95.     The actual value of Barrick Bullion is the Prevailing Market Price of the Precious

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 80 of 194   PageID 2314

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 27 of 109   PageID 86
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 26 of 108   PageID 28

Metals Bullion contained in the bullion coins.

96.     Barrick charged investors undisclosed excessive Markups on Barrick Bullion that bore no reasonable relation to the Prevailing Market Price.

97.     Barrick's failure to disclose unreasonable and excessive Markups on Barrick Bullion is a material undisclosed fact which prevented investors from making an informed decision on purchasing Barrick Bullion.

98.     Barrick, directly and by and through their sales representatives or other agents, failed to disclose to SDIRA investors that the Markup on the fraudulently over-priced Barrick Bullion at the time of purchase averaged:

   a.  312% for 1/10 ounce Silver Spade Guinea over the Prevailing Market Price of silver bullion;

   b.  287% for 1/10 ounce Silver Britannia over the Prevailing Market Price of silver bullion; and

   c.  128% for the 1/10 ounce Gold Royal Canadian Wildlife Series over the Prevailing Market Price of gold bullion.

99.     During the Relevant Period, Barrick fraudulently sold to SDIRA investors:

   a.  At least 567,800 units of the 1/10 ounce Silver Spade Guinea for over $3.8 million;

   b.  At least 93,000 units of the ounce Silver Britannia for over $611,600; and

   c.  At least 17,660 units of the 1/10 ounce Gold Royal Canadian Wildlife Series for over $6.59 million.

100.    During the Relevant Period, the percentages of Precious Metals Bullion sold to SDIRA investors by Barrick were approximately:

   a.  32.5% of sales were Silver Spade Guinea;

   b.  5% of sales were Silver Britannia;

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 81 of 194   PageID 2315

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 28 of 109   PageID 87
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 27 of 108   PageID 29

    c.   56% of sales were Gold Royal Canadian Wildlife; and

    d.   6% of sales were every other type of Precious Metals Bullion sold by Barrick to investors.

    101.   Barrick knew or had a reckless disregard for the truth that the Spread charged by Barrick to their elderly or retirement-aged SDIRA investors for the Barrick Bullion averaged:

    a.   114.5% for Silver Spade Guinea;

    b.   100% for Silver Britannia; and

    c.   95.7% for Gold Royal Canadian Wildlife.

    102.   During the Relevant Period, approximately 89% of the total amount of investors' funds solicited and received by Barrick, directly and by and through its sales representatives or other agents, from investors was used to buy Barrick Bullion.

    103.   Contrary to Barrick's misrepresentations and omissions, Barrick knew or had a reckless disregard for the truth that virtually all of its SDIRA investors lost the majority of their funds invested in Barrick Bullion.

    104.   Barrick, directly and by and through their sales representatives or other agents, failed to disclose to its SDIRA investors that the fraudulently overpriced Barrick Bullion materially impacted their ability to profit and the risk of loss.

    105.   Barrick, directly and by and through its sales representatives or other agents, failed to disclose to its SDIRA investors that an investor's ability to profit and not sustain a loss on the fraudulently overpriced Barrick Bullion was dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and selling their Precious Metals Bullion could incur additional transaction costs.

    106.   Barrick knew or had a reckless disregard for the truth that Barrick's undisclosed,

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 82 of 194   PageID 2316

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 29 of 109   PageID 88
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 28 of 108   PageID 30

fraudulent, and exorbitant Markups on Barrick Bullion resulted in most investors losing the majority of their investment funds immediately upon consummating the transaction. It is a material fact to an investor who is making an investment decision that he or she will lose the majority of their funds immediately upon consummating a transaction.

### I. Defendants Acted in the States as Unregistered Investment Advisers or Investment Adviser Representatives, Violated Their Fiduciary Duty, and Engaged in Fraud

107.    The Laws of the States govern the registration of Investment Advisers ("IAs") and investment adviser representatives ("IARs") (collectively, "IAs & IARs").

108.    The Laws of the States prohibit (1) fraud in connection with investment advisory services, (2) fraud in connection with the offer, purchase, or sale of securities, (3) fraud in connection with the offer, purchase, or sale of commodities, (4) unfair trade practices, and (5) financial exploitation of the elderly.

#### a. Defendants Acted in the States as Unregistered Investment Advisers or Investment Adviser Representatives

109.    Defendants, directly and by and through their sales representatives or other agents, offered and provided investment advice to investors for compensation.

110.    Defendants, by and through their sales representatives or other agents, engaged in the business of providing investment advice to investors in order to earn compensation from the liquidation of investors' Qualified Retirement Savings, some of which held securities.

111.    Metals financially and culturally incentivized its sales representatives or other agents to liquidate investors' Qualified Retirement Savings and transfer as much money as possible to a SDIRA to purchase Precious Metals Bullion.

112.    Defendants, directly and by and through their sales representatives or other

28

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 83 of 194   PageID 2317

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 30 of 109   PageID 89
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 29 of 108   PageID 31

agents, offered and provided investment advice to investors to sell securities.

113.     As part of the scheme to defraud, when Defendants, directly and by and through their sales representatives or other agents, recruited a potential investor, Defendants provided investment advice to induce the investors to liquidate their Qualified Retirement Savings, which included securities holdings. Defendants, directly and by and through their sales representatives or other agents, transferred those Qualified Retirement Savings into SDIRAs and assisted the investors in doing so.

114.     Defendants, directly and by and through their sales representatives or other agents, sent investors electronic SDIRA transfer forms that were already filled out and ready for investors to sign. In some cases, Defendants' sales representatives or other agents facilitated phone calls between an investor and the entity holding the investor's Qualified Retirement Savings, which included securities, to arrange the liquidation of investor's Qualified Retirement Savings and the transfer of their Qualified Retirement Savings into a SDIRA.

115.     Defendants, directly and by and through its sales representatives or other agents, provided investment advice and directed investors to purchase Precious Metals Bullion through their SDIRAs. Batashvili selected the types of Precious Metals Bullion, including Polar Bear Bullion, sold to investors and determined when to buy back from investors who sought to liquidate their investments.

116.     Metals and Barrick, directly and by and through their sales representatives or other agents, generally designated themselves as an "interested party" on investors' SDIRA accounts. Defendants, through Barrick's and Metals' designation as an interested party, received unlimited access to investors' SDIRA account information.

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 84 of 194   PageID 2318

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 31 of 109   PageID 90
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 30 of 108   PageID 32

117.    Defendants, directly and by and through their sales representatives or other agents, acted as IAs & IARs, because Defendants, for compensation, engaged in the business of advising another, directly and by or through publications or writings, to wit:

    a.  Defendants, directly and by and through their sales representatives or other agents, held themselves out as IAs & IARs to investors;

    b.  Defendants, directly and by and through their sales representatives or other agents, solicited investors and provided investment advice to investors with respect to the value of securities or to the advisability of selling securities;

    c.  Asher determined what advice and recommendations should be given to investors by instructing Metals' sales representatives or other agents on what to tell investors to induce the investors to liquidate their Qualified Retirement Savings that contained securities;

    d.  Defendants, directly and by and through their sales representatives or other agents, touted the advantages of Precious Metals Bullion as an alternative to stocks, bonds, and the Dollar;

    e.  Defendants, directly and by and through their sales representatives or other agents, advised about market trends, specifically that the stock market would fail or lose value;

    f.  Metals, directly and by and through its sales representatives or other agents, sent victims emails highlighting articles that would induce fear in the investors about their preexisting Qualified Retirement Savings; and

    g.  Defendants, directly and by and through their sales representatives or other agents, advised and directed investors to sell securities held in Qualified Retirement Savings and transfer to SDIRAs in order to purchase Precious Metals Bullion, including Polar Bear Bullion and Barrick Bullion, from Defendants;

    h.  Defendants, directly and by and through their sales representatives or other agents, provided asset allocation advice, contrary their own websites' recommendations regarding the maximum percentage of Qualified Retirement Savings that should be allocated to Precious Metals Bullion, specifically recommending the full liquidation of Qualified Retirement Savings in order to purchase Precious Metals Bullion with all of the funds transferred; and

    i.  Metals, directly and by and through its sales representatives or other agents,

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 85 of 194   PageID 2319

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 32 of 109   PageID 91
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 31 of 108   PageID 33

advised investors to liquidate specific Qualified Retirement Savings or specific investments that contained securities.

118.   By way of example, Defendants, directly and by and through its sales representatives or other agents, provided investment advice to the following investors:

    a.   Alabama Investor #2 was advised by his sales representative that a stock market crash was probably going to happen, so Alabama Investor #2 should get out of his current investments and get into gold; the risks of investing in Precious Metals Bullion were very low, and that Precious Metals Bullion holds value better than investments in the stock market; Precious Metals Bullion were a safe investment as compared to stocks; people buy Precious Metals Bullion when the stock market goes down because Precious Metals Bullion were safe, and that Alabama Investor #2 should do the same; any money held in an IRA or retirement account was going to be taken or seized by the Government, but an investment in Precious Metals Bullion would not be taken or seized; and that Alabama Investor #2 should place all of his retirement funds in Precious Metals Bullion;

    b.   California Investor #1 was advised by his sales representative that the stock market was due for an imminent, major crash, worse than the 2008 crash, securities invested in the stock market should be sold to purchase Precious Metals Bullion; Metals would pick the best distribution for growth and stability with rock solid value and stability, and investing in Precious Metals Bullion would result in California Investor #1 earning money, not losing it;

    c.   California Investor #6 was advised by her sales representatives that it was important to transfer her money from securities to Precious Metals Bullion and imperative that she learned the truth about why her current account structure in the securities markets was dangerous to her financial future;

    d.   Colorado Investor #4 was advised by their sales representative that Precious Metals Bullion were a good investment considering the economy and that if they stayed in a traditional retirement account they would be at risk of a "buy-in." Colorado Investor #4 was told that a "buy-in" meant the government would nationalize 401(k)'s, if there was another financial crisis, to bail out financial institutions. In addition, the Metals sales representative held himself out as an IAR by calling Colorado Investor #4's custodian and stating to the custodian that Metals and the Custodian had a "mutual client on the line."

    e.   Maryland Investor #4 explained to Metals representatives that he was unsatisfied with his Qualified Retirement Savings, needed a return at or better than the stock market, could not afford to lose money, and needed access to

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 86 of 194   PageID 2320

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 33 of 109   PageID 92
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 32 of 108   PageID 34

his account if his financial situation worsened. Maryland Investor #4 noted that he was not a businessperson or a stockbroker and would have to depend on Metals as experts to advise. Metals advised Maryland Investor #4:

    i. Precious Metals Bullion were better than stock, and would get a greater rate;

    ii. The tax value of Precious Metals Bullion was better than Qualified Retirement Savings, that the face value of the coins was the tax value, and he would get more money when selling;

    iii. That "[w]e recommend you move your qualified funds in one self-directed IRA trust account that is non-leveraged, has minimal/lower fees, and allows all IRS approved investment options."

f. Maryland Investor #5 was advised Metals expected a large upswing in the Precious Metals Bullion market, and that something around $300,000 in Precious Metals Bullion could be worth as much as $1.2 million in ten years, but that he could lose everything in the stock market. Metals concluded to Maryland Investor #5 that based on the volatility of the market, the sound investment was Precious Metals Bullion;

g. Maryland Investor #8 was advised by a Barrick representative who, claiming years of experience in the stock market, represented it would be wise to invest in gold as the stock market continued to fall, gold would climb to $3,000/oz, and there was no risk in converting securities to Precious Metals Bullion;

h. Maryland Investor #9 was advised by a Metals representative who, claiming to be experienced in the financial industry, represented the Federal Reserve was unstable, that when the Federal Reserve went down, Precious Metals Bullion went up, and thus Precious Metals Bullion were more stable and secure than Qualified Retirement Savings;

i. South Carolina Investor #1 was advised by a Metals "Senior Portfolio Manager" that she needed to liquidate her investments in the stock market because it was about to collapse because of the chaos in the markets and that gold was a safe investment;

j. South Carolina Investor #2 was advised that stocks were not safe and that he needed to buy precious metals right away;

k. Texas Investor #2 was advised Polar Bear Bullion were safer than keeping his Qualified Retirement Savings in securities. He was told his investment would double in 4 years if he instead invested in Polar Bear Bullion. Metals' sales

32

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 87 of 194   PageID 2321

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 34 of 109   PageID 93
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 33 of 108   PageID 35

representative persuaded Texas Investor #2 to invest approximately $289,000 instead of the approximately $50,000 he originally intended to invest in Precious Metals Bullion

l.   Texas Investor #3 was advised to transfer her Qualified Retirement Savings to a SDIRA to invest in Polar Bear Bullion. She had no knowledge of Precious Metals Bullion but trusted Metals' sales representative because he built a rapport with her by discussing the market for Precious Metals Bullion, the outlook for her Qualified Retirement Savings, and built up his expertise and their relationship over approximately a year and a half

m.   Texas Investor #4 was advised he should protect his savings by liquidating his Qualified Retirement Savings, rolling the funds into a SDIRA, and purchasing Polar Bear Bullion. He was told Precious Metals Bullion were more stable and secure and a better investment than the stocks in this Qualified Retirement Savings. Texas Investor #4 was persuaded to liquidate his entire Qualified Retirement Savings account to buy Precious Metals Bullion instead of the approximately $50,000 he initially intended to invest in Precious Metals Bullion. After he purchased Polar Bear Bullion, Metals' sales representative advised against selling some of the Precious Metals Bullion to buy a particular stock.

119.   Metals and Barrick have never been registered as IAs, nor have their agents or Asher or Batashvili been registered as IARs required under state and/or federal law. Defendants or their agents never submitted a notice filing with the appropriate State regulator as an IA or IAR, nor are they exempt from State registration as an IA or IAR.

**b.   As Investment Advisers or Investment Adviser Representatives, Defendants Violated Their Fiduciary Duty to Investors and Engaged in Fraud**

120.   Defendants acted as IAs & IARs. IAs & IARs have a fiduciary duty to their clients. By acting as IAs & IARs, Defendants have a duty to their clients beyond the general prohibition on fraud arising from the CEA.

121.   The fiduciary duty requires IAs & IARs to act primarily for the benefit of their clients. At a minimum, to avoid violating their fiduciary duty, IAs & IARs:

a.   Must avoid conflicts of interest with investors;

33

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 88 of 194   PageID 2322

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 35 of 109   PageID 94
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 34 of 108   PageID 36

    b.  Must have reasonable grounds that their recommendations to investors are suitable based on a reasonable inquiry concerning the investor's investment objectives, financial situation and needs, and any other information known or acquired by the investment adviser after reasonable examination of the investor's finances;

    c.  May not charge unreasonable fees;

    d.  Must disclose material facts to the investors, including conflicts of interest; and

    e.  May not make material misrepresentations or omissions to investors;

122.    Defendants violated their fiduciary duty to investors by making recommendations where they have a conflict of interest with their clients, making unsuitable recommendations, charging unreasonable fees, failing to disclose conflicts of interest, including those related to how Defendants and their sales representatives or other agents were paid, and making material misrepresentations or omissions to investors.

123.    Regarding suitability, Defendants engaged in fraud and violated their fiduciary duty through conduct including, but not limited to, the following:

    a.  Defendants targeted primarily senior and retirement-age investors with scare tactics to instill the fear that investors' Qualified Retirement Savings, including securities, were imperiled by government action or market forces;

    b.  Defendants failed to make reasonable inquiry into, or take consideration of, investors' investment objectives, financial situation and needs, or station in life when advising investors to liquidate their Qualified Retirement Savings;

    c.  Defendants used information gathered about investors' circumstances to encourage investment in Precious Metals Bullion instead of using the information to determine the suitability of the recommendations for the investors;

    d.  Defendants advised investors to transfer their entire Qualified Retirement Savings to Precious Metals Bullion—a single alternative asset class; and

    e.  Defendants failed to advise investors of the recommendation in Metals'

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 89 of 194   PageID 2323

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 36 of 108   PageID 95
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 35 of 108   PageID 37

Customer Agreements that no investor should invest more than 20 percent of the available investment funds in Precious Metals Bullion, and instead advised Defendants to transfer as much funds as they could, up to their entire Qualified Retirement Savings.

124.   Defendants further violated their fiduciary duty to investors by charging Spreads that constitute an unreasonable fee. The Spreads disclosed in the Customer Agreements lack definiteness and are unreasonable at the upper end of the range. Most egregiously, and fraudulently, the Spreads actually charged investors were far greater than the range represented in the Customer Agreements. In particular:

a.   The Spread indicated by Metals' Customer Agreements for IRA transactions ranged from 2-33% in Customer Agreement #1 and from 1-19.9% in Customer Agreement #2. The Customer Agreement describes Precious Metals Bullion products with a Spread of 1-5% and actual purchases of other Precious Metals Bullion had a Spread of 9%;

b.   The Spread actually charged to investors for Polar Bear Bullion had no rational relationship to the Spread or fee Metals' otherwise represented or charged for other Precious Metals Bullion;

c.   The range of the Spread indicated by Metals' Customer Agreements for IRA transactions lacked definiteness and disclosed an unreasonable range, leaving the true cost to prospective investors uncertain;

d.   Most of the range of the Spread indicated by Metals' Customer Agreements for IRA transactions provided a fee far in excess of IAs & IARs' industry standards; and

e.   Defendants knew that due to the size of the Spread actually charged investors, in addition to the upper ranges of the Spread represented in the Customer Agreements for IRA transactions, investors' ability to profit and not sustain a loss on the overpriced Precious Metals Bullion were dependent on the Prevailing Market Price appreciating significantly above historical all-time high prices and selling their Precious Metals Bullion could incur additional transaction costs.

125.   Defendants, directly and by and through their sales representatives or other agents, engaged in fraud and violated their fiduciary duty by making material misrepresentations

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 90 of 194   PageID 2324

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 37 of 109   PageID 96
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 36 of 108   PageID 38

and material omissions in providing investment advice to investors to transfer their Qualified

Retirement Savings, including divesting themselves of securities, and purchase Precious Metals

Bullion from Metals.

126.    Defendants, directly and by and through their sales representatives or other

agents, made material misrepresentations and material omissions regarding Qualified Retirement

Savings, including securities, as compared to Precious Metals Bullion which included, but were

not limited to, the following:

    a.  Made misleading statements to instill fear in elderly and retirement-aged
investors about their Qualified Retirement Savings in order to justify the
advice to liquidate and transfer these funds to Defendants for purchase of
Precious Metals Bullion;

    b.  Misrepresented that the government was going to take their retirement funds
from Qualified Retirement Savings in a "Bail-in" to help banks and
government programs;

    c.  Misrepresented that IRA custodians are in bad shape, custodians are likely to
fall apart, and that it is unclear who actually owns the underlying securities
held in Qualified Retirement Savings accounts;

    d.  Misrepresented that the government could seize funds held in Qualified
Retirement Savings, but not Precious Metals Bullion accounts;

    e.  Misrepresented that Precious Metals Bullion investments could not lose value;

    f.  Misrepresented that investors would profit from Precious Metals Bullion;

    g.  Misrepresented that Precious Metals Bullion would provide a greater rate of
return that securities;

    h.  Misrepresented that the tax benefits of Precious Metals Bullion were better
than securities;

    i.  Misrepresented that Precious Metals Bullion were definitively a safer, more
conservative, or less volatile investment than securities; and

    j.  Omitted that precious metals involve considerable risk and are at times

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 91 of 194   PageID 2325

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 38 of 109   PageID 97
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 37 of 108   PageID 39

volatile investments that are affected by economic conditions, political events, and speculative activities.

127.   Defendants, by and through their sales representatives or other agents, made material misrepresentations and material omissions regarding their connections to and relationships with conservative media personalities which included, but were not limited to, the following:

    a.   Misrepresented that Asher and Batashvili are friends with a conservative television and radio personality and that this conservative personality recommended buying Precious Metals Bullion, despite receiving a cease and desist demand from this media personality to stop touting this purported affiliation; and

    b.   Misrepresented that this conservative television and radio personality was affiliated with, backed, or endorsed Metals despite receiving a cease and desist demand from this media personality to stop touting this purported affiliation.

128.   Defendants, directly and by and through their sales representatives or other agents, made material misrepresentations and material omissions regarding the experience and expertise of their sales representatives or other agents which included, but were not limited to, the following:

    a.   Misrepresented and/or omitted their lack of experience in determining whether securities and other investments constitute suitable investments for the investor;

    b.   Misrepresented or omitted their lack of experience in valuing securities and calculating market volatility;

    c.   Misrepresented or omitted their lack of experience in forecasting economic conditions, such as the likelihood of recession and the possibility of inflation, as well as predicting the exchange rate of the Dollar; and

    d.   Misrepresented or omitted their experience in determining whether securities and other investments constitute appropriate products for these elderly investors.

37

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 92 of 194   PageID 2326

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 39 of 109   PageID 98
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 38 of 108   PageID 40

129.   Defendants, directly and by and through their sales representatives or other agents, made material omissions by failing to disclose information about complaints, including complaints relating to fraudulent, deceptive, and illegal practices, sent, submitted, or otherwise levied by prior investors.

130.   Defendants, directly and by and through their sales representatives or other agents, made material omissions by failing to disclose the identities of Defendants' sales representatives or other agents during interactions with investors by using false names and not disclosing the true identity of Defendants' sales representatives or other agents.

131.   Defendants, directly and by and through their sales representatives or other agents, made material misrepresentations and material omissions regarding their compensation structure which included, but were not limited to, the following:

a.   Misrepresented how the Defendants' sales representatives or other agents were compensated; and

b.   Failed to reveal conflicts of interest arising from Defendants' sales representative compensation being tied to the amount of funds from investors' Qualified Retirement Savings invested in Precious Metals Bullion.

132.   Defendants, directly and by and through their sales representatives or other agents, made material misrepresentations regarding their Spread and fees, which included, but were not limited to, the following:

a.   Misrepresented to investors that Metals would pay any fees, such as storage fees, associated with their Precious Metals Bullion for the first 2-5 years, depending on the investor; and

b.   Misrepresented to investors that the funds transferred from Qualified Retirement Savings and Cash Accounts were used to purchase Precious Metals Bullion, when in fact Metals and Barrick charged large percentages in excess of the Prevailing Market Price.

38

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 93 of 194   PageID 2327

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 40 of 109   PageID 99
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 39 of 108   PageID 41

133.     Defendants, directly and by and through their sales representatives or other

agents, made material omissions regarding Defendants' Spread on Precious Metals Bullion,

which included, but were not limited to, the following:

    a.  Failed to disclose the actual Spread charged to investors;

    b.  Failed to disclose the method of calculating compensation and amount of
compensation actually paid to sales representatives or other agents who sold
Precious Metals Bullion to investors;

    c.  Failed to disclose that the Spreads actually charged and that the Spreads
represented in Customer Agreement #1 and Customer Agreement #2
materially impacted investors' ability to profit and the risk of loss;

    d.  Failed to disclose that an investor's ability to profit and not sustain a loss on
the Precious Metals Bullion investment was dependent on the Prevailing
Market Price appreciating significantly above historical all-time high prices
and selling their Precious Metals Bullion could incur additional transaction
costs;

    e.  Failed to disclose the losses that investors would incur upon transferring their
Qualified Retirement Savings to a SDIRA and purchasing Precious Metals
Bullion based on the Spread actually charged by Metals or the Spread
represented in Customer Agreement #1 and Customer Agreement #2; and

    f.  Failed to disclose that Precious Metals Bullion might not appreciate enough to
cover storage and SDIRA fees associated with Precious Metals Bullion
investments.

**c.   The Fraud Defendants Engaged in Violates Additional States' Laws**

134.     The foregoing conduct also violates state laws prohibiting: (1) any person from

making material misrepresentations or omissions in connection with the offer, purchase, or sale

of securities, (2) material misrepresentations or omissions in connection with the offer, purchase,

or sale of commodities, (3) unfair or deceptive trade practices, and (4) financial exploitation of

the elderly.

135.     Defendants, directly and by and through their sales representatives or other

Case 3:21-cv-02181-X  Document 209  Filed 08/04/23  Page 94 of 194  PageID 2328

Case 3:21-cv-02181-S  Document 1-3  Filed 09/13/21  Page 41 of 109  PageID 100
Case 3:20-cv-02910-L  Document 2  Filed 09/22/20  Page 40 of 108  PageID 42

agents, used material misrepresentations and omissions as set forth in paragraphs 124 through 131 and elsewhere in this complaint in connection with investors' sale of securities held in Qualified Retirement Savings.

136.    Through these material misrepresentations and omissions, Defendants solicited investors to sell securities in order to ultimately gain access to those funds through the sale of overpriced Precious Metals Bullion. The profits obtained by the Defendants and compensation paid to their sales representatives or other agents were related to the amount of Qualified Retirement Savings, including securities, that Defendants convinced investors to liquidate.

137.    The conduct described in paragraphs, 55 through 75, 124 through 131, and elsewhere in this complaint also violates state law governing commodities fraud, unfair or deceptive trade practices, and financial exploitation of the elderly.

## V.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS

### COUNT I

#### Fraud

**Violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (2018), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019)**

*(Brought by all Plaintiffs)*

138.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

139.    During the Relevant Period, Defendants, individually and also operating as a common enterprise, and acting through various officers, employees or agents, intentionally or recklessly, in connection with contracts of sale of commodities in interstate commerce,

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 95 of 194   PageID 2329

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 42 of 109   PageID 101
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 41 of 108   PageID 43

    a. Used or employed, or attempted to use or employ, a scheme or artifice to defraud;

    b. Made, or attempted to make untrue or misleading statements of material fact, or omitted to state material facts necessary to make the statements made not untrue or misleading; and/or

    c. Engaged in, or attempted to engage in, acts, practices, or a course of business that operated or would operate as a fraud or deceit on Metals' and Barrick's customers.

140.  As a result of the foregoing conduct, Defendants' fraudulent conduct violated 7 U.S.C. § 9(1) (2018) and 17 C.F.R. § 180.1(a)(1)-(3) (2019).

141.  The acts, omissions, and failures of Asher and Batashvili and other officials, agents, or persons acting for Metals and Barrick described in this Complaint, including sales representatives or other agents, have occurred within the scope of their employment, agency, or office with Metals and Barrick are deemed to be the acts, omissions, and failures of Metals and Barrick by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2018), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2019).

142.  Asher and Batashvili controlled Metals and Barrick and have not acted in good faith or have knowingly induced, directly or indirectly, the acts constituting Metals' and Barrick's violations alleged in this count. As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2018), Asher and Batashvili are liable for Metals' and Barrick's violations of 7 U.S.C. § 9(1) (2018), and 17 C.F.R. § 180.1(a)(1)-(3) (2019), as controlling persons.

143.  At all times relevant to this Complaint, Asher and Batashvili acted within the course and scope of their employment, agency, or office with Metals and Barrick. Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2018), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2019), Metals and Barrick are liable as principals for Asher's, Batashvili's, and their other

41

Case 3:21-cv-02181-X  Document 209  Filed 08/04/23  Page 96 of 194  PageID 2330

Case 3:21-cv-02181-S  Document 1-3  Filed 09/13/21  Page 43 of 109  PageID 102
Case 3:20-cv-02910-L  Document 2  Filed 09/22/20  Page 42 of 108  PageID 44

agents' acts and omissions in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

144.    Each use or employment or attempted use or employment of any manipulative

device, scheme, or artifice to defraud; untrue or misleading statement of fact, omission of

material fact necessary to make statements not untrue or misleading; or act of engaging, or

attempting to engage, in acts, practices or courses of business that operated or would have

operated as a fraud or deceit on Metals' and Barrick's investors is alleged as a separate and

distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

## VI.  VIOLATIONS OF THE CODE OF ALABAMA

*(Brought by Plaintiff State of Alabama)*

### Securities Fraud
### Definitions

145.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

146.    Section 8-6-2(7), Code of Alabama (1975), defines the term "person" to include a

natural person; a corporation created under the laws of this or any other state, country,

sovereignty, or political subdivision thereof; a partnership; an association; a joint-stock

company; a trust, excluding testamentary trusts, trusts for the benefit of the creator or another,

court-created trusts, or public charitable trusts; and any unincorporated organization.

147.    Section 8-6-2(10), Code of Alabama (1975) defines the term "security" broadly to

include, but not limit to, any note, stock, treasury stock, bond, debenture, evidence of

indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-

trust certificate, preorganization certificate or subscription, transferable share, investment

Case 3:21-cv-02181-X    Document 209    Filed 08/04/23    Page 97 of 194    PageID 2331

Case 3:21-cv-02181-S    Document 1-3    Filed 09/13/21    Page 44 of 109    PageID 103
Case 3:20-cv-02910-L    Document 2    Filed 09/22/20    Page 43 of 108    PageID 45

contract, as well as any instrument of any kind commonly known as a security.

148.    Section 8-6-2(18), Code of Alabama (1975), defines an investment adviser as any person, who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

149.    Section 8-6-2(19), Code of Alabama (1975), defines an investment adviser representative as any partner, officer, director of (or a person occupying a similar status or performing similar functions) or other individual employed by or associated with an investment adviser, except clerical or ministerial personnel, who makes any recommendation or otherwise renders advice regarding securities; manages accounts or portfolios of clients; determines which recommendation or advice regarding securities should be given; and/or supervises employees who perform any of the foregoing.

## COUNT II

### Unregistered Investment Adviser and Investment Adviser Representatives Violations of § 8-6-3(b) and (c), Code of Alabama (1975)

150.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

151.    Section 8-6-3(b) Code of Alabama (1975) makes it unlawful for any person to transact business in the State of Alabama as an investment adviser or as an investment adviser representative unless:

(1) He or she is so registered under Article 6 of the Alabama Code (1975);

(2) His or her only clients in this state are investment companies as defined in the Investment Company Act of 1940, other investment advisers, broker-dealers,

43

Case 3:21-cv-02181-X    Document 209    Filed 08/04/23    Page 98 of 194    PageID 2332

Case 3:21-cv-02181-S    Document 1-3    Filed 09/13/21    Page 45 of 109    PageID 104
Case 3:20-cv-02910-L    Document 2    Filed 09/22/20    Page 44 of 108    PageID 46

banks, trust companies, savings and loan associations, insurance companies, employee benefit plans with assets of not less than $1,000,000, and governmental agencies or instrumentalities, whether acting for themselves or as trustees with investment control, or other institutional investors as are designated by rule or order of the commission; or

(3) He or she has no place of business in the state and during any period of 12 consecutive months does not direct business communications in this state in any manner to more than five clients, other than those specified in the previous subdivision, whether or not he, she, or any of the persons to whom the communications are directed is then present in the state.

152.    Section 8-6-3(c) Code of Alabama (1975) makes it unlawful for any investment adviser required to be registered to employ an investment adviser representative unless the investment adviser representative is registered under Article 6 of the Code of Alabama (1975).

153.    Metals and Barrick unlawfully acted as investment advisers by, for compensation, engaging in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of selling securities.

154.    Asher and Batashvili unlawfully acted as investment adviser representatives by being a partner, officer, director of (or a person occupying a similar status or performing similar functions) or other individual employed by or associated with Metals and Barrick, who made recommendations or otherwise rendered advice regarding securities; determined which recommendation or advice regarding securities should be given; and supervised employees, to include sales representatives or other agents, who performed these functions.

155.    During the relevant period, the Defendants were at no time registered as Investment Advisers or Investment Adviser Representatives in the State of Alabama and had not perfected an exemption.

156.    As a result of their conduct, the Defendants violated Sections 8-6-3(b) and (c),

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 99 of 194   PageID 2333

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 46 of 109   PageID 105
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 45 of 108   PageID 47

Code of Alabama (1975).

## COUNT III

**Investment Advice Fraud**
**Violations of § 8-6-17(b)(2), Code of Alabama (1975)**

157.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

158.     Section 8-6-17(b)(2), Code of Alabama (1975), makes it unlawful for any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person.

159.     During the relevant period, the Defendants, willfully and unlawfully, directly or indirectly, by and through others, including their sales representatives or other agents, received compensation from Alabama investors by fraudulently and deceitfully advising Alabama investors to sell their securities held in Qualified Retirement Savings, and then use those funds to purchase Precious Metals Bullion. The fraudulent and deceitful advice resulted in the Defendants converting the majority of the investment funds to their own benefit without the knowledge of the Alabama Investors.

160.     As a result of their conduct, the Defendants violated Section 8-6-17(b)(2), Code of Alabama (1975).

## COUNT IV

**Material Misrepresentations & Omissions in Connection with the Sale of a Security**
**Violations of § 8-6-17(a)(2), *Code of Alabama* (1975)**

45

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 100 of 194   PageID 2334

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 47 of 109   PageID 106
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 46 of 108   PageID 48

161.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

162.    Section 8-6-17(a)(2) makes it unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

163.    During the relevant period, Defendants, willfully and unlawfully, in connection with the sale of any security, directly or indirectly, by and through others, including their sales representatives or other agents, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, as contained in the complaint. As a result of the material misrepresentations and omissions by the Defendants, Alabama investors sold their securities held in Qualified Retirement Savings, and then used those funds to purchase Precious Metals Bullion. The material misrepresentations and omissions resulted in the Defendants converting the majority of the investment funds to their own benefit without the knowledge of the Alabama Investors.

164.    As a result of their conduct, the Defendants violated Section 8-6-17(a)(2), *Code of Alabama* (1975).

## COUNT V

### Financial Exploitation of the Elderly
### Definitions

165.    Section 13A-6-191(3), Code of Alabama (1975), defines an elderly person as a

person 60 years of age or older.

166.    Section 13A-6-191(2), Code of Alabama (1975), defines deception as occurring

when a person knowingly:

    a.   Creates or confirms another's impression which is false and which the
defendant does not believe to be true;

    b.   Fails to correct a false impression which the defendant previously has created
or confirmed;

    c.   Fails to correct a false impression when the defendant is under a duty to do so;

    d.   Prevents another from acquiring information pertinent to the disposition of the
property involved;

    e.   Sells or otherwise transfers or encumbers property, failing to disclose a lien,
adverse claim, or other legal impediment to the enjoyment of the property,
whether that impediment is or is not valid, or is not a matter of official record;

    f.   Promises performance which the defendant does not intend to perform or
knows will not be performed.

167.    Section 13A-6-191(5), Code of Alabama (1975), defines financial exploitation as

the use of deception, intimidation, undue influence, force, or threat of force to obtain or exert

unauthorized control over an elderly person's property with the intent to deprive the elderly

person of his or her property or the breach of a fiduciary duty to an elderly person by the person's

guardian, conservator, or agent under a power of attorney which results in an unauthorized

appropriation, sale, or transfer of the elderly person's property.

47

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 102 of 194   PageID 2336

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 49 of 109   PageID 108
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 48 of 108   PageID 50

## Financial Exploitation of the Elderly
### Violations of § 13A-6-195, *Code of Alabama* (1975)

168.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

169.    Section 13A-6-195 Code of Alabama (1975) makes it unlawful for any person to financially exploit an elderly person in which the value of the property taken exceeds two thousand five hundred dollars ($2,500).

170.    During the relevant period, the Defendants, by and through others, including their sales representatives or other agents, intentionally and knowingly used deception to obtain or exert unauthorized control over the retirement funds of Alabama Investors with the intent to deprive the Alabama Investors of a majority of their retirement funds. Each Alabama Investor was 60 years of age or older and lost more than $2,500.00 dollars.

171.    Due to the deceptive conduct and statements made by the Defendants, by and through others, including their sales representatives or other agents, Alabama investors liquidated Qualified Retirement Savings and purchased Precious Metals Bullion. The deception resulted in the Defendants converting the majority of the investment funds to their own benefit without the knowledge of the Alabama Investors.

172.    As a result of their conduct, the Defendants violated Section 13A-6-195, *Code of Alabama* (1975).

48

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 103 of 194   PageID 2337

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 50 of 109   PageID 109
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 49 of 108   PageID 51

## VII.  VIOLATIONS OF THE ALASKA STATUTES

*(Brought by Plaintiff State of Alaska)*

### COUNT VI

**Unfair Trade Practices**
**Violations of Alaska Stat. § 45.50.471**

173.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

174.     Alaska Stat. § 45.50.471(a) provides that "Unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful."

175.     Alaska Stat. § 45.50.471(b) provides that "[t]he terms 'unfair methods of competition' and 'unfair or deceptive acts or practices' include the following acts: . . .

> (11) engaging in any other conduct creating a likelihood of confusion or of misunderstanding and that misleads, deceives, or damages a buyer or a competitor in connection with the sale or advertisement of goods or services;
> (12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged;
> . . .
> (35) violating Alaska Stat. § 45.63 (solicitations by telephonic means) ...

176.     Metals, Barrick, Batashvili, and Asher, and their agents or employees, engaged in conduct creating a likelihood of confusion or misunderstanding that mislead, deceived, or damaged buyers in connection with the sale or advertisement of goods.

177.     Metals, Barrick, Batashvili, and Asher, and their agents or employees, used or employed deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealed, suppressed, or omitted material facts with the intent that others rely upon the

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 104 of 194   PageID 2338

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 51 of 109   PageID 110
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 50 of 108   PageID 52

concealment, suppression, or omission in connection with the sale or advertisement of goods.

178.   Alaska Stat. § 45.63.010(a) provides that:

> A person may not sell or attempt to sell property or services by telephonic means if the person makes substantially the same offer on substantially the same terms to two or more persons, unless the telephone seller is registered with the Department of Law at least 30 days before the solicitation campaign.

179.   Alaska Stat. § 45.63.100(a)(4) and (5) provide that:

> (4) "solicitation campaign" means a sale or attempt to sell property or services by telephonic means by making substantially the same offer on substantially the same terms to two or more persons.
> (5) "telephone seller" means a person required to be registered under Alaska Stat. § 45.63.010.

180.   Through telephonic means, Metals, Barrick, Batashvili, and Asher, and their employees or agents, offered to sell or sold substantially similar property or services on substantially similar terms to two or more persons, but did not register with the Department of Law. Specifically, Metals, Barrick, Batashvili, and Asher, directly and by and through their agents or employees, sold Precious Metals Bullion to at least eight Alaska investors at a Spread so high it consumed more than half of the amount initially invested and used similar standard form agreements for each transaction.

181.   As described herein, Metals, Barrick, Batashvili, and Asher engaged in unfair and deceptive acts or practices in violation of Alaska Stat. § 45.50.471 related to the sale of Precious Metals Bullion and related financial services.

182.   Batashvili and Asher had actual knowledge, were recklessly indifferent, or knew that it was highly probable that Metals and Barrick or the agents and employees of Metals and Barrick were engaging in unfair or deceptive acts or practices. Batashvili and Asher had the

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 105 of 194   PageID 2339

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 52 of 109   PageID 111
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 51 of 108   PageID 53

authority to control the unfair or deceptive acts or practices that Metals, Barrick, and their employees or agents engaged in. Batashvili and Asher are thus liable for any such violations of Alaska Stat. § 45.50.471 committed by Metals or Barrick, regardless of whether Batashvili and Asher personally committed the violations.

183.    Because Metals and Barrick are a common enterprise, Metals and Barrick are both liable for any violations of Alaska Stat. § 45.50.471.

184.    Batashvili and Asher used Metals and Barrick to perpetuate the fraudulent scheme. Batashvili and Asher are thus liable for any violations of Alaska Stat. § 45.50.471, regardless of whether Batashvili and Asher personally committed the violations.

## VIII. VIOLATIONS OF THE CALIFORNIA STATUTES

*(Brought by Plaintiff State of California)*

### COUNT VII

**Unlicensed Investment Advice**
**(Cal. Corp. Code, § 25230)**

185.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

186.    An "investment adviser" is defined under the Corporate Securities Law of 1968 (CSL) (Corp. Code, § 25000 et seq.) section 25009 in relevant part as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of . . . selling securities . . . "

187.    California Corporations Code section 25230 provides, in relevant part:

(a) It is unlawful for any investment adviser to conduct business as an investment adviser in this state unless the investment adviser has first

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 106 of 194   PageID 2340

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 53 of 109   PageID 112
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 52 of 108   PageID 54

applied for and secured from the commissioner a certificate, then in effect,
authorizing the investment adviser to do so or unless the investment
adviser is exempted by the provisions of Chapter 1 (commencing
with Section 25200) of this part or unless the investment adviser is subject
to Section 25230.1.

188.   California Corporations Code section 25403 provides:

(a) Every person who with knowledge directly or indirectly controls and induces
any person to violate any provision of this division or any rule or order thereunder
shall be deemed to be in violation of that provision, rule, or order to the same
extent as the controlled and induced person.

(b) Any person that knowingly provides substantial assistance to another
person in violation of any provision of this division or any rule or order
thereunder shall be deemed to be in violation of that provision, rule, or
order to the same extent as the person to whom the assistance was
provided.

(c) It shall be unlawful for any person directly or indirectly to do any act
or thing which would be unlawful for that person to do under any
provision of this division or any rule or order thereunder through or by any
other person.

(d) Nothing in this section shall be construed to limit the power of the state to
punish any person for any conduct which constitutes a crime under any other
statute.

189.   At all relevant times, Defendants working from their Beverly Hills, California

offices conducted business as investment advisers without a certificate from the Commissioner,

or a valid exemption, in violation of CSL section 25230 by the conduct described in this

complaint including warning senior citizens that the stock market was due for an imminent,

major crash, worse than 2008, and advising investors to sell securities to purchase Precious

Metals Bullion to save and protect their investment because the government could seize

retirement savings and bank accounts, but not Precious Metals Bullion holdings. Defendants

further warned investors that leaving investments in the securities markets was dangerous to

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 107 of 194   PageID 2341

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 54 of 109   PageID 113
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 53 of 108   PageID 55

investors' financial future. Defendants gained, and investors lost, when investors sold securities and purchased overpriced Precious Metals Bullion.

190.    Alternatively, Metals and Barrick violated CSL section 25230 and Batashvili and Asher, as Metals and Barrick's founders and owners, knowingly controlled and induced, or knowingly substantially assisted, Metals and Barrick's violations of CSL section 25230, by the conduct described in this complaint including: (1) hiring, training, and supervising sales representatives or other agents, (2) training sales representatives or other agents to provide investors with securities market and Precious Metals Bullion advice, and (3) training sales representatives or other agents to advise investors to sell their Qualified Retirement Savings to purchase Precious Metals Bullion.

## COUNT VIII

### Investment Adviser Fraud
### (Cal. Corp. Code § 25235)

191.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

192.    California Corporations Code section 25235 provides, in relevant part:

> It is unlawful for any investment adviser, directly or indirectly, in this state:
> (a) To employ any device, scheme, or artifice to defraud any client or prospective client.
> (b) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon any client or prospective client.

193.    At all relevant times, Defendants violated CSL section 25235 by the conduct described in this complaint including operating a scheme to defraud investors out of their

53

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 108 of 194   PageID 2342

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 55 of 109   PageID 114
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 54 of 108   PageID 56

retirement savings by misrepresenting to elderly and retirement aged investors that the securities

markets would imminently crash, worse than the 2008 crash, and that the government could seize

funds held in retirement accounts but not Precious Metals Bullion accounts, which were safer

and less volatile than securities accounts and could not lose value. Inexperienced, trusting, senior

citizens allowed Defendants to choose the Precious Metals Bullion they purchased. Defendants

deceptively placed approximately 90% of all investors' investments in overpriced Polar Bear

Bullion and Barrick Bullion. Defendants failed to disclose: (1) the risks associated with investing

in Precious Metals Bullion, (2) conflicts of interest arising from Defendants' compensation being

tied to the amount of funds invested, and (3) the Markup on the overpriced Precious Metals

Bullion.

194.    Alternatively, Metals and Barrick violated CSL section 25235 and Batashvili and

Asher as Metals' and Barrick's founders and owners, knowingly controlled and induced, or

knowingly substantially assisted, Metals and Barrick's violations of CSL section 25235, by: (1)

hiring, training, and supervising sales representatives or other agents, (2) training sales

representatives or other agents to provide investors with securities market and Precious Metals

Bullion advice; (3) training sales representatives or other agents to direct investors to sell their

Qualified Retirement Savings to purchase Precious Metals Bullion, (4) choosing the Precious

Metals Bullion that trusting, inexperienced, senior citizens purchased, and placing approximately

90% of all investors' investments in the overpriced Polar Bear Bullion and Barrick Bullion ; and

(5) failing to disclose Defendants' Markup, leading to investors' immediate loss, when investors

purchased the overpriced Precious Metals Bullion.

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 109 of 194   PageID 2343

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 56 of 109   PageID 115
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 55 of 108   PageID 57

## COUNT IX

### Commodities Fraud
### (Cal. Corp. Code, § 29536)

195.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

196.    California Corporations Code section 29536 provides:

It is unlawful for any person, directly or indirectly, in connection with the
purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into,
or the entry into, a commodity, commodity contract, or commodity option to do
any of the following:

(a) To willfully employ any device, scheme, or artifice to defraud.

(b) To willfully make any false report, enter any false record, make any
untrue statement of a material fact, or omit to state a material fact
necessary in order to make the statements made, in the light of the
circumstances under which they were made, not misleading.

(c) To willfully engage in any transaction, act, practice, or course of
business which operates or would operate as a fraud or deceit upon any
persons.

(d) To willfully misappropriate or convert the funds, security, or property of any
other person

197.    California Corporations Code section 29552 provides:

Any person who materially assists in any violation of this law, or any rule or order
of the commissioner under this law, is jointly and severally liable with any other
person liable under this law for the violation.

198.    Under California Commodity Law of 1990 (CCL) (Corp. Code, § 29500 et seq.)

sections 29504 and 29515, precious metals including gold and silver coins and bullion are

"commodities."

199.    Under CCL section 29505, a "commodity contract" means "any account,

agreement, or contract for the purchase or sale, primarily for speculation or investment purposes and not for consumption by the offeree or purchaser . . .."

200.    At all relevant times, Defendants offered to sell and sold, and offered to purchase and purchased, commodities and entered into commodity contracts from its principal place of business in Beverly Hills, California.

201.    CCL section 29536 applies to the transactions, agreements, or contracts offered by Defendants.

202.    At all relevant times Defendants violated CCL section 29536 by the conduct described in this complaint including employing a scheme to defraud investors out of their retirement savings by misrepresenting to elderly and retired aged investors that the securities markets would imminently crash, worse than the 2008 crash, and that the government could seize funds held in retirement accounts but not Precious Metals Bullion accounts, which were safer and less volatile than securities accounts and could not lose value. Inexperienced, trusting, senior citizens allowed Defendants to choose the Precious Metals Bullion they purchased. Defendants deceptively placed approximately 90% of all investors' investments in overpriced Polar Bear Bullion and Barrick Bullion. Defendants failed to disclose: (1) the risks associated with investing in Precious Metals Bullion, (2) conflicts of interest arising from Defendants' compensation being tied to the amount of funds invested, and (3) the Markup on the overpriced Precious Metals Bullion.

203.    Alternatively, Metals and Barrick violated CCL section 29536 and Batashvili and Asher as Metals and Barrick's founders and owners knowingly controlled and induced, or knowingly substantially assisted, Metals and Barrick's violations of CCL section 29536, by the

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 111 of 194   PageID 2345

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 58 of 109   PageID 117
Case 3:20-cv-02910-L   Document 2-3   Filed 09/22/20   Page 57 of 108   PageID 59

conduct described in this complaint including: (1) hiring, training, and supervising sales representatives or other agents, (2) training sales representatives or other agents to provide investors with securities market and Precious Metals Bullion advice, (3) training sales representatives or other agents to direct investors to sell their Qualified Retirement Savings to purchase Precious Metals Bullion, (4) choosing the Precious Metals Bullion that trusting, inexperienced, senior citizens purchased, and placing approximately 90% of all investors' investments in the overpriced Polar Bear Bullion and Barrick Bullion ; and (5) failing to disclose Defendants' Markup, leading to investors' immediate loss, when investors purchased the overpriced Precious Metals Bullion.

## IX.  VIOLATIONS OF THE COLORADO STATUTES

*(Brought by Plaintiff State of Colorado)*

### COUNT X

**Commodities Fraud**
**§§ 11-53-107(1)(a)-(c), C.R.S.**

204.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

205.    In connection with the purchase or sale of a commodity contract or option, the offer to sell or offer to purchase a commodity contract or option, the offer to enter into a commodity contract or option, or the entry into a commodity contract or option, Defendants, directly or indirectly, in violation of § 11-53-107(1)(a)–(c), C.R.S., did:

    a.  Cheat or defraud, attempt to cheat or defraud, or employ a device, scheme, or artifice to defraud;

    b.  Make a false report, enter a false record, make an untrue statement of material fact or omit to state a material fact necessary to make the statements made, in

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 112 of 194   PageID 2346

Case 3:21-cv-02181-S   Document 13   Filed 09/13/21   Page 59 of 189   PageID 118
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 58 of 168   PageID 60

        light of the circumstances under which they were made, not misleading; or

    c.   Engage in a transaction, act, practice, or course of business, including without limitation any form of advertising or solicitations, which operates or would operate as a fraud or deceit on Metals customers or potential customers.

206.    At all times relevant to this Complaint, Batashvili and Asher acted within the scope of their employment or office with Metals and Barrick. Pursuant to § 11-53-109(1), C.R.S., Metals and Barrick are liable as principals for Batashvili's and Asher's violations of § 11-53-107, C.R.S.

207.    At all times relevant to this Complaint, Defendants Batashvili and Asher controlled Metals and Barrick and have not acted in good faith or have knowingly induced, directly or indirectly, the acts constituting Metals' and Barrick's violations alleged in this Count. As a result, pursuant to § 11-53-109(2), C.R.S., Defendants Asher and Batashvili are liable for Metals' and Barrick's violations of § 11-53-107, C.R.S.

## COUNT XI

### Securities Fraud
### Violations of §§ 11-51-501(1)(a), (b) and (c), C.R.S.

208.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

209.    In connection with the sale of securities in Colorado, the Defendants, directly or indirectly:

    a.   employed a device, scheme or artifice to defraud;

    b.   made written and oral untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.   engaged in acts, practices or courses of business which operated and would

operate as a fraud and deceit on investors;

all in violation of § 11-51-501(1), C.R.S.

## X.   VIOLATIONS OF FLORIDA STATUTES

*(Brought by Plaintiff State of Florida)*

### <u>COUNT XII</u>

**Deceptive and Unfair Trade Practices
Violations of Fla. Stat. 501.204**

210.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

211.   At least 60 or more Florida consumers, including consumers aged 60 or older, relied on the Defendants' misrepresentations, false statements, and omissions of material fact, which were made through phone, email, and written communications, in deciding to purchase Precious Metals Bullion or other bullion from the Defendants.

212.   At least 60 or more Florida consumers opened SDIRAs at the recommendation of the Defendants or their sales agents to facilitate the transactions.

213.   Certain of these Florida consumers purchased more than one form of Polar Bear Bullion at the recommendation of the Defendant or their sales agents.

214.   At least 60 or more Florida consumers have suffered harm, and certain Florida consumers continue to suffer harm, associated with the Defendants' deceptive and unfair trade practices.

215.   Section 501.204(1), Florida Statutes, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), provides that unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are

59

unlawful. Misrepresentations, false statements or omissions of material fact constitute deceptive acts or practices prohibited by FDUTPA.

216.    Section 501.203(7), Florida Statutes, defines "consumer" as "an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination."

217.    Section 501.203(8), Florida Statutes, defines "trade or commerce" as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated."

218.    During the Relevant Period, Defendants and their agents or employees, individually or as a common enterprise, violated Section 501.204(1), Florida Statutes, in each of 60 or more transactions with Florida consumers, because they made representations or omissions of material fact in trade or commerce to Florida consumers which were likely to mislead a consumer acting reasonably in the circumstances to the consumer's detriment.

## COUNT XIII

**Commodities Prohibited Practices - Fraud**
**Violations of Fla. Stat. 517.275**

219.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

220.    Section 517.275, Florida Statutes, provides "[i]t is unlawful and a violation of this chapter for any person to engage in any act or practice in or from this state, which act or practice

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 115 of 194   PageID 2349

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 62 of 109   PageID 121
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 61 of 108   PageID 63

constitutes a violation of any provision of the Commodity Exchange Act, 7 U.S.C. ss. 1 *et seq.*,

as amended, or the rules and regulations of the Commodity Futures Trading Commission

adopted under that act as amended."

221.   During the Relevant Period, Defendants and their agents or employees,

individually or as a common enterprise, violated the Commodity Exchange Act as set forth in

Count I of this Complaint, in each of 60 or more transactions with Florida investors, and thereby

violated Section 517.275, Florida Statutes, on 60 or more occasions.

## XI.  VIOLATIONS OF THE GEORGIA CODE

*(Brought by Plaintiff State of Georgia)*

### COUNT XIV

**Unregistered Investment Adviser**
**Violations of Ga. Code Ann. § 10-5-32**

222.   The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

223.   Ga. Code Ann. § 10-5-2 provides in relevant part:

> A.   "Investment adviser" means a person that, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as a part of a regular business, issues or promulgates analysis or reports concerning securities. The term includes a financial planner or other person that, as an integral component of other financially related services, provides investment advice to others for compensation as part of a business or that holds itself out as providing investment advice to others for compensation

> B.   "Investment adviser representative" means an individual employed by or associated with an investment adviser

61

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 116 of 194   PageID 2350

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 63 of 109   PageID 122
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 62 of 108   PageID 64

or federal covered investment adviser who makes any recommendations or otherwise gives investment advice regarding securities, manages accounts or portfolios of clients, determines which recommendation or advice regarding securities should be given, provides investment advice or holds herself or himself out as providing investment advice, receives compensation to solicit, offer, or negotiate for the sale of or for selling investment advice, or supervises employees who perform any of the foregoing.

224.   Ga. Code Ann. § 10-5-32 provides in relevant part:

A.   It is unlawful for a person to transact business in this state as an investment adviser unless the person is registered under this chapter as an investment adviser or is exempt from registration as an investment adviser.

B.   It is unlawful for an individual to transact business in this state as an investment adviser representative unless the individual is registered under this chapter as an investment adviser representative or is exempt from registration as an investment adviser.

225.   Ga. Code Ann. § 10-5-33 provides in relevant part:

It is unlawful for an individual to transact business in this state as an investment adviser representative unless the individual is registered under this chapter as an investment adviser representative or is exempt from registration as an investment adviser

226.   Metals unlawfully acted as an investment adviser because Metals, for compensation, engaged in the business of advising another, directly and/or through publications or writings, with respect to the sale of securities or to the advisability of investing in, purchasing, or selling securities.

227.   Metals has not been registered with the Commissioner, nor has Metals submitted a notice filing with the Commissioner at any time.

228.   Barrick unlawfully acted as an investment adviser because Barrick, for

62

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 64 of 109   PageID 123

compensation, engaged in the business of advising another, directly and/or through publications or writings, with respect to the sale of securities or to the advisability of investing in, purchasing, or selling securities.

229.   Barrick has not been registered with the Commissioner, nor has Barrick submitted a notice filing with the Commissioner at any time.

230.   Batashvili and Asher unlawfully acted as investment adviser representatives, because Batashvili and Asher, for compensation, are employed, appointed, and/or authorized by Metals, an investment adviser, to solicit clients for Metals and they are providing investment advice to Metals' clients on behalf of Metals.

231.   As a result of the foregoing unlawful conduct, Metals, Barrick, Batashvili, and Asher violated Ga. Code Ann. § 10-5-32 and Ga. Code Ann § 10-5-33.

## COUNT XV

### Securities Fraud
### Violations of Ga. Code Ann. § 10-5-51

232.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

233.   Ga. Code Ann. § 10-5-51 provides, in relevant part, that it is unlawful for a person that advises others for compensation, either directly or indirectly, or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities: (1) [t]o employ a device, scheme, or artifice to defraud another person; or (2) [t]o engage in an act, practice, or course of business that operates or would

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 118 of 194   PageID 2352

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 65 of 109   PageID 124
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 64 of 108   PageID 66

operate as a fraud or deceit upon another person.

234.    Metals and Barrick, acting through various officers, employees, or agents, and

Batashvili and Asher in connection with the rendering of investment advice, (1) employed a

device, scheme, or artifice to defraud another person; or (2) engaged in an act, practice, or course

of business that operates or would operate as a fraud or deceit upon another person.

235.    As a result of the foregoing unlawful conduct, Metals, Barrick, Batashvili, and

Asher violated S Ga. Code Ann. § 10-5-51.

## COUNT XVI

### Unlawful Solicitation and Sale of Commodities
### Violations of Ga. Code Ann. § 10-5A-2

236.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

237.    Ga. Code Ann. § 10-5A-1 provides in relevant part:

> A.    "Commodity" means, except as otherwise specified by the
> Commissioner by rule, regulation, or order . . . any metal or
> mineral
> B.    "Precious metal" means the following in either coin,
> bullion, or other form:
> (A) Silver;
> (B) Gold;
> (C) Platinum;
> (D) Palladium;
> (E) Copper; and
> (F) Such other items as the Commissioner may specify by rule,
> regulation, or order.

238.    Ga. Code Ann. § 10-5A-2 provides in relevant part:

> Except as otherwise provided in Code Section 10-5A-3 or 10-5A-
> 4, no person shall solicit the purchase or sale of or offer to sell or
> purchase any commodity under any commodity contract or under

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 119 of 194   PageID 2353

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 66 of 109   PageID 125
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 65 of 108   PageID 67

any commodity option or offer to enter into as seller or purchaser any commodity contract or commodity option.

239.   Ga. Code Ann. § 10-5A-7 provides in relevant part:

A.   The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

B.   Every person who directly or indirectly controls another person liable under any provision of this chapter . . . is also liable jointly and severally with and to the same extent as such other person.

240.   Metals unlawfully solicited the sale of precious metals and sold precious metals to Georgia investors.

241.   Metals has never been registered with the Commissioner, nor has Metals submitted a notice filing with the Commissioner at any time.

242.   Barrick unlawfully solicited the sale of precious metals and sold precious metals to Georgia investors.

243.   Barrick has never been registered with the Commissioner, nor has Barrick submitted a notice filing with the Commissioner at any time.

244.   Batashvili and Asher unlawfully solicited the sale of precious metals and sold precious metals to Georgia investors, because Batashvili and Asher are employed, appointed, and/or authorized by Metals to solicit the sale of precious metals and sell precious metals on behalf of Metals.

245.   As a result of the foregoing conduct, Metals, Barrick, Batashvili, and Asher

violated Ga. Code Ann. § 10-5A-2.

## COUNT XVII

**Commodities Fraud**
**Violations of Ga. Code Ann. § 10-5A-6**

246.     The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

247.     Ga. Code Ann. § 10-5A-6 provides in relevant part, that in connection with the

solicitation of a purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into,

or the entry into of any commodity contract or commodity option:

> No person shall directly or indirectly in connection with the solicitation of
> a purchase or sale of, the offer to sell, the offer to purchase, the offer to
> enter into, or the entry into of any commodity contract or commodity
> option. :
>
>> **(1)** Cheat or defraud, or attempt to cheat or defraud, any
>> other person or employ any device, scheme, or artifice to
>> defraud any other person;
>>
>> **(2)** Willfully make any false report, enter any false record,
>> or make any untrue statement of a material fact or fail to
>> state a material fact necessary in order to make the
>> statements made, in the light of the circumstances under
>> which they were made, not misleading;
>>
>> **(3)** Engage in any transaction, act, practice, or course of
>> business, including, without limitation, any form of
>> advertising or solicitation, which operates or would operate
>> as a fraud or deceit upon any person; or
>>
>> **(4)** Willfully misappropriate or convert the funds, security,
>> or property of any other person in connection with the
>> solicitation of a purchase or sale of, the offer to sell, the
>> offer to purchase, the offer to enter into, or the entry into of
>> any commodity contract or commodity option subject to the
>> provisions of Code Section 10-5A-2, Code Section 10-5A-

66

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 121 of 194   PageID 2355

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 68 of 109   PageID 127
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 67 of 108   PageID 69

3, or paragraph (2) or (4) of subsection (a) of Code Section 10-5A-4.

248.    Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, in connection with the solicitation to sell and the sale of precious metals: **(1)** Cheated or defrauded, or attempted to cheat or defraud, another person or employed a device, scheme, or artifice to defraud another person; **(2)** willfully made a false report, entered a false record, or made an untrue statement of a material fact or failed to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; **(3)** engaged in a transaction, act, practice, or course of business, including, without limitation, any form of advertising or solicitation, which operated or would operate as a fraud or deceit upon another person; or **(4)** willfully misappropriated or converted the funds, security, or property of another person in connection with the solicitation of a purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of any commodity contract or commodity option.

249.    As a result of the foregoing unlawful conduct, Metals, Barrick, Batashvili, and Asher violated Ga. Code Ann. § 10-5A-6.

## XII.  VIOLATIONS OF KENTUCKY STATUTES

*(Brought by Plaintiff State of Kentucky)*

### COUNT XVIII

**Unregistered Investment Adviser
Violations of KRS 292.330(8)**

250.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

67

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 122 of 194   PageID 2356

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 69 of 109   PageID 128
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 68 of 108   PageID 70

251.    KRS 292.310(11) defines "Investment adviser" as "any person who, for compensation, directly or indirectly, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities."

252.    KRS 292.310(19) defines "Security", in relevant part, as,

"[A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, life settlement investment, voting-trust certificate, certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; or, in general, any interest or instrument commonly known as a "security.""

253.    KRS 292.330(8) makes it "unlawful for any person to transact business in this state as an investment adviser unless the person is registered under this chapter as an investment adviser or is exempt from registration under subsection (9) of this section."

254.    Based on the facts set forth above, Defendants, directly and by and through their agents or representatives, in direct contravention of KRS 292.330(8), transacted business as an investment adviser by advising clients to roll their stock-funded IRAs, a security, into self-directed IRAs invested in Precious Metals Bullion, despite failing to be registered as an investment adviser under KRS Chapter 292 and accordingly violated KRS 292.330(8).

**COUNT XVIX**

**Securities Fraud**
**Violations of KRS 292.320(1)**

255.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 123 of 194   PageID 2357

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 70 of 109   PageID 129
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 69 of 108   PageID 71

by reference.

256.    Pursuant to KRS 292.320(1), "[i]t is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

257.    Defendants, directly and by and through their agents or representatives, employed a device, scheme, or artifice to defraud, made an untrue statement of a material fact or to omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person." Defendants therefore violated KRS 292.320(1).

### XIII. VIOLATIONS OF THE MARYLAND CODE

*(Brought by Plaintiff State of Maryland)*

### <u>COUNT XX</u>

**Unregistered Investment Adviser and Investment Adviser Representative Violations of Md. Code, Corps. & Assn's § 11-401(b)(1)**

258.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 124 of 194   PageID 2358

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 71 of 109   PageID 130
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 70 of 108   PageID 72

259.    The Maryland Securities Act, Md. Code, Corps. & Assn's § 11-101(i)(1) provides

in relevant part:

260.         Investment adviser" means a person who, for compensation:

(i) Engages in the business of advising others, either directly or
through publications or writings, as to the value of securities or as
to the advisability of investing in, purchasing, or selling securities,
or who, for compensation and as a part of a regular business, issues
or promulgates analyses or reports concerning securities; or
(ii) Provides or offers to provide, directly or indirectly, financial
and investment counseling or advice, on a group or individual
basis; or
(iii) Holds out as an investment adviser in any way, including
indicating by advertisement, card, or letterhead, or un any other
manner indicates that the person is, a financial or investment
"planner", "counselor," "consultant," or any other similar type of
adviser or consultant.

261.    The Maryland Securities Act, Md. Code, Corps. & Assn's § 11-101(j) provides in

relevant part:

"Investment adviser representative" or "representative" means any
partner, officer, director of (or a person occupying a similar status
or performing similar functions) or other individual who is
employed by or associated with an investment adviser, or who has
a place of business located in this State and is employed by or
associated with a federal covered adviser . . and who:

(i) Makes any recommendations or otherwise renders investment
advice to clients;
(ii) Represents an investment adviser in rendering [investment
adviser services];
(iii) Manages accounts or portfolios of clients;
(iv) Determines which recommendation or investment advice
should be given with respect to a particular client account;
(v) Solicits, offers, or negotiates for the sale of or sells investment
advisory services;
(vi) Directly supervises employees who perform any of the
foregoing; or
(vii) Holds out as an investment adviser.

70

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 125 of 194   PageID 2359

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 72 of 109   PageID 131
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 71 of 108   PageID 73

262.    The Maryland Securities Act, Md. Code, Corps. & Assn's § 11-401(b)(1), provides in relevant part that a person may not transact business in this State as an investment adviser or as an investment adviser representative unless the person is registered as an investment adviser or an investment adviser representative under this subtitle.

263.    Metals and Barrick have never been registered in Maryland as an investment adviser nor is Metals exempt from registration.

264.    Metals and Barrick unlawfully acted as investment advisers by: (1) for compensation advising investors regarding the value of securities or as to the advisability of investing in, purchasing, or selling securities, (2) by providing, directly or indirectly, financial and investment counseling to investors, and (3) by holding itself out as an investment adviser.

265.    Batashvili and Asher have never been registered in Maryland as investment adviser representatives nor are they exempt from registration.

266.    Batashvili and Asher, as partners, officers, or directors of Metals and Barrick, unlawfully acted as investment adviser representatives by: (1) making any recommendations or otherwise rendering investment advice to clients, (2) representing Metals and Barrick in rendering investment adviser services, (3) determining which recommendation or investment advice should be given with respect to a particular client account, (4) soliciting, offering, or negotiating for the sale of or sells investment advisory services, (5) directly supervising employees who perform any investment adviser representative services, and (6) holding out as an investment adviser.

267.    As a result of the foregoing unlawful conduct, Metals, Barrick, Batashvili, and

Case 3:21-cv-02181-X    Document 209    Filed 08/04/23    Page 126 of 194    PageID 2360

Case 3:21-cv-02181-S    Document 1-3    Filed 09/13/21    Page 73 of 109    PageID 132
Case 3:20-cv-02910-L    Document 2    Filed 09/22/20    Page 72 of 108    PageID 74

Asher violated the Maryland Securities Act, Md. Code, Corps. & Assn's § 11-401(b)(1).

## COUNT XXI

### Employment of Unregistered Investment Adviser Representative
### Violations of Md. Corps. & Assn's § 11-402(b)(1)

268.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

269.    Md. Code, Corps. & Assn's § 11-402(b)(1) provides in relevant part:

An investment adviser required to be registered may not employ or associate with an investment adviser representative unless the representative is registered under this subtitle.

270.    Metals and Barrick, acting as an investment adviser required to be registered, employed and associated with Batashvili, Asher, and numerous other individuals as investment adviser representatives.

271.    As a result of the foregoing unlawful conduct, Metals and Barrick violated Md. Code, Corps. & Assn's § 11-402(b)(1).

## COUNT XXII

### Securities Fraud
### Violations of Md. Code, Corps. & Assn's § 11-301

272.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

273.    Md. Code, Corps. & Assn's § 11-302(1) provides in relevant part:

It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:

(1) Employ any device, scheme, or artifice to defraud;
(2) Make any untrue statement of a material fact or omit to state a

72

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 127 of 194   PageID 2361

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 74 of 109   PageID 133
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 73 of 108   PageID 75

material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

(3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person.

274.    In connection with the sale of securities held by Marylanders primarily for retirement purposes, Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, employed a device, scheme, or artifice to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaged in acts, practices, and courses of business which operates or would operate as a fraud or deceit on any person.

275.    Based on the foregoing conduct, Metals, Barrick, Batashvili, and Asher violated Md. Code, Corps. & Assn's § 11-302(1).

## COUNT XXIII

### Fraud and Unethical Business Practices in Investment Advisory Activities Violations of Md. Code, Corps. & Assn's § 11-302 and COMAR 02.02.05.03

276.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

277.    Md. Code, Corps. & Assn's § 11-302 provides in relevant part:

(a) It is unlawful for any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, or for acting as an investment adviser or representative under § 11-101(i) and (j) of this title, whether through the issuance of analyses, reports, or otherwise to:

(1) Employ any device, scheme, or artifice to defraud the other

73

Case 3:21-cv-02181-X    Document 209    Filed 08/04/23    Page 128 of 194    PageID 2362

Case 3:21-cv-02181-S    Document 1-3    Filed 09/13/21    Page 75 of 109    PageID 134
Case 3:20-cv-02910-L    Document 2    Filed 09/22/20    Page 74 of 108    PageID 76

person;

(2) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on the other person; [or]

(3) Engage in dishonest or unethical practices.

(c) In the solicitation of or dealings with advisory clients, it is unlawful for any person willfully to make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

278.    COMAR 02.02.05.03 provides in relevant part:

(B) An investment adviser is a fiduciary and has a duty to act primarily for the benefit of its clients. While the extent and nature of this duty varies according to the nature of the relationship between an investment adviser and its clients and the circumstances of each case, and investment adviser may not engage in unethical business practices, including the following:

(1) Recommending to a client to whom investment supervisory, management, or consulting services are provided the purchase, sale, or exchange of a security without reasonable grounds to believe that the recommendation is suitable for the client on the basis of information furnished by the client after reasonable inquiry concerning the client's investment objectives, financial situation and needs, and any other information known or acquired by the investment adviser after reasonable examination of the client's financial records.

(8) Misrepresenting to an advisory client or prospective advisory client the qualifications of the investment adviser, or an investment adviser representative employed by or associated with the investment adviser or an employee of the investment adviser, or misrepresenting the nature of the advisory services being offered or fees to be charged for that service, or omitting to state a material fact necessary to make the statements made regarding qualifications, services, or fees, in light of the circumstances under which they are made, not misleading.

(10) Charging a client an unreasonable advisory fee in light of the fees charged by other investment advisers providing essentially the

74

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 129 of 194   PageID 2363

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 76 of 109   PageID 135
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 75 of 108   PageID 77

same services.

(12) Guaranteeing a client that a certain or specific result will be achieved, for example, gain or no loss, as a result of the advice that will be rendered.

279.    Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as investment advisers or representatives employed a device, scheme, or artifice to defraud, in violation of Md. Code, Corps. & Assn's § 11-302.

280.    Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as investment advisers or representatives engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit on any person in violation of Md. Code, Corps. & Assn's § 11-302.

281.    Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as an investment adviser or representative, willfully to made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading in violation of Md. Code, Corps. & Assn's § 11-302.

282.    Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as an investment adviser or representative, engaged in unethical or dishonest business practices in violation of Md. Code, Corps. & Assn's § 11-302 and COMAR

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 130 of 194   PageID 2364

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 77 of 109   PageID 136
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 76 of 108   PageID 78

02.02.05.03.

## XIV.  VIOLATIONS OF THE SOUTH CAROLINA CODE

*(Brought by Plaintiff State of South Carolina)*

### COUNT XXIV

**Unregistered Investment Adviser and Investment Adviser Representative
Violations of S.C. Code Ann. § 35-1-403 to 35-1-404**

283.    The allegations in the preceding paragraphs are re-alleged and incorporated herein
by reference.

284.    South Carolina Code Ann. § 35-1-102(15), provides in relevant part:

> "Investment adviser" means a person that, for compensation, engages in the
> business of advising others, either directly or through publications or
> writings, as to the value of securities or the advisability of investing in,
> purchasing, or selling securities or that, for compensation and as a part of a
> regular business, issues or promulgates analyses or reports concerning
> securities. The term includes a financial planner or other person that, as an
> integral component of other financially related services, provides
> investment advice regarding securities to others for compensation as part of
> a business or that holds itself out as providing investment advice regarding
> securities to others for compensation.

285.    South Carolina Code Ann. § 35-1-102(16), provides in relevant part:

> "Investment adviser representative" means an individual employed by or
> associated with an investment adviser or federal covered investment adviser
> and who makes any recommendations or otherwise gives investment advice
> regarding securities, manages securities accounts or portfolios of clients,
> determines which recommendation or advice regarding securities should be
> given, provides investment advice regarding securities or holds herself or
> himself out as providing investment advice regarding securities, receives
> compensation to solicit, offer, or negotiate for the sale of or for selling
> investment advice regarding securities, or supervises employees who
> perform any of the foregoing.

286.    It is unlawful for a person to transact business in South Carolina as an investment

76

Case 3:21-cv-02181-X    Document 209    Filed 08/04/23    Page 131 of 194    PageID 2365

Case 3:21-cv-02181-S    Document 1-3    Filed 09/13/21    Page 78 of 109    PageID 137
Case 3:20-cv-02910-L    Document 2    Filed 09/22/20    Page 77 of 108    PageID 79

adviser unless the person is registered under this chapter as an investment adviser or is exempt from registration as an investment adviser. S. C. Code Ann. § 35-1-403(a).

287.    It is unlawful for an individual to transact business in this State as an investment adviser representative unless the individual is registered under this chapter as an investment adviser representative or is exempt from registration as an investment adviser representative. S. C. Code Ann. § 35-1-404(a).

288.    Metals unlawfully acted as an investment adviser because Metals, for compensation, engaged in the business of advising another, directly and/or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities, despite not being registered as an investment adviser under the Act, in violation of S.C. Code Ann. § 35-1-403(a).

289.    Batashvili and Asher, as partners, officers, or directors of Metals, unlawfully acted as investment adviser representatives because they, directly and through their sales representatives or other agents, made recommendations or otherwise gave investment advice regarding securities, managed securities accounts or portfolios of clients, determined which recommendation or advice regarding securities should be given, provided investment advice regarding securities or held herself or himself out as providing investment advice regarding securities, received compensation to solicit, offer, or negotiate for the sale of or for selling investment advice regarding securities, or supervised employees who perform any of the foregoing, despite not being registered as an investment adviser representative under the Act, in violation of S.C. Code Ann. § 35-1-404(a).

290.    Therefore, Defendants violated the South Carolina Uniform Securities Act of

2005.

## COUNT XXV

### Securities Fraud
### Violations of S.C. Code Ann. § 35-1-501(1)-(3) and § 35-1-502(a)

291.   The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference.

292.   South Carolina Code Ann. § 35-1-501(1)-(3), provides in relevant part:

> It is unlawful for a person, in connection with the offer, sale, or
> purchase of a security, directly or indirectly:
> a.  employed a device, scheme or artifice to defraud;
> b.  made untrue statements of a material fact or omitted to state a
>     material fact necessary in order to make the statements made,
>     in light of the circumstances under which they were made, not
>     misleading; or
> c.  engaged in acts, practices, or courses of business that operated
>     or would operate as a fraud or deceit upon another person.

293.   The Defendants participated in the offer or sale of securities by means of a

scheme to defraud, with untrue statements of material fact or omissions to state material facts

necessary in order to make the statements, in light of the circumstances under which they were

made, not misleading (the buyers not knowing of the untruths or omissions), or engaged in acts,

practices, or courses of business that operated as a fraud on the investors. Therefore, Defendants

violated S.C. Code Ann. § 35-1-501(1)-(3).

294.   South Carolina Code Ann. § 35-1-502(a), provides in relevant part:

> It is unlawful for a person that advises others for compensation, either directly or
> indirectly or through publications or writings, as to the value of securities or the
> advisability of investing in, purchasing, or selling securities or that, for
> compensation and as part of a regular business, issues or promulgates analyses or
> reports relating to securities:

78

Case 3:21-cv-02181-X    Document 209    Filed 08/04/23    Page 133 of 194    PageID 2367

Case 3:21-cv-02181-S    Document 1-3    Filed 09/13/21    Page 80 of 109    PageID 139
Case 3:20-cv-02910-L    Document 2    Filed 09/22/20    Page 79 of 108    PageID 81

(1) to employ a device, scheme, or artifice to defraud another person; or
(2) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person

295.    Metals and Barrick, acting through various officers, employees, or agents, and Batashvili and Asher in connection with the rendering of investment advice, (1) employed a device, scheme, or artifice to defraud another person; or (2) engaged in an act, practice, or course of business that operated or would operate as a fraud or deceit upon another person. Therefore, Defendants violated S.C. Code Ann. § 35-1-502(a).

296.    Therefore, Defendants violated the South Carolina Uniform Securities Act of 2005.

## COUNT XXVI

### Unlawful Solicitation and Sale of Commodities
### Violations of S.C. Code Ann. § 39-73-20

297.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

298.    South Carolina Ann. § 39-73-10(13), provides in relevant part:

(4) "Commodity" means, except as otherwise specified by the administrator . . . a metal or mineral, including a precious metal, a gem, or gemstone whether characterized as precious, semi-precious, or otherwise . . .

(9) "Commodity option" means an account, an agreement, or a contract giving a party the right but not the obligation to purchase or sell one or more commodities or one or more commodity contracts, or all of the foregoing, whether characterized as an option, privilege, indemnity, bid, offer, put, call, advance guaranty, decline guaranty, or otherwise. . . .

(13) "Precious metal" means the following in either coin, bullion, or other form:
　　　　　(a) silver;

79

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 134 of 194   PageID 2368

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 81 of 109   PageID 140
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 80 of 108   PageID 82

(b) gold;
(c) platinum;
(d) palladium;
(e) copper;
(f) other items the administrator may specify by regulation.

299.    South Carolina Code Ann. § 39-73-20, provides in relevant part:

Except as otherwise provided in Section 39-73-30 or Section 39-73-40 no
person may sell or purchase or offer to sell or purchase a commodity under
commodity contract or under commodity option or offer to enter into or
enter into as seller or purchaser a commodity contract or a commodity
option.

300.    South Carolina Code Ann. 39-73-70, provides in relevant part:

(A) The act, omission or failure of an official, an agent, or another person
acting for an individual, an association, a partnership, a corporation, or a
trust within the scope of his employment or office is deemed the act,
omission or failure of the individual, association, partnership, corporation,
or trust as well as of the official, agent, or other person.

(B) Every person who directly or indirectly controls another person liable
under this chapter, every partner, officer, or director of the other person,
every person occupying a similar status or performing similar functions,
every employee of the other person who materially aids in the violation also
is liable jointly and severally with and to the same extent as the other
person, unless the person who also is liable by virtue of this section sustains
the burden of proof that he did not know and in exercise or reasonable care
could not have known of the existence of the facts by reason of which the
liability is alleged to exist.

301.    Metals unlawfully solicited the sale of precious metals and sold precious metals to

South Carolina investors.

302.    Metals has never been registered with the South Carolina Secretary of State's

Office, nor has Metals submitted a notice filing with the South Carolina Secretary of State's

Office at any time.

303.    Batashvili and Asher, directly and by and through their sales representatives or other agents, unlawfully solicited the sale of precious metals and sold precious metals to South Carolina investors, because Batashvili and Asher are employed, appointed, and/or authorized by Metals to solicit the sale of precious metals and sell precious metals on behalf of Metals.

304.    As a result of the foregoing conduct, Metals, Batashvili, and Asher violated S.C. Code Ann. § 39-73-20.

305.    Therefore, the Defendants violated the South Carolina State Commodity Code, S.C. Code Ann. § 39-73-10, *et. seq*.

## COUNT XXVII

### Commodities Fraud
### Violations of S.C. Code Ann. § 39-73-60 (1)-(4)

306.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

307.    South Carolina Code Ann. § 39-73-60 (1)-(4), provides in relevant part that no person, directly or indirectly, in or in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of, a commodity contract or commodity option, may:

    a.  Cheat or defraud, attempt to cheat or defraud, or employ a device, a scheme, or an artifice to defraud;

    b.  Make a false report, enter a false record, or make an untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    c.  Engage in a transaction, an act, a practice, or a course of business, including without limitation a form of advertising or solicitation, which operates or would operate as a fraud or deceit on Metals customers or potential customers;

Case 3:21-cv-02181-X    Document 209    Filed 08/04/23    Page 136 of 194    PageID 2370

Case 3:21-cv-02181-S    Document 1-3    Filed 09/13/21    Page 83 of 109    PageID 142
Case 3:20-cv-02910-L    Document 2    Filed 09/22/20    Page 82 of 108    PageID 84

or

    d.  misappropriate or convert the funds, security, or property of a person.

308.    Metals, acting through various officers, employees, or other agents, and Batashvili and Asher, in connection with the solicitation to sell and the sale of precious metals: (1) cheated or defrauded, or attempted to cheat or defraud, another person or employed a device, scheme, or artifice to defraud another person; (2) made a false report, entered a false record, or made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; (3) engaged in a transaction, act, practice, or course of business, including, without limitation, any form of advertising or solicitation, which operated or would operate as a fraud or deceit upon another person; or (4) misappropriated or converted the funds, security, or property of another person, in connection with the solicitation of a purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of any commodity contract or commodity option.

309.    Therefore, the Defendants violated the South Carolina State Commodity Code, S.C. Code Ann. § 39-73-10, *et. seq*.

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 137 of 194   PageID 2371

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 84 of 109   PageID 143
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 83 of 108   PageID 85

## XV.  VIOLATIONS OF THE TEXAS SECURITIES ACT

*(Brought by Plaintiff State of Texas)*

### COUNT XXVIII

**Unregistered Investment Adviser and Investment Adviser Representative
Violations of Tex. Rev. Civ. Stat. Ann. art. 581-12**

310.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

311.    The Texas Securities Act makes it unlawful for a person to act or render services as an investment adviser or investment adviser representative in Texas, including rendering investment advice, unless the person is registered under the Texas Securities Act.

312.    The Texas Securities Act defines an investment adviser as "a person who, for compensation, engages in the business of advising another, either directly or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities . . . ."

313.    The Texas Securities Act defines "investment adviser representative" as "each person or company who, for compensation, is employed, appointed, or authorized by an investment adviser to solicit clients for the investment adviser or who, on behalf of the investment adviser, provides investment advice, directly or through subagents…to the investment adviser's clients."

314.    The acts, omissions, and failures of Asher and Batashvili and other officials, agents, or persons acting for Metals described in this Complaint, including sales representatives or other agents, have occurred within the scope of their employment or agency with Metals and

83

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 138 of 194   PageID 2372

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 85 of 109   PageID 144
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 84 of 108   PageID 86

are deemed to be the acts, omissions, and failures of Metals.

315.    Metals, acting through various officers, employees, or agents, and Batashvili and Asher, unlawfully acted as an investment adviser because Metals, for compensation, engaged in the business of advising another, directly and/or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities.

316.    Batashvili and Asher unlawfully acted as investment adviser representatives because Batashvili and Asher, for compensation, are employed, appointed, and/or authorized by Metals, an investment adviser, to solicit clients for Metals and they are providing investment advice to Metals' clients, on behalf of Metals.

317.    Metals, Batashvili, and Asher did not register with the Commissioner nor did they submit a notice filing with the Commissioner at any time.

318.    These unlawful acts and practices of Metals, Batashvili, and Asher were committed against Texas residents age 65 and older.

319.    As a result of the foregoing unlawful conduct, Metals, Batashvili, and Asher violated Article 581-12 of the Texas Securities Act and unless permanently enjoined are reasonably likely to continue to violate the Texas Securities Act.

## COUNT XXIX

### Securities Fraud

320.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

321.    Article 581-32 of the Texas Securities Act makes it unlawful for a person to engage in or about to engage in fraud or fraudulent practices in connection with the rendering of

services as an investment adviser or investment adviser representative.

322.    Article 581-4 of the Texas Securities Act defines "fraud" or "fraudulent practice" to "include any misrepresentations, in any manner, of a relevant fact; any promise or representation or predication as to the future not made honestly and in good faith, or an intentional failure to disclose a material fact; the gaining, directly or indirectly, through the sale of a security, of an underwriting or promotion fee or profit, selling or managing commission or profit, so gross or exorbitant as to be unconscionable; any scheme device or other artifice to obtain such profit, fee, or commission; provided, that nothing herein shall limit or diminish the full meaning of the terms "fraud," "fraudulent," and "fraudulent practice" as applied or accepted in courts of law or equity."

323.    The acts, omissions, and failures of Asher and Batashvili and other officials, agents, or persons acting for Metals described in this Complaint, including sales representatives or other agents, have occurred within the scope of their employment or agency with Metals and are deemed to be the acts, omissions, and failures of Metals.

324.    Metals, acting through various officers, employees, or other agents, and Batashvili and Asher, in connection with the rendering of investment advice, have and continue to intentionally fail to disclose the following material facts:

      a.  Precious Metals Bullion involve considerable risk and market prices are at times volatile and may be affected by economic conditions, political events, and speculative activities; and

      b.  Information about complaints, including complaints relating to fraudulent, deceptive, and illegal practices sent, submitted, or otherwise levied by prior investors.

325.    Metals, acting through various officers, employees, or other agents, and Batashvili

85

Case 3:21-cv-02181-X    Document 209    Filed 08/04/23    Page 140 of 194    PageID 2374

Case 3:21-cv-02181-S    Document 1-3    Filed 09/13/21    Page 87 of 109    PageID 146
Case 3:20-cv-02910-L    Document 2    Filed 09/22/20    Page 86 of 108    PageID 88

and Asher, in connection with the rendering of investment advice, have misrepresented and are continuing to misrepresent relevant facts to potential investors. These misrepresentations include:

    a.  Metals does not charge fees for the purchase of Precious Metals Bullion;

    b.  Potential investors only pay the retail prices of the Precious Metals Bullion; and

    c.  Advising potential investors that investments in Precious Metals Bullion are safe and conservative investments but stating on their website and in their Customer Agreements that investments in Precious Metals Bullion are not safe and conservative investments.

326.    These unlawful acts and practices of Metals, Batashvili, and Asher were committed against Texas residents age 65 and older.

327.    As a result of the foregoing unlawful conduct, Metals, Batashvili, and Asher have engaged in and are engaging in fraud and fraudulent practices in connection with rendering investment advice in violation of Article 581-32 the Texas Securities Act, and unless permanently enjoined are reasonably likely to continue to engage in fraud or fraudulent practices in connection with rendering investment advice in violation of the Texas Securities Act.

## XVI.  DISGORGEMENT OF **FUNDS** FROM RELIEF DEFENDANT TOWER EQUITY

### COUNT XXX

### Disgorgement of Funds from Relief Defendant

*(Brought by all Plaintiffs)*

328.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

329.    During the Relevant Period, Relief Defendant Tower Equity received funds

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 141 of 194   PageID 2375

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 88 of 109   PageID 147
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 87 of 108   PageID 89

and/or property as a result of Defendants' fraudulent conduct and has received benefits or
otherwise has been unjustly enriched thereby.

330.    Relief Defendant Tower Equity has no legitimate entitlement to or interest in all
of the funds and/or property received as a result of the Defendants' fraudulent conduct.

331.    Relief Defendant Tower Equity should be required to disgorge funds and/or
property up to the amount it received from Defendants' fraudulent conduct or the value of those
funds that it may have subsequently transferred to third parties.

## XVII. RELIEF REQUESTED

332.    The CFTC and the States respectfully request that this Court, as authorized by
Section 6c of the CEA, 7 U.S.C. § 13a-1 (2018), Section 6d(1) of the CEA, 7 U.S.C. § 13a-2(1)
(2018), 28 U.S.C § 1367(1) (2018), and pursuant to its own equitable powers:

A.      Find that Defendants violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1) (2018),
        and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019);

B.      Find that Defendants violated the laws of the States as set forth above;

C.      Enter an order of permanent injunction enjoining Defendants and their affiliates,
        agents, servants, employees, successors, assigns, attorneys, and all persons in
        active concert with them, who receive actual notice of such order by personal
        service or otherwise, from violating 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-
        (3) and the laws of the States.

D.      Enter an order of permanent injunction restraining and enjoining Defendants and
        their affiliates, agents, servants, employees, successors, assigns, attorneys, and all

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 142 of 194   PageID 2376

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 89 of 109   PageID 148
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 88 of 108   PageID 90

persons in active concert with them, from directly or indirectly:

1)  Trading on or subject to the rules of any registered entity (as that term is
    defined by Section 1a(40) of the CEA, 7 U.S.C. § 1a(40) (2018));

2)  Entering into any transactions involving "commodity interests" (as that
    term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for accounts
    held in the name of any Defendant or for accounts in which any Defendant
    has a direct or indirect interest;

3)  Having any commodity interests traded on any Defendant's behalf;

4)  Controlling or directing the trading for or on behalf of any other person or
    entity, whether by power of attorney or otherwise, in any account
    involving commodity interests;

5)  Soliciting, receiving, or accepting any funds from any person for the
    purpose of purchasing or selling of any commodity interests;

6)  Applying for registration or claiming exemption from registration with the
    CFTC in any capacity, and engaging in any activity requiring such
    registration or exemption from registration with the CFTC except as
    provided for in CFTC Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9)
    (2019);

7)  Acting as a principal (as that term is defined in CFTC Regulation 3.1(a),
    17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any
    person registered, exempted from registration, or required to be registered
    with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9) (2019);

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 143 of 194   PageID 2377

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 90 of 109   PageID 149
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 89 of 108   PageID 91

and

8)      Acting as a broker-dealer or investment adviser or associating with a

licensed broker-dealer or investment adviser, in violation of the laws of

the States.

E.      Enter an order directing Defendants as well as any third-party transferee and/or

successors thereof, to disgorge, pursuant to such procedure as the Court may

order, all benefits received including, but not limited to, salaries, commissions,

loans, fees, revenues, and trading profits derived, directly or indirectly, from acts

or practices which constitute violations of the CEA or CFTC Regulations or the

Laws of the States, as described herein, during the Relevant Period, including pre-

judgment and post-judgment interest;

F.      Enter an order directing Relief Defendant Tower Equity, including any third-party

transferee and/or successors thereof, to disgorge, pursuant to such procedure as

the Court may order, all benefits received including, but not limited to, funds,

salaries, commissions, loans, fees, revenues, and trading profits derived, directly

or indirectly, from acts or practices which constitute violations of the CEA or

CFTC Regulations, or the laws of the States, including pre-judgment and post-

judgment interest;

G.      Enter an Order requiring Defendants to make restitution, pursuant to such

procedure as the Court may order, to persons who have sustained losses

proximately caused by Defendants' violations of the CEA or CFTC Regulations,

or the laws of the States, as described herein, including pre-judgment and post-

89

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 144 of 194   PageID 2378

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 91 of 109   PageID 150
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 90 of 108   PageID 92

judgment interest;

H.    Enter an order directing Defendants to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Defendants and any of the investors whose funds were received by Defendants as a result of Defendants' violations of the CEA or CFTC Regulations, or the laws of the States, as described herein;

I.    Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the CEA, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, title VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the CEA or CFTC Regulations, and pay civil monetary penalties and/or damages pursuant to the laws of the States during the Relevant Period;

J.    Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2018) and the laws of the States;

K.    Enter an order appointing a temporary and permanent receiver; and

L.    Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 145 of 194   PageID 2379

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 92 of 109   PageID 151
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 91 of 108   PageID 93

Dated: September 22, 2020

Respectfully submitted,

By: _____

JONMARC BUFFA *pro hac vice pending*
jbuffa@cftc.gov
California Bar # 217324

RICHARD FOELBER *pro hac vice pending*
rfoelber@cftc.gov
Illinois Bar # 0840904

Attorneys for Plaintiff
COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street. NW
Washington, DC 20580
(202) 418-5000


FOR THE STATE OF ALABAMA

By: /s/ Jeffery A. "Beau" Brown, Jr _____

JEFFERY A. "BEAU" BROWN, JR., *pro hac vice pending*
Beau.Brown@asc.alabama.gov
Alabama Bar No. 7258R80B

ANNE GUNTER, *pro hac vice pending*
anne.gunter@asc.alabama.gov
Alabama Bar No. 4666N91P

Attorneys for Plaintiff
STATE OF ALABAMA
SECURITIES COMMISSION
445 Dexter Avenue, Suite 12000
Montgomery, AL 36104
Telephone: (334) 322-8586
Fax: (334) 242-0240

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 146 of 194   PageID 2380

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 93 of 109   PageID 152
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 92 of 108   PageID 94

FOR THE STATE OF ALASKA

By: /s/ Robert Schmidt

ROBERT SCHMIDT, *pro hac vice pending*
rob.schmidt@alaska.gov
Alaska Bar No. 9909048
JOHN HALEY
john.haley@alaska.gov
Alaska Bar No. 1402010

Attorneys for Plaintiff
STATE OF ALASKA
OFFICE OF ATTORNEY GENERAL
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-6645
Fax: (907) 276-3697

FOR THE STATE OF ARIZONA

By: /s/ Christopher Nichols

CHRISTOPHER NICHOLS, *pro hac vice pending*
cnichols@azcc.gov
Arizona Bar No. 029958

Attorney for Plaintiff
ARIZONA CORPORATION COMMISSION
1300 W. Washington St.
Phoenix, AZ 85007
Telephone: (602) 542-0639
Fax: (602) 714-8120

FOR THE STATE OF CALIFORNIA

By: /s/ Danielle Stoumbos

MARY ANN SMITH
MaryAnn.Smith@dbo.ca.gov

92

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 147 of 194   PageID 2381

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 94 of 109   PageID 153
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 93 of 108   PageID 95

SEAN ROONEY
Sean.Rooney@dbo.ca.gov
DANIELLE A. STOUMBOS, *pro hac vice pending*
California Bar No. 264784
Danielle.Stoumbos@dbo.ca.gov

Attorneys for Plaintiff
STATE OF CALIFORNIA
DEPARTMENT OF BUSINESS OVERSIGHT
320 West Fourth Street, Suite 750
Los Angeles, California 90013
Telephone: (213) 503-2046
Fax: (213) 576-7181

FOR THE STATE OF COLORADO
PHILIP J. WEISER
Attorney General of the State of Colorado

By: /s/ Janna Fischer

JANNA FISCHER*, *pro hac vice pending*
janna.fischer@coag.gov
Colorado Bar No. 44952
ROBERT FINKE*, *pro hac vice pending*
robert.finke@coag.gov
Colorado Bar No. 40756
*Counsel of Record

Attorneys for Plaintiff
SECURITIES COMMISSIONER
FOR THE STATE OF COLORADO
1300 Broadway, 8th Floor
Denver, Colorado 80203
Telephone: (720) 508-6374
Fax: (720) 508-6037

FOR THE STATE OF DELAWARE
KATHLEEN JENNINGS
Attorney General of the State of Delaware

By: /s/ Katherine M. Devanney

93

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 148 of 194   PageID 2382

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 95 of 109   PageID 154
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 94 of 108   PageID 96

KATHERINE M. DEVANNEY, *pro hac vice pending*
Deputy Attorney General
Delaware Bar No. 6356
Texas Bar No. 24116281
katherine.devanney@delaware.gov
JILLIAN LAZAR
Director of Investor Protection
Delaware Bar No. 6049
jillian.lazar@delaware.gov

Delaware Department of Justice
820 N. French St.
Wilmington, DE 19801
Telephone: (302) 577-8356
Fax: (302) 577-6987

Attorneys for Plaintiff the State of Delaware


FOR THE STATE OF FLORIDA
ASHLEY MOODY
Attorney General for the State of Florida


By: /s/ Victoria Butler

VICTORIA BUTLER, *pro hac vice pending*
Assistant Attorney General
Director of Consumer Protection
victoria.butler@myfloridalegal.com
Florida Bar No. 861250

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL
Department of Legal Affairs
3507 E Frontage Rd, Suite 325
Tampa, FL 33607-1795
Telephone: (813) 287-7950
Fax: (813) 281-5515

94

By: /s/ A. Gregory Melchior

A. GREGORY MELCHIOR, *pro hac vice pending*
Assistant General Counsel
greg.melchior@flofr.com
Florida Bar No. 407290

Attorney for Plaintiff
STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION
1313 Tampa Street, Suite 615
Tampa, Florida 33602-3394
Telephone: (813) 218-5327
Fax: (813) 272-2498

FOR THE STATE OF GEORGIA

By: /s/ Logan B. Winkles

LOGAN B. WINKLES, *pro hac vice pending*
Georgia Bar No. 136906
lwinkles@law.ga.gov
RONALD J. STAY, *pro hac vice pending*
Georgia Bar No. 621732
rstay@law.ga.gov

Attorneys for Plaintiff
OFFICE OF THE GEORGIA
SECRETARY OF STATE
Georgia Department of Law
40 Capitol Square SW
Atlanta, GA 30334
Telephone: (404) 458-3434
Fax: (404) 657-3239

FOR THE STATE OF HAWAII

By: /s/ Rayni M. Nakamura-Watanabe

RAYNI M. NAKAMURA-WATANABE, *pro hac vice pending*
Hawaii Bar No. 9032-0
RNakamur@dcca.hawaii.gov
PATRICIA J. MOY
Hawaii Bar No. 5845-0
PMoy@dcca.hawaii.gov

Attorneys for Plaintiff
STATE OF HAWAII
SECURITIES ENFORCEMENT BRANCH
335 Merchant Street, Suite 205
Honolulu, Hawaii 96813
Telephone: (808) 586-2740
Fax: (808) 586-3977

FOR THE STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL
STATE OF IDAHO
LAWRENCE G. WASDEN

By: /s/ Loren Messerly

LOREN MESSERLY, *pro hac vice pending*
Deputy Attorney General
loren.messerly@finance.idaho.gov
Idaho Bar No. 7434

Attorney for Plaintiff
STATE OF IDAHO
IDAHO DEPARTMENT OF FINANCE
P.O. Box 83720
Boise, ID 83720-0031
Telephone: (208) 332-8093
Fax: (208) 332-8099

FOR THE STATE OF INDIANA
OFFICE OF THE INDIANA ATTORNEY
GENERAL
Patricia Orloff Erdmann
Chief Counsel of Litigation

By: /s/ Jefferson S. Garn _____

JEFFERSON S. GARN, *pro hac vice pending*
Deputy Attorney General
Jefferson.Garn@atg.in.gov
Indiana Bar No. 29921-49

Attorney for Plaintiff
STATE OF INDIANA
INDIANA SECURITIES COMMISSIONER
302 W. Washington Street
IGCS – 5th Floor
Indianapolis, IN 46204
Fax: (317) 232-7979


FOR THE STATE OF KANSAS

By: /s/ Thomas E. Knutzen _____

THOMAS E. KNUTZEN, *pro hac vice pending*
*Special Assistant Attorney General*
tom.knutzen@ks.gov
Kansas Bar No. 24471

Attorney for Plaintiff
OFFICE OF THE KANSAS SECURITIES
COMMISSIONER
1300 SW Arrowhead Road
Topeka, KS 66604
Telephone: (785) 296-7890
Fax: (785) 296-6872

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 152 of 194   PageID 2386

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 99 of 109   PageID 158
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 98 of 108   PageID 100

FOR THE STATE OF KENTUCKY

By: /s/ Gary Stephens

GARY STEPHENS, *pro hac vice pending*
Gary.stephens@ky.gov
Kentucky Bar No. 87740
CATHERINE FALCONER
Catherine.falconer@ky.gov

Attorneys for Plaintiff
STATE OF KENTUCKY
DEPARTMENT OF FINANCIAL INSTITUITONS
500 Mero St. 2SW19
Frankfort, KY 40601
Telephone: (502) 782-9052
Fax: (502) 573-8787


FOR THE STATE OF MAINE

By: /s/ Gregg D. Bernstein

GREGG D. BERNSTEIN, *pro hac vice pending*
gregg.bernstein@maine.gov
Maine Bar No. 8424

Attorney for Plaintiff
STATE OF MAINE SECURITIES
ADMINISTRATOR
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8800
Fax: (207) 626-8828


FOR THE STATE OF MARYLAND

BRIAN E. FROSH
ATTORNEY GENERAL OF THE STATE OF
MARYLAND

By: /s/ Max F. Brauer

98

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 153 of 194   PageID 2387

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 100 of 109   PageID 159
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 99 of 108   PageID 101

MAX F. BRAUER, *pro hac vice pending*
Assistant Attorney General
mbrauer@oag.state.md.us
Maryland State Does Not Use Bar Numbers

Attorney for Plaintiff
STATE OF MARYLAND EX REL
MARYLAND SECURITIES COMMISSIONER
200 Saint Paul Place
Baltimore, MD 21202
Telephone: (410) 576-6950
Fax: (410) 576-6532


FOR THE PEOPLE OF MICHIGAN

By: /s/ Aaron W. Levin_____

PEOPLE OF THE STATE OF
MICHIGAN, by DANA NESSEL
ATTORNEY GENERAL

Aaron W. Levin, *pro hac vice pending*
Assistant Attorney General
levina@michigan.gov
Michigan Bar No. P81310

Attorney for Plaintiff
Michigan Department of Attorney General
525 W. Ottawa Street,
P.O. Box 30736
Lansing, MI 48909
Telephone: (517) 335-7632
Fax: (517) 335-7632


FOR THE STATE OF MISSISSIPPI

By: /s/ Seth Shannon_____

SETH SHANNON, *pro hac vice pending*
seth.shannon@ago.ms.gov

99

Mississippi Bar No. 103466
CRYSTAL UTLEY SECOY
crystal.utley@ago.ms.gov

Attorneys for Plaintiff
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205
Telephone: (769) 237-6406
Fax: (601) 359-4231


FOR THE STATE OF NEBRASKA
L. JAY BARTEL
Bureau Chief
Legal Services Bureau


By: /s/ Joshua R. Shasserre _____

JOSHUA R. SHASSERRE, *pro hac vice pending*
Assistant Attorney General
Nebraska Bar No. 23885
joshua.shasserre@nebraska.gov

Attorney for Plaintiff
STATE OF NEBRASKA
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-3888
Fax: (402) 471-3297


FOR THE STATE OF NEVADA

By: /s/ Erin M. Houston _____

ERIN M. HOUSTON, *pro hac vice pending*
Deputy Secretary of State, Securities Administrator
Nevada Bar No. 11814
ehouston@sos.nv.gov

100

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 155 of 194   PageID 2389

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 102 of 109   PageID 161
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 101 of 108   PageID 103

Attorney for Plaintiff
STATE OF NEVADA
Office of the Nevada Secretary of State
Securities Division
2250 North Las Vegas Blvd., Suite 400
North Las Vegas, NV 89030
Telephone: (702) 486-2440
Fax: (702) 486-2452


FOR THE STATE OF NEW MEXICO

By: /s/ Alissa N. Berger _____

ALISSA N. BERGER, *pro hac vice pending*
Securities Enforcement Prosecutor
New Mexico Securities Division
New Mexico Bar No. 21769
Alissa.Berger@state.nm.us

Attorney for Plaintiff
STATE OF NEW MEXICO
New Mexico Securities Division
New Mexico Regulation and Licensing Department
5500 San Antonio Rd NE
Albuquerque, New Mexico 87109
Telephone: (505) 503-5987
Fax: (505) 222-9848


FOR THE STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL OF THE STATE OF
NEW YORK

By: /s/ Tatyana Trakht _____

TATYANA "TANYA" TRAKHT, *pro hac vice
pending*
Assistant Attorney General
tanya.trakht@ag.ny.gov
New York State Does Not Use Bar Numbers
PETER POPE

101

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 156 of 194   PageID 2390

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 103 of 109   PageID 162
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 102 of 108   PageID 104

Chief, Investor Protection Bureau
peter.pope@ag.ny.gov

Attorneys for Plaintiff
ATTORNEY GENERAL FOR THE STATE OF
NEW YORK
28 Liberty Street, 21st Floor
New York, New York 10005
Telephone: (212) 416-8457
Fax: (212) 416-8816


FOR THE STATE OF OKLAHOMA

By: /s/ Robert Fagnant _____

ROBERT FAGNANT, *pro hac vice pending*
rfagnant@securities.ok.gov
Oklahoma Bar No. 30548

Attorney for Plaintiff
OKLAHOMA DEPARTMENT OF SECURITIES
204 N. Robinson Avenue, Suite 400
Oklahoma City, OK 73102
Telephone: (405) 280-7718
Fax: (405) 280-7742


FOR THE STATE OF SOUTH CAROLINA

By: /s/ Jonathan Williams _____

JONATHAN WILLIAMS, *pro hac vice pending*
jwilliams@scag.gov
South Carolina Bar No. 72509

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF ATTORNEY GENERAL
P.O. Box 11549
Columbia, SC 29211
Telephone: (803) 734-7208
Fax: (803) 734-7208

By: /s/ Shannon A. Wiley

SHANNON A. WILEY, *pro hac vice pending*
swiley@sos.sc.gov
South Carolina Bar No. 69806

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF THE SECRETARY OF STATE
1205 Pendleton Street, Suite 525
Columbia, SC 29201
Telephone: (803) 734-0246
Fax: (803) 734-1661

FOR THE STATE OF SOUTH DAKOTA

By: /s/ Clayton Grueb

CLAYTON GRUEB, *pro hac vice pending*
South Dakota Bar No. 4642
Clayton.grueb@state.sd.us

Attorney for Plaintiff
South Dakota Department of Labor & Regulation,
Division of Insurance
2330 N. Maple Ave, Suite 1
Rapid City, SD 57701
Telephone: (605) 773-3563
Fax: (605) 773-5369

FOR THE STATE OF TENNESSEE
HERBERT H. SLATERY III
Attorney General and Reporter
for the State of Tennessee

By: /s/ James P. Urban

JAMES P. URBAN, *pro hac vice pending*
Deputy Attorney General

103

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 158 of 194   PageID 2392

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 105 of 109   PageID 164
Case 3:20-cv-02910-L   Document 2   Filed 09/22/20   Page 104 of 108   PageID 106

TN B.P.R. No. 033599
james.urban@ag.tn.gov

Office of Tennessee Attorney General
Financial Division
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 741-3739
Fax: (615) 532-8223

Attorney for Plaintiff
Commissioner of the Tennessee Department of
Commerce and Insurance


FOR THE STATE OF TEXAS
KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

JOSHUA R. GODBEY
Division Chief
Financial Litigation and Charitable Trusts Division

By: */s/ Christina Cella* _____

CHRISTINA CELLA
Assistant Attorney General
State Bar No. 24106199
christina.cella@oag.texas.gov
LEA N. BRIGTSEN
Assistant Attorney General
State Bar No. 24054504
lea.brigtsen@oag.texas.gov

Financial Litigation and Charitable Trusts Division
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 475-2952
Fax: (512) 477-2348
*Attorneys for Plaintiff the State of Texas*


FOR THE STATE OF WASHINGTON

By: /s/ Ian S. McDonald _____

IAN S. MCDONALD, *pro hac vice pending*
Washington Bar No. 41403
Ian.McDonald@atg.wa.gov
Telephone: (360) 586-3264
Fax: (360) 664-0229

Attorney for Plaintiff
Washington State Department of Financial
Institutions, Securities Division
150 Israel Rd. SW
Tumwater, WA 98501
Telephone: (360) 902-8700
Fax: (360) 902-0524


FOR THE STATE OF WEST VIRGINIA

By: /s/ Michael Nusbaum _____

MICHAEL NUSBAUM, *pro hac vice pending*
michael.nusbaum@wvsao.gov
West Virginia Bar No. 12708

Attorney for Plaintiff
STATE OF WEST VIRGINIA
WEST VIRGINIA SECURITIES COMMISSION
1900 Kanawha Boulevard, East
Building 1, Room W-100
Charleston, WV 25305


105

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 160 of 194   PageID 2394

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 107 of 109   PageID 166
Case 3:20-cv-02916-L   Document 2   Filed 09/22/20   Page 106 of 108   PageID 108

Telephone: (304) 558-2251
Fax: (304) 558-4211


FOR THE STATE OF WISCONSIN
JOSHUA L. KAUL
Attorney General
State of Wisconsin
Wisconsin Department of Justice


By: /s/ Shannon A. Conlin

SHANNON A. CONLIN, *pro hac vice pending*
Assistant Attorney General
Wisconsin Bar No. 1089101
Conlinsa@doj.state.wi.us

WISCONSIN DEPARTMENT OF JUSTICE
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-1677
Fax: (608) 267-2779

*Attorney for Plaintiff State of Wisconsin*


FOR THE IOWA INSURANCE
COMMISSIONER
DOUGLAS M. OMMEN

By: */s/ Adam J. Kenworthy*
ADAM KENWORTHY* *pro hac vice pending*
Iowa Bar No. AT0012137
Enforcement Attorney
adam.kenworthy@iid.iowa.gov

Attorney for Plaintiff
IOWA INSURANCE DIVISION
1963 Bell Ave, Ste 100
Des Moines, IA 50315
Telephone: (515) 654-6562
Fax: (515)-654-6500

106

Case 3:21-cv-02181-X   Document 209   Filed 08/04/23   Page 161 of 194   PageID 2395

Case 3:21-cv-02181-S   Document 1-3   Filed 09/13/21   Page 108 of 109   PageID 167
Case 3:20-cv-02910-E   Document 2-3   Filed 09/22/20   Page 107 of 108   PageID 109

JS 44 (Rev. 06/17) - TXND (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Commodity Futures Trading Commission, and States

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS
TMTE, Inc. a/k/a Metals.com, Chase Metals, Inc., Chase Metals, LLC, Barrick Capital, Inc., Lucas Thomas Erb a/k/a Lucas Asher a/k/a Luke Asher, and Simon Batashvili

County of Residence of First Listed Defendant    Laramie County Wyoming
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
        THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

RECEIVED
SEP 22 20

NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☒ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | **IMMIGRATION** | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | | ☐ 462 Naturalization Application | |
| | ☐ 448 Education | ☐ 550 Civil Rights | | ☐ 465 Other Immigration Actions | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
7 U.S.C. § 9(1) (2018)

Brief description of cause:
Fraudulent scheme involving purchases of gold and silver bullion

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*

JUDGE

DOCKET NUMBER

DATE  9/22/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

JS 44 Reverse (Rev. 06/17)- TXND (Rev. 06/17)

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# EXHIBIT C

## EXHIBIT C-1

**DAVID BLEEDEN AND HIS ENTITIES BEAR HUNTER, LLC AND XAN, LLC:**

**Total: $1,219,294.67**

### David Bleeden

Chase Metals payment to David Bleeden for $41,343.00 on his 2016 1099.

Chase Metals payroll payment to David Bleeden for $66,885.20 in his 2018 W2.

Chase Metals payment to David Bleeden for $2,500.00 on his 2018 1099 for miscellaneous income.

Chase Metals payment to David Bleeden for $2,500.00 on his 2018 1099.

Chase Metals payment to David Bleeden for $66,885.20 on his 2018 W-2

Chase Metals payment to David Bleeden for $1,795.17 on 1/19/2019.

Chase Metals check to David Bleeden for $6,000.00 on 1/16/2019.

Chase Metals payment to David Bleeden for $2,386.11 on 1/22/2019.

Chase Metals payroll payment to David Bleeden for $878.45 on 2/1/2019.

Chase Metals payment to David Bleeden for $878.45 on 2/7/2019.

Chase Metals payment to David Bleeden for $45,797.01 on 2/15/2019.

Chase Metals payment to David Bleeden for $6,356.55 on 4/11/2019.

Chase Metals payment to David Bleeden for $9,899.83 on 4/26/2019.

Chase Metals payment to David Bleeden for $8,702.44 on 5/1/2019.

Chase Metals payment to David Bleeden for $39,201.13 on 5/3/2019.

Chase Metals payment to David Bleeden for $6,582.54 on 5/10/2019.

Chase Metals payment to David Bleeden for $11,888.29 on 5/24/2019.

Chase Metals payment to David Bleeden for $1,152.12 on 6/21/2019.

Chase Metals payment to David Bleeden for $4,592.11 on 7/5/2019.

Chase Metals payment to David Bleeden for $806.71 on 7/29/2019.

Chase Metals payment to David Bleeden for $10,756.79 on 7/31/2019.

Chase Metals payment to David Bleeden for $5,568.78 on 8/2/2019.



Chase Metals payment to David Bleeden for $1,931.12 on 8/9/2019.

Chase Metals payment to David Bleeden for $13,532.27 on 8/16/2019.

Chase Metals payment to David Bleeden for $5,668.20 on 8/26/2019.

Chase Metals payment to David Bleeden for $5,410.58 on 8/30/2019.

Chase Metals payment to David Bleeden for $4,846.10 on 8/26/2019.

Chase Metals payment to David Bleeden for $35,491.43 on 9/13/2019.

Chase Metals payment to David Bleeden for $34,520.46 on 9/16/2019.

Chase Metals payment to David Bleeden for $8,251.83 on 9/27/2019.

Chase Metals payment to David Bleeden for $6,655.33 on 10/11/2019.

Chase Metals payment to David Bleeden for $11,561.69 on 10/25/2019.

Chase Metals payment to David Bleeden for $12,638.69 on 10/29/2019.

Chase Metals payment to David Bleeden for $15,539.39 on 11/8/2019

Chase Metals payment to David Bleeden for $9,632.37on 11/12/2019.

Chase Metals payment to David Bleeden for $2,666.35 on 11/22/2019

Chase Metals payment to David Bleeden for $1,265.66 on 12/2/2019.

Chase Metals payment to David Bleeden for $16,922.13 on 12/6/2019

Chase Metals payment to David Bleeden for $11,339.01 on 12/11/2019.

Chase Metals payment to David Bleeden for $9,403.26 on 12/20/2019.

Chase Metals payroll payment to David Bleeden for $23,779.90 in 2020.

First American Estate and Trust LLC payment to David Bleeden $25,277.17.

**Total: $599,688.82**

**Bearhunter, LLC**

Chase Metals payment to Bearhunter for $41,343.00 in his 2016 W-2.

Chase Metals wire to Bearhunter for $110,000.00 on 2/9/2017

Chase Metals check to Bearhunter for $1,000.00 on 6/16/2017

Chase Metals check to Bearhunter for $899.00 on 6/21/2017

Chase Metals check to Bearhunter for $1,250.00 on 6/22/2017

Chase Metals check to Bearhunter for $3,759.00 on 8/11/2017

Chase Metals payments to Bearhunter for $83,495.76 in 2018 W-2.

Chase Metals payment to Bearhunter for $4,447.45 on his 2019 1099 form.

Chase Metals payments to Bearhunter for $198,595.12 in 2020 W-2.


**Total: $444,789.63**

**Xan, LLC**

Payment to Xan, LLC (per Bleeden deposit records) for $9,266.33 from 12/20/2019 -1/22-20

Barrick wire to Xan, LLC for $11,918.12 on 2/26/2020.

Barrick wire to Xan, LLC for $12,944.61 on 3/13/2020.

Barrick wire to Xan, LLC for $8,254.65 on 3/27/2020.

Barrick wire to Xan, LLC for $7,749.80 on 4/10/2020.

Barrick check payment to Xan LLC for $484.22 on 5/8/2020.

Barrick check payment to Xan LLC for $11,989.90 on 5/22/2020.

Barrick check payment to Xan LLC for $13,957.38 on 6/5/2020.

Barrick check payment to Xan LLC for $6,228.23 on 6/19/2020.

Barrick check payment to Xan LLC for $14,667.86 7/2/2020.

Barrick wire to Xan, LLC for $3,234.00 on 7/2/2020

Barrick check payment to Xan LLC for $1,398.56 on 7/31/2020.

Barrick check payment to Xan LLC for $15,425.73 on 8/17/2020.

Payment to Xan, LLC (per Bleeden deposit records) for $18,495.12 on 8/17/2020

Barrick check payment to Xan LLC for $7,036.10 on 8/28/2020.

Barrick check payment to Xan LLC for $7,202.77 on 9/8/2020.

Barrick check payment to Xan LLC for $14,520.84  on 9/15/2020.

Barrick check payment to Xan LLC for $10,041.00 on 9/8/2020.


**Total: $174,816.22**

## EXHIBIT C-2

**DANIEL HALIMI AND HIS ENTITY HALIMI GROUP:**

**Total $271,772.96**

### Halimi Group

Chase Metals payment to Daniel Halimi for $16,712.95 for his 2018 W-2 form.

TMTE, Inc. payment to Halimi Group for $102,843.81 on TMTE, Inc.'s 2018 profit and loss sheet.

Chase Metals payroll payment to Daniel Halimi for $1,127.22 on 2/20/2019.

Chase Metals check to Halimi Group for $1,129.29 on 2/20/2019.

Chase Metals check to Halimi Group for $8,508.31 on 2/20/2019.

Chase Metals check to Halimi Group for $10,120.79 on 3/1/2019.

Barrick wire to Halimi Group for $4,518.30 on 3/13/2019.

Chase Metals check to Halimi Group for $1,727.86 on 3/27/2019.

Chase Metals wire to Halimi Group for $676.99 on 3/29/2019.

TMTE, Inc. wire to Halimi Group for $21,934.18 on 4/26/2019.

Chase Metals check to Halimi Group for $3,333.67 on 4/26/2019.

Chase Metals wire to Halimi Group for $2,151.21 on 6/21/2019.

TMTE, Inc. wire to Halimi Group for $7,606.81 on 7/19/2019.

Chase Metals wire to Halimi Group for $162.74 on 8/2/2019.

Chase Metals wire to Halimi Group for $2,943.52 on 8/16/2019.

Chase Metals wire to Halimi Group for $4,097.90 on 8/30/2019.

TMTE, Inc. wire to Halimi Group for $6,975.91 on 9/27/2019.

Chase Metals wire to Halimi Group for $7,350.28 on 10/11/2019.

TMTE, Inc. wire to Halimi Group for $7,317.59 on 11/8/2019.

Chase Metals wire to Halimi Group for $1,052.14 on 12/20/2019.

Barrick wire to Halimi Group for $4,518.30 by 3/13/2020.

Barrick wire to Halimi Group for $1,620.94 on 3/27/2020.

TMTE, Inc. wire to Halimi Group for $3,969.27 on 3/27/2020.

Barrick wire to Halimi Group for $1,620.94 on 3/27/2020.

Barrick wire to Halimi Group for $7,371.14 on 4/10/2020.

Barrick check to Halimi Group for $20,766.91 on 4/27/2020.

Barrick check to Halimi Group for $4,316.36 on 5/12/2020.

Barrick check to Halimi Group for $4,814.21 on 5/26/2020.

Barrick check to Halimi Group for $5,711.35 on 6/9/2020.

Barrick check to Halimi Group for $4,956.20 on 6/22/2020.

Barrick check to Halimi Group for $682.49 on 7/20/2020.

FAET wire to Daniel Halimi for $754.32 on 8/25/2020.


**Total: $271,772.96**

## EXHIBIT C-3

ATHENA HUNTER AND HER ENTITY TP BOSS:                          Total: $132,902.00

### TPH Boss

Chase Metals check to Athena Hunter for $1,200 on 12/19/2017.

Chase Metals check to Athena Hunter for $840 on 12/19/2017.

Chase Metals check to Athena Hunter for $1,200 on 1/9/2018.

Chase Metals check to Athena Hunter for $97 on 3/12/2018.

Chase Metals check to Athena Hunter for $123 on 3/12/2018.

Chase Metals check to Athena Hunter for $2,000 on 11/8/2018.

Chase Metals check to Athena Hunter for $250 on 11/8/2018.

Chase Metals check to Athena Hunter for $9,135 on 1/22/2019.

Chase Metals check to Athena Hunter for $4,635 on 5/14/2019.

Chase Metals check to Athena Hunter for $1,000 on 5/30/2019.

Chase Metals check to Athena Hunter for $2,500 on 9/6/2019.

Barrick wire to TPH Boss for $4,203.15 on 2/14/2020.

Chase Metals wire to TPH Boss for $11,535 on 2/28/2020.

Barrick wire to TPH Boss for $10,717.76 on 3/13/2020.

Barrick wire to TPH Boss for $12,951.31 on 3/27/2020.

Barrick wire to TPH Boss for $8,445.76 on 4/10/2020.

Barrick check to TPH Boss for $3,183.91 on 4/30/2020.

Barrick check to TPH Boss for $8,153.57 on 5/11/2020.

Barrick check to TPH Boss for $6,832.98 on 5/26/2020.

Barrick check to TPH Boss for $5,145.10 on 6/9/2020.

Barrick check to TPH Boss for $5,127.53 on 6/22/2020.

Administrative Account Services check to TPH Boss for $1,200 by 7/2/2020.

Barrick check to TPH Boss for $5,434.03 on 7/6/2020.

Barrick check to TPH Boss for $1,153.85 on 7/20/2020.

Barrick check to TPH Boss for $2,499.99 on 7/20/2020.

Barrick check to Athena Hunter for $6,499 on 7/31/2020.

Barrick check to TPH Boss for $1,153.85 on 7/31/2020.

Barrick check to TPH Boss for $4,345.76 on 8/17/2020.

Barrick check to TPH Boss for $1,153.85 on 8/17/2020.

Barrick check to TPH Boss for $5,337.86 on 8/31/2020.

Newmont Admin., Inc, check to TPH Boss for $1,000 on 9/11/2020.

Barrick check to TPH Boss for $3,848.77 on 9/15/2020.

**Total: $132,902**

**EXHIBIT C- 4**

RANDALL KOHL AND IS ENTITY THE VOICE

**Total: $236,806.95**

**The Voice, Inc.**

Barrick wire to The Voice, Inc. for $31,552.28 on 2/14/2020.

Barrick wire to The Voice, Inc. for $2,317.51 on 2/28/2020.

Barrick wire to The Voice, Inc. for $6,212.75 on 3/13/2020.

Barrick wire to The Voice, Inc. for $4,934.87 on 3/27/2020.

Barrick wire to The Voice, Inc. for $17,478.43 on 4/10/2020.

Barrick wire to Alan Kohl for $35,000 on 4/20/2020.

Barrick check to The Voice, Inc. for $23,458.62 on 4/27/2020.

Barrick check to The Voice, Inc. for $11,742.07 on 5/8/2020.

Barrick check to The Voice, Inc. for $6,380 on 5/26/2020.

Barrick check to The Voice, Inc. for $1,211.65 on 5/26/2020.

Barrick check to The Voice, Inc. for $2,042.63 on 6/9/2020.

Barrick check to The Voice, Inc. for $2,594.95 on 7/1/2020.

Barrick check to The Voice, Inc. for $5,845.46 on 7/6/2020.

Barrick check to The Voice, Inc. for $30,269.90 on 8/4/2020.

Barrick check to The Voice, Inc. for $24,041.06 on 8/20/2020.

Barrick check to The Voice, Inc. for $14,304 on 9/1/2020.

USA Accounts, Inc. to The Voice, Inc. for $2,500 on 9/11/2020.

Barrick check to The Voice, Inc. for $14,520.84 on 9/15/2020.

**Total: $236,806.95**

**EXHIBIT C-5**

**BENJAMIN LEE AND HIS ENTITY METTABEL**                              **Total: $219,724.79**

**Mettabel**

Chase Metals payment to Benjamin Lee for $44,025.92 on his 2018 W-2 form.

Chase Metals payroll payment to Benjamin Lee for $15,065.60 on 2/1/2019.

Chase Metals check to Benjamin Lee for $1,806.20 on 5/24/2019.

Chase Metals check to Benjamin Lee for $4,000 on 6/19/2019.

Chase Metals check to Benjamin Lee for $5,000 on 6/27/2019.

Chase Metals check to Benjamin Lee for $4,000 on 6/28/2019.

Chase Metals heck to Benjamin Lee for $5,000 on 12/23/2019.

Chase Metals check to Benjamin Lee for $5,000 on 12/24/2019.

Barrick wire to Mettabel, Inc. for $6,000 on 1/31/2020.

Chase Metals check to Benjamin Lee for $1,981.16 on 3/13/2020.

Barrick wire to Mettabel for $3,407.83 on 3/13/2020.

Barrick wire to Mettabel for $5,346.89 on 3/27/2020.

metals check to Mettabel for $2,231.49 on 3/27/2020.

Barrick wire to Mettabel for $24,102.52 on 4/10/2020.

metals check to Mettabel for $1,666.35 on 4/10/2020.

Barrick check to Mettabel for $1,552.61 on 4/24/2020.

Barrick check to Mettabel for $17,084.17 on 5/8/2020.

Barrick check to Mettabel for $19,904.55 on 5/26/2020.

Barrick check to Mettabel for $17,470.24 on 6/22/2020.

Barrick wire to Mettabel for $1,600.02 on 7/2/2020.

Barrick wire to Mettabel for $3,400.98 on 7/3/2020.

Barrick check to Mettabel for $1,622.53 on 7/31/2020.

Barrick check to Mettabel for $6,431.34 on 8/14/2020.

Newmont Admin., Inc. check to Mettabel for $8,777.24 on 8/27/2020.

Newmont Admin., Inc. check to Mettabel for $9,349.90 on 9/11/2020.

USA Accounts, Inc. check to Mettabel for $3,897.25 on 9/11/2020.

**Total: $219,724.79**

**EXHIBIT C-6**

**DERIC NED AND HIS ENTITIES POORTRAP ENTERTAINMENT AND DEEP STATE MARKETING:**
**Total $2,975,316.10**

**Poortrap Entertainment, Inc.**

Tower Equity, LLC wire to Poortrap Entertainment, Inc. for $36,000 on 12/30/2019.

Barrick wire to Poortrap Entertainment, Inc. for $7,199.92 on 1/17/2020.

Barrick wire to Poortrap Entertainment, Inc. for $8,000 on 2/4/2020.

Barrick wire to Poortrap Entertainment, Inc. for $8,006.20 on 2/5/2020.

Barrick wire to Poortrap Entertainment, Inc. for $7,216.32 on 2/14/2020.

Barrick wire to Poortrap Entertainment, Inc. for $77,605.05 on 2/28/2020.

metals wire to Poortrap Entertainment, Inc. for $4,193.63 by 3/13/2020.

Barrick wire to Poortrap Entertainment, Inc. for $44,752.14 on 3/13/2020.

Barrick wire to Poortrap Entertainment, Inc. for $71,266.89 on 3/13/2020.

Barrick wire to Poortrap Entertainment, Inc. for 45,999.56 on 3/27/2020.

Barrick wire to Poortrap Entertainment, Inc. for $58,769.41 on 4/10/2020.

Barrick check to Poortrap Entertainment, Inc. for $40,750.41 on 4/24/2020.

Barrick check to Poortrap Entertainment, Inc. for $20,134.45 on 5/11/2020.

Barrick check to Poortrap Entertainment, Inc. for $63,632.91 on 5/26/2020.

Barrick check to Poortrap Entertainment, Inc. for $63,559.17 on 6/9/2020.

Barrick check to Poortrap Entertainment, Inc. for $47,990.89 on 7/6/2020.

Barrick check to Poortrap Entertainment, Inc. for $52,029.13 on 7/6/2020.

Barrick check to Poortrap Entertainment, Inc. for $706.16 on 7/20/2020.

Barrick check to Poortrap Entertainment, Inc. for $64,884.82 on 7/30/2020.

Barrick check to Poortrap Entertainment, Inc. for $37,770.36 on 8/3/2020.

Barrick check to Poortrap Entertainment, Inc. for $39,864 on 8/7/2020.

Newmont Admin., Inc. check to Poortrap Entertainment, Inc. for $9,809.45 on 8/14/2020.

Barrick check to Poortrap Entertainment, Inc. for $55,313.33 on 8/17/2020.

Newmont Admin., Inc. check to Poortrap Entertainment, Inc. for $21,708.36 on 8/27/2020.

Barrick check to Poortrap Entertainment, Inc. for $7,425.45 on 8/31/2020.

USA Accounts, Inc. check to Poortrap Entertainment, Inc. for $3,780 on 9/11/2020.

Newmont Admin., Inc. check to Poortrap Entertainment, Inc. for $31,797.22 on 9/11/2020.

Barrick check to Poortrap Entertainment, Inc. for $6,039.92 on 9/14/2020.

**Total: $900,205.15**

**Deep State Marketing**

TMTE, Inc. check to Deep State Marketing for $41,196.08 on 12/15/2017.

TMTE, Inc. payment to Deric Ned for $34,155.09 on his 2018 1099 form.

TMTE, Inc. payment to Deep State Marketing for $941,189.19 on its 2018 1099 form.

TMTE, Inc. check to Deep State Marketing for $20,306.92 on 1/11/2019.

TMTE, Inc. check to Deep State Marketing for $53,657.73 on 1/18/2019.

TMTE, Inc. payroll payment to Deric Ned for $741.72 on 2/1/2019.

TMTE, Inc. check to Deep State Marketing for $201,035.61 on 2/5/2019.

TMTE, Inc. check to Deep State Marketing for $21,021.03 on 2/15/2019.

TMTE, Inc. check to Deep State Marketing for $63,090.60 on 3/6/2019.

Instribution, LLC wire to Deep State Marketing for $50,000 on 3/15/2019.

TMTE, Inc. check to Deep State Marketing for $30,683.65 on 3/18/2019.

TMTE, Inc. wire to Deep State Marketing for $54,962.17 on 3/29/2019.

TMTE, Inc. check to Deep State Marketing for $70,103.04 on 4/12/2019.

TMTE, Inc. wire to Deep State Marketing for $52,383.83 on 4/26/2019.

TMTE, Inc. wire to Deep State Marketing for $28,719.95 on 5/10/2019.

TMTE, Inc. wire to Deep State Marketing for $19,826.97 on 6/21/2019.

TMTE, Inc. wire to Deep State Marketing for $44,144.69 on 7/5/2019.

TMTE, Inc. wire to Deep State Marketing for $18,767.62 on 7/19/2019.

TMTE, Inc. wire to Deep State Marketing for $11,689.19 on 8/2/2019.

TMTE, Inc. wire to Deep State Marketing for $24,759.23 on 8/16/2019.

TMTE, Inc. wire to Deep State Marketing for $69,839.12 on 8/30/2019.

TMTE, Inc. wire to Deep State Marketing for $52,670.62 on 9/13/2019.

TMTE, Inc. wire to Deep State Marketing for $35,644.61 on 9/27/2019.

TMTE, Inc. wire to Deep State Marketing for $30,398.97 on 10/11/2019.

TMTE, Inc. wire to Deep State Marketing for $9,736.55 on 10/25/2019.

TMTE, Inc. wire to Deep State Marketing for $16,439.66 on 11/8/2019.

TMTE, Inc. wire to Deep State Marketing for $31,293.93 on 11/22/2019.

TMTE, Inc. wire to Deep State Marketing for $6,326.98 on 12/6/2019.

TMTE, Inc. wire to Deep State Marketing for $2,304.63 on 12/20/2019.

TMTE, Inc. wire to Deep State Marketing for $798.08 on 1/3/2020.

TMTE, Inc. wire to Deep State Marketing for $4,193.63 on 3/13/2020.

TMTE, Inc. check to Deric Ned Marketing for $6,977.28 on 3/30/2020.

TMTE, Inc. check to Deric Ned for $4,592.51 on 4/10/2020.

Tower Equity check to Deric Ned for $3,902.75 on 7/27/2020.

**Total: $2,075,300.95**

## EXHIBIT C-7

**MICHAEL PERALTA AND HIS ENTITY MPERA CORP.**

**Total: $130,341.25**

### MPERA Corp.

Chase Metals check to MPERA Corp. for $578 on 12/4/2017.

TMTE, Inc. payment to Michael Peralta for $32,355.91 on his 2018 1099 form.

Chase Metals payroll payment to Michael Peralta for $3,703.22 on 2/1/2019.

Chase Metals payroll payment to Michael Peralta. for $5,801.35 on 3/29/2019.

Barrick wire to MPERA Corp. for $5,938.07 on 1/31/2020.

Barrick wire to MPERA Corp. for $6,356.66 on 3/2/2020.

Barrick wire to MPERA Corp. for $9,139.69 on 3/16/2020.

FAET wire to MPERA Corp. for $9,139.69 on 3/17/2020.

Barrick wire to MPERA Corp. for $3,212.32 on 4/10/2020.

Barrick check to MPERA Corp. for $3,084.13 on 4/24/2020.

Barrick check to MPERA Corp. for $13,878.76 on 5/8/2020.

FAET payroll payment to Michael Peralta for $1,643.58 on 5/22/2020.

Barrick check to MPERA Corp. for $5,784.89 on 6/22/2020.

Barrick check to MPERA Corp. for $7,659.80 on 7/17/2020.

Barrick check to MPERA Corp. for $20,024.57 on 7/31/2020.

FAET payroll payment to Michael Peralta for $1,153.13 on 9/25/2020.

Barrick check to MPERA Corp. for $273.48 on 8/31/2020.

Barrick check to MPERA Corp. for $614.24 on 9/15/2020.

**Total: $130,341.25**

## EXHIBIT C-8

**SEAN REZA, ALSO KNOWN AS THOMAS REZA AND HIS ENTITY AMERIGOLD**

**Total: $737,094.44**

**Amerigold, Inc.**

TMTE, Inc. check to Sean Reza for $30,041.01 on 12/1/2017.

TMTE, Inc. check to Sean Reza for $33,416.91 on 12/29/2017.

TMTE, Inc. payment to Sean Reza for $19,012.76 on his 2018 W-2 form.

TMTE, Inc. payment to Thomas Reza for $65,546.71 on his 2018 W-2 form.

TMTE, Inc. check to Amerigold, Inc. for $57,287.31 on 2/20/2018.

TMTE, Inc. check to Amerigold, Inc. for $37,786.72 on 4/6/2018.

TMTE, Inc. check to Amerigold, Inc. for $28,662.88 on 5/8/2018.

TMTE, Inc. check to Amerigold, Inc. for $25,086.53 on 5/21/2018.

TMTE, Inc. check to Amerigold, Inc. for $21,583.01 on 6/25/2018.

TMTE, Inc. check to Amerigold, Inc. for $4,592.43 on 6/25/2018.

TMTE, Inc. check to Amerigold, Inc. for $8,037.09 on 7/16/2018.

TMTE, Inc. check to Amerigold, Inc. for $4,239.31 on 7/16/2018.

TMTE, Inc. check to Amerigold, Inc. for $10,225.35 on 8/8/2018.

TMTE, Inc. check to Amerigold, Inc. for $31,687.05 on 8/22/2018.

TMTE, Inc. check to Amerigold, Inc. for $6,294.43 on 9/7/2018.

TMTE, Inc. check to Amerigold, Inc. for $22,182.92 on 9/17/2018.

TMTE, Inc. check to Amerigold, Inc. for $3,506.48 on 10/1/2018.

TMTE, Inc. check to Amerigold, Inc. for $34,540.90 on 10/15/2018.

TMTE, Inc. check to Amerigold, Inc. for $11,265.33 on 10/29/2018.

TMTE, Inc. check to Amerigold, Inc. for $18,852.03 on 11/13/2018.

TMTE, Inc. check to Amerigold, Inc. for $47,566.41 on 11/21/2018.

TMTE, Inc. check to Amerigold, Inc. for $14,727.26 on 12/24/2018.

TMTE, Inc. check to Amerigold, Inc. for $3,079.45 on 12/24/2018.

TMTE, Inc. check to Amerigold, Inc. for $3,271 on 1/31/2019.

TMTE, Inc. check to Amerigold, Inc. for $13,027 on 1/31/2019.

TMTE, Inc. payroll payment to Sean Reza for $942.86 on 2/1/2019.

TMTE, Inc. payment payroll to Thomas Reza for $690.94 on 2/1/2019.

TMTE, Inc. check to Amerigold, Inc. for $21,070 on 3/1/2019.

TMTE, Inc. check to Amerigold, Inc. for $3,886 on 3/1/2019.

TMTE, Inc. check to Amerigold, Inc. for $996 on 3/11/2019.

TMTE, Inc. wire to Amerigold, Inc. for $21,187.28 on 3/29/2019.

TMTE, Inc. check to Amerigold, Inc. for $7,050 on 4/8/2019.

TMTE, Inc. check to Amerigold, Inc. for $40,544 on 4/12/2019.

TMTE, Inc. wire to Amerigold, Inc. for $28,070.36 on 4/26/2019.

TMTE, Inc. wire to Amerigold, Inc. for $1,242.27 on 5/10/2019.

TMTE, Inc. wire to Amerigold, Inc. for $5,468.61 on 5/24/2019.

TMTE, Inc. wire to Amerigold, Inc. for $5,196.96 on 7/5/2019.

TMTE, Inc. wire to Amerigold, Inc. for $10,053.75 on 7/19/2019.

TMTE, Inc. wire to Amerigold, Inc. for $23,815.98 on 8/16/2019.

TMTE, Inc. wire to Amerigold, Inc. for $3,332 on 9/13/2019.

TMTE, Inc. wire to Amerigold, Inc. for $5,854.38 on 11/8/2019.

TMTE, Inc. wire to Amerigold, Inc. for $2,163.36 on 1/3/2020.

**Total: $737,084.44**

## EXHIBIT C-9

### KYLE SANNA AND HIS ENTITIES LTK MARKETING AND HURRICANE HOLDINGS, INC.

**Total: $1,274,142.71**

### LTK Marketing

Barrick wire to LTK Marketing for $150,190.70 on 3/27/2020.

Barrick wire to LTK Marketing, Inc. for $49,073.36 on 4/10/2020.

Barrick wire to LTK Marketing, Inc. for $31,279.93 on 4/10/2020.

Barrick wire to LTK Marketing, Inc. for $18,036.82 on 4/10/2020.

Talent Writers, LLC wire to LTK Marketing, LLC for $31,218.75 on 10/30/2020.

Barrick wire to LTK Marketing, Inc. for $9,395.53 by 7/2/2020.

Newmont Admin, Inc. check to LTK Marketing, Inc. for $10,112.84 by 8/14/2020.

Newmont Admin, Inc. check to LTK Marketing, Inc. for $30,871.78 by 9/11/2020.

**Total: $330,179.71**

### Hurricane Holdings

Chase Metals payment to Kyle Sanna for $128,874 on his 2018 1099 form.

Chase Metals payment to Kyle Sanna for $17,747 on his 2018 W-2 form.

Chase Metals check to Hurricane Holdings for $19,196 on 1/4/2019.

Chase Metals check to Hurricane Holdings for $26,262 on 1/18/2019.

Chase Metals payroll payment to Kyle Sanna for $1,027 on 2/1/2019.

Chase Metals check to Hurricane Holdings for $12,722 on 2/19/2019.

Chase Metals check to Hurricane Holdings for $58,730 on 3/1/2019.

Chase Metals check to Hurricane Holdings for $26,322 on 3/15/2019.

Chase Metals check to Hurricane Holdings for $19,934 on 3/29/2019.

Chase Metals check to Hurricane Holdings for $8,473 on 4/12/2019.

TMTE, Inc. wire to Hurricane Holdings for $11,218.91 on 4/26/2019.

TMTE, Inc. wire to Hurricane Holdings for $34,070.93 on 5/10/2019.

TMTE, Inc. wire to Hurricane Holdings for $12,785.44 on 6/21/2019.

TMTE, Inc. wire to Hurricane Holdings for $17,126.25 on 7/5/2019.

TMTE, Inc. wire to Hurricane Holdings for $5,111.12 on 7/19/2019.

TMTE, Inc. wire to Hurricane Holdings for $9,587 on 8/2/2019.

TMTE, Inc. wire to Hurricane Holdings for $304.54 on 8/16/2019.

TMTE, Inc. wire to Hurricane Holdings for 72,324.39 on 8/30/2019.

TMTE, Inc. wire to Hurricane Holdings for $40,338.24 on 9/13/2019.

TMTE, Inc. wire to Hurricane Holdings for $18,402.79 on 9/27/2019.

TMTE, Inc. wire to Hurricane Holdings for $39,136.36 on 10/11/2019.

TMTE, Inc. wire to Hurricane Holdings for $10,818.15 on 10/25/2019.

TMTE, Inc. wire to Hurricane Holdings for $22,892.92 on 11/8/2019.

TMTE, Inc. wire to Hurricane Holdings for $15,061.79 on 11/22/2019.

TMTE, Inc. wire to Hurricane Holdings for $10,372.54 on 12/6/2019.

TMTE, Inc. wire to Hurricane Holdings for $1,344.53 on 12/20/2019.

TMTE, Inc. wire to Hurricane Holdings for $4,140.85 on 1/3/2020.

TMTE, Inc. wire to Hurricane Holdings for $773.48 on 2/14/2020.

Metals wire to Hurricane Holdings for $4,323.33 by 3/12/2020.

Barrick wire to Hurricane Holdings for $71,244.78 by 3/12/2020.

Barrick wire to Hurricane Holdings for $68,058.33 by 3/13/2020.

TMTE, Inc. wire to Hurricane Holdings for $6,554.83 on 3/27/2020.

Barrick wire to Hurricane Holdings for $143,922.57 by 3/27/2020.

FAET payroll payment to Kyle Sanna for $728.02 on 3/27/2020.

FAET payroll payment to Kyle Sanna for $958.37 on 4/24/2020.

FAET payroll payment to Kyle Sanna for $711.63 on 5/22/2020.

Administrative Account Services wire to Hurricane Holdings for $1,600.02 by 3/12/2020.

FAET payroll payment to Kyle Sanna for $763.11 on 8/28/2020.

**Total: $943,963**

**EXHIBIT C- 10**

CHRISTOPHER STEPHAN AND HIS ENTITY ECO BLUE

**Total: $255,689.00**


**Eco Blue**

Chase Metals wire to Eco Blue for $983 on 11/22/2019.

Chase Metals check to Christopher Stephen for $4,000 on 3/11/2019.

Chase Metals check to Christopher Stephen for $2,500 on 4/17/2019.

Chase Metals check to Christopher Stephen for $2,800 on 5/15/2019.

Chase Metals check to Christopher Stephen for $5,000 on 5/24/2019.

Chase Metals check to Christopher Stephen for $5,000 on 6/14/2019.

Chase Metals check to Christopher Stephen for $5,000 on 7/1/2019.

Chase Metals check to Eco Blue for $4,500 on 9/13/2019.

Chase Metals wire to Eco Blue for $20,232.30 on 9/19/2019.

Chase Metals wire to Eco Blue for $3,053.46 on 11/8/2019.

Chase Metals wire to Eco Blue for $3,257.70 on 12/6/2019.

Chase Metals wire to Eco Blue for $2,539.45 on 12/20/2019.

Chase Metals wire to Eco Blue for $609.50 on 1/3/2020.

Chase Metals wire to Eco Blue for $1,591.58 on 1/17/2020.

Barrick wire to Eco Blue for $24,457.99 on 2/14/2020.

Chase Metals wire to Eco Blue for $2,629.04 on 2/28/2020.

Chase Metals check to Eco Blue for $1,989.99 on 3/13/2020.

TMTE, Inc. wire to Eco Blue for $33,680.90 on 3/13/2020.

Barrick wire to Eco Blue for $50,450.44 by 3/13/2020.

Barrick wire to Eco Blue for $17,619.43 on 3/27/2020.

Barrick wire to Eco Blue for $8,693.41 on 4/1/2020.

Barrick wire to Eco Blue for $20,572.88 on 4/10/2020.

Barrick check to Eco Blue for $11,971.47 on 4/24/2020.

Barrick check to Eco Blue for $4,472.57 on 5/12/2020.

Barrick check to Eco Blue for $9,000 on 6/8/2020.

Barrick check to Eco Blue for $9,084.02 on 9/10/2020.

**Total: $255,689**

### EXHIBIT C- 11

WALTER VERA AND HIS ENTITIES VERASTAN GROUP AND MIDWOOD CAPITAL

**Total: $4,533,519.50**

#### Verastan Group

Chase Metals check to Walter Vera for $75,048 on 12/18/2017.

Chase Metals check to Verastan Group for $13,487 on 12/29/2017.

Chase Metals wire to Walter Vera for $100,000 on 4/10/2018.

Chase Metals payment to Verastan Group for $1,655,085.99 on its 2018 1099 form.

Chase Metals payment to Walter Vera for $17,747.31 on his 2018 W-2 form.

TMTE, Inc. check to Verastan Group for $2,475 on 1/18/2019.

TMTE, Inc. check to Verastan Group for $35,989.11 on 1/11/2019.

TMTE, Inc. wire to Verastan Group for $9,803.46 on 1/17/2019.

TMTE, Inc. check to Verastan Group for $2,475 on 1/18/2019.

TMTE, Inc. check to Verastan Group for $74,271 on 1/18/2019.

TMTE, Inc. wire to Verastan Group for $35,989.11 on 1/30/2019.

TMTE, Inc. wire to Verastan Group for $100,016.41 on 1/30/2019.

Chase Metals payroll payment to Walter Vera for $1,036.35 on 2/1/2019.

TMTE, Inc. check to Verastan Group for $100,016 on 2/1/2019.

TMTE, Inc. wire to Verastan Group for $13,143.77 on 2/3/2019.

TMTE, Inc. check to Verastan Group for $83,311 on 2/25/2019.

TMTE, Inc. check to Verastan Group for $2,475 on 2/28/2019.

TMTE, Inc. check to Verastan Group for $36,000 on 3/1/2019.

TMTE, Inc. check to Verastan Group for $94,467 on 3/1/2019.

TMTE, Inc. wire to Verastan Group for $11,876.57 on 3/13/2019.

TMTE, Inc. check to Verastan Group for $96,111 on 3/15/2019.

TMTE, Inc. check to Verastan Group for $2,475 on 3/18/2019.

TMTE, Inc. wire to Verastan Group for $73,824.07 on 4/8/2019.

TMTE, Inc. check to Verastan Group for $73,824 on 4/16/2019.

TMTE, Inc. check to Verastan Group for $1,600 on 4/16/2019.

TMTE, Inc. check to Verastan Group for $2,475 on 4/16/2019.

TMTE, Inc. check to Verastan Group for $119,729 on 4/16/2019.

TMTE, Inc. check to Verastan Group for $118,692 on 4/26/2019.

TMTE, Inc. wire to Verastan Group for $49,187.39 on 5/10/2019.

TMTE, Inc. wire to Verastan Group for $5,172.78 on 5/24/2019.

Metals.com wire to Verastan Group for $7,857.03 by 7/2/2019.

TMTE, Inc. wire to Verastan Group for $22,171.56 on 7/5/2019.

TMTE, Inc. wire to Verastan Group for $27,468.48 on 8/2/2019.

TMTE, Inc. check to Verastan Group for $1,198 on 8/5/2019.

TMTE, Inc. wire to Verastan Group for $31,607.51 on 8/30/2019.

TMTE, Inc. wire to Verastan Group for $40,842 on 9/13/2019.

TMTE, Inc. wire to Verastan Group for $49,641.40 on 9/27/2019.

TMTE, Inc. wire to Verastan Group for $31,998.45 on 10/11/2019.

TMTE, Inc. wire to Verastan Group for $26,190.16 on 10/25/2019.

TMTE, Inc. wire to Verastan Group for $55,053.61 on 11/8/2019.

TMTE, Inc. wire to Verastan Group for $55,054 on 11/8/2019.

TMTE, Inc. wire to Verastan Group for $23,306.20 on 12/6/2019.

TMTE, Inc. wire to Verastan Group for $2,400 on 12/17/2020.

TMTE, Inc. wire to Verastan Group for $29,690.98 on 12/20/2019.

TMTE, Inc. wire to Verastan Group for $26,149.95 on 1/3/2020.

TMTE, Inc. wire to Verastan Group for $9,803 on 1/17/2019.

TMTE, Inc. wire to Verastan Group for $13,143.77 on 2/3/2020.

TMTE, Inc. wire to Verastan Group for $11,876.57 on 3/13/2020.

Tower Equity check to Verastan Group for $560,000 on 7/17/2020.

Administrative Account Services, LLC.  check to Verastan Group for $7,857 on 7/17/2020.

**Total: $3,961,597**

**Midwood Capital**

Barrick wire to Midwood Capital for $8,977.02 on 2/7/2020.

Barrick wire to Midwood Capital for $15,183.73 on 2/14/2020.

Barrick wire to Midwood Capital for $40,414.66 on 2/28/2020.

Barrick wire to Midwood Capital for $59,304.63 on 2/28/2020.

Barrick wire to Midwood Capital for $11,876.57 by 3/13/2020.

Barrick wire to Midwood Capital for $64,631.71 on 3/13/2020.

Barrick wire to Midwood Capital for $14,517.69 on 3/27/2020.

Barrick wire to Midwood Capital for $42,254.16 on 4/10/2020.

Barrick check to Midwood Capital for $3,690.03 on 4/24/2020.

Barrick check to Midwood Capital for $5,238 on 4/24/2020.

Barrick check to Midwood Capital for $31,248.37 on 5/15/2020.

Barrick check to Midwood Capital for $23,783.24 on 6/1/2020.

Barrick check to Midwood Capital for $22,288.06 on 6/22/2020.

Barrick check to Midwood Capital for $23,812.70 on 6/22/2020.

Barrick wire to Midwood Capital for $28,233.70 by 7/2/2020.

Barrick check to Midwood Capital for $12,156.44 on 8/3/2020.

Barrick check to Midwood Capital for $30,822.31 on 8/3/2020.

Barrick check to Midwood Capital for $7,775.84 on 8/14/2020.

Barrick check to Midwood Capital for $16,584.49 on 9/14/2020.

Barrick check to Midwood Capital for $9,338.86 on 9/18/2020.

**Total: $465,925.50**

## EXHIBIT C- 12

**RICHARD JOE DOUGHERTY AND HIS ENTITY RICH DOUGH**          **Total: $247,024.36**

### Rich Dough, Inc.

TMTE, Inc. check to Joe Dougherty for $3,316.32 on 12/18/2017.

TMTE, Inc. payment to Richard Dougherty for $133,557.22 on his 2018 1099 form.

TMTE, Inc. payment to Rich Dough, Inc. for $33,778.55 on TMTE, Inc.'s 2018 profit and loss sheet.

TMTE, Inc. check to Rich Dough, Inc. for $4,038.22 on 1/11/2019.

TMTE, Inc. payroll payment to Richard Dougherty for $1,263.38 on 2/1/2019.

TMTE, Inc. check to Rich Dough, Inc. for $26,348.43 on 2/1/2019.

TMTE, Inc. wire to Rich Dough, Inc. for $3,422.77 on 3/15/2019.

TMTE, Inc. wire to Rich Dough, Inc. for $1,650 on 5/24/2019.

TMTE, Inc. wire to Rich Dough, Inc. for $1,576.39 on 6/21/2019.

TMTE, Inc. check to Rich Dough, Inc. for $1,471.31 on 6/24/2019.

TMTE, Inc. check to Rich Dough, Inc. for $1,775.46 on 7/2/2019.

TMTE, Inc. check to Rich Dough, Inc. for $2,000 on 8/1/2019.

TMTE, Inc. check to Rich Dough, Inc. for $1,600 on 8/16/2019.

TMTE, Inc. wire to Rich Dough, Inc. for $11,827.66 on 8/30/2019.

TMTE, Inc. check to Rich Dough, Inc. for $9,216 on 9/13/2019.

TMTE, Inc. check to Rich Dough, Inc. for $5,000 on 11/1/2019.

TMTE, Inc. wire to Rich Dough, Inc. for $1,454.69 on 11/22/2019.

TMTE, Inc. wire to Rich Dough, Inc. for $3,231.37 on 12/6/2019.

TMTE, Inc. wire to Rich Dough, Inc. for $4,163.45 on 12/20/2019.

TMTE, Inc. wire to Rich Dough, Inc. for $5,884.75 on 12/31/2019.

Barrick wire to Rich Dough, Inc. for $5,318.64 on 2/28/2020.

TMTE, Inc. check to Rich Dough, Inc. for $3,419.84 on 4/29/2020.

TMTE, Inc. check to Rich Dough, Inc. for $1,709.91 on 4/29/2020.

**Total: $247,024.36**

C

## EXHIBIT C- 13

**MATTHEW LEVITT AND HIS ENTITY GOONER ENTERPRISES, INC.**

**Total: $625,413.69**

**Gooner Enterprises, Inc.**

TMTE, Inc. payment to Matthew Levitt for $101,040.47 on his 2018 W-2 form.

TMTE, Inc. payment to Gooner Enterprises, Inc. for $248,775 on TMTE's 2018 profit and loss form.

TMTE, Inc. check to Gooner Enterprises, Inc. for $20,942 on 1/7/2019.

TMTE, Inc. payroll payment to Matthew Levitt for $846.37 on 2/1/2019.

TMTE, Inc. check to Gooner Enterprises, Inc. for $5,141.88 on 2/11/2019.

TMTE, Inc. check to Gooner Enterprises, Inc. for $13,266.68 on 2/22/2019.

TMTE, Inc. check to Gooner Enterprises, Inc. for $9,648.79 on 3/5/2019.

TMTE, Inc. check to Gooner Enterprises, Inc. for $4,635.70 on 3/21/2019.

TMTE, Inc. wire to Gooner Enterprises, Inc. for $37,422.26 on 3/29/2019.

TMTE, Inc. check to Gooner Enterprises, Inc. for $31,553.66 on 4/18/2019.

TMTE, Inc. wire to Gooner Enterprises, Inc. for $23,679.84 on 4/26/2019.

TMTE, Inc. wire to Gooner Enterprises, Inc. for $10,162.38 on 5/10/2019.

TMTE, Inc. wire to Gooner Enterprises, Inc. for $4,848.44 on 5/24/2019.

TMTE, Inc. wire to Gooner Enterprises, Inc. for $494.87 on 6/21/2019.

Barrick check to Gooner Enterprises, Inc. for $1,340.01 on 4/24/2020.

FAET payroll payment to Matthew Levitt for $888.37 on 5/22/2020.

Barrick check to Gooner Enterprises, Inc. for $16,037.95 on 5/26/2020.

Barrick check to Gooner Enterprises, Inc. for $10,612.94 on 6/12/2020.

Barrick check to Gooner Enterprises, Inc. for $13,904.58 on 6/19/2020.

Barrick check to Gooner Enterprises, Inc. for $33,838.08 on 7/6/2020.

Barrick check to Gooner Enterprises, Inc. for $10,470.18 on 8/18/2020.

Barrick check to Gooner Enterprises, Inc. for $25,384 on 8/18/2020.

FAET payroll payment to Matthew Levitt for $478.84 on 8/25/2020.

**Total: $625,413.69**

C

**EXHIBIT C-15**

**JOSHUA FERDMAN AND HIS ENTITY FERDMAN GROUP INC.**

**Total: $126,114.60**

**Ferdman Group**

TMTE, Inc. check to Joshua Ferdman for $1,128 on 12/8/2017.

TMTE, Inc. payment to Joshua Ferdman for $18,590.94 on his 2018 W-2 form.

TMTE, Inc. payment to Joshua Ferdman for $46,914.04 on his 2018 1099 form.

TMTE, Inc. check to Ferdman Group, Inc. for $11,844.53 on 1/3/2019.

TMTE, Inc. check to Ferdman Group, Inc. for $11,087.64 on 1/18/2019.

TMTE, Inc. payroll payment to Joshua Ferdman for $888.51 on 2/1/2019.

TMTE, Inc. check to Ferdman Group, Inc. for $2,905.70 on 2/15/2019.

TMTE, Inc. check to Ferdman Group, Inc. for $14,542.50 on 3/4/2019.

TMTE, Inc. check to Ferdman Group, Inc. for $8,028.47 on 3/15/2019.

TMTE, Inc. check to Ferdman Group, Inc. for $3,616.59 on 4/12/2019.

TMTE, Inc. wire to Ferdman Group for $1,159.82 on 4/26/2019.

TMTE, Inc. wire to Ferdman Group for $1,061.95 on 5/10/2019.

TMTE, Inc. wire to Ferdman Group, Inc. for $1,300.95 on 6/21/2019.

TMTE, Inc. check to Ferdman Group, Inc. for $1,008 on 7/2/2019.

TMTE, Inc. check to Ferdman Group, Inc. for $2,036.96 on 7/26/2019.

**Total: $126,114.60**

## EXHIIBIT C- 16

**ANDREW J. EILERS AND HIS ENTITY ANDREW J. EILERS CONSULTING      Total: $61,331.94**

**Andrew J Eilers Consulting, Inc.**

Chase Metals payment to Andrew J Eilers Consulting, Inc. for $5,280 on his 2018 1099 form.

Chase Metals payment to Andrew Eilers for $14,529.12 on his 2018 W-2 form.

TMTE, Inc. check to Andrew J Eilers Consulting, Inc. for $9,033.71 on 1/4/2019.

TMTE, Inc. check to Andrew J Eilers Consulting, Inc. for $9,524.13 on 1/18/2019.

Chase Metals payroll payment to Andrew Eilers for $991.13 on 2/1/2019.

TMTE, Inc. check to Andrew J Eilers Consulting, Inc. for $2,905.70 on 2/15/2019.

TMTE, Inc. check to Andrew J Eilers Consulting, Inc. for $5,197.34 on 3/18/2019.

TMTE, Inc. wire to Andrew J Eilers Consulting, Inc. for $4,882.79 on 3/29/2019.

TMTE, Inc. check to Andrew J Eilers Consulting, Inc. for $6,953.70 on 4/12/2019.

TMTE, Inc. wire to Andrew J Eilers Consulting, Inc. for $2,034.32 on 4/26/2019.

**Total: $61,331.94**

### EXHIIBT C-17

**ALEXANDER FLAMER AND HIS ENTITY 9INTH LEVEL MARKETING**

**Total: $26,696.68**


### 9inth Level Marketing

Chase Metals payment to 9inth Level, Inc. for $26,646.68 on his 2018 1099 form.

TMTE, Inc. payment to Alexander Flamer for $50.00 on TMTE, Inc.'s profit and loss sheet.


**Total: $26,696.68**

## EXHIBIT C-18

**DAVID WOLAN AND HIS ENTITY HARPER METALS**                    **Total: $129,092.56**

**Harper Metals Group, LLC**

Chase Metals, Inc. check to Harper Metals Group, LLC for $25,725 on 12/15/2017.

Chase Metals, Inc. payment to Harper Metals Group, LLC for $103,367.50 on its 2018 1099 form.

**Total: 129,092.50**

## EXHIBIT C-19

**BROCK BOWERS, DOING BUSINESS AS BA BOWERS, LLC, AND HIS ENTITY TOTM PRODUCTION GROUP**

**Total: $58,616.30**

### TOTM Production Group, LLC

Chase Metals check to Brock Bowers for $1,500 on 12/8/2017.

Chase Metals payroll payment to Brock Bowers for $5,489 on 2/1/2019.

Barrick to TOTM Production Group, LLC. for $2,495.89 by 7/2/2020.

Chase Metals payroll payment to Brock Bowers for $1,652.01 on 7/2/2020.

Chase Metals payroll payment to Brock Bowers for $1,504.88 on 7/17/2020.

Newmont Admin., Inc. to TOTM Production Group, LLC. for $303.39 by 8/14/2020.

Newmont Admin., Inc. to TOTM Production Group, LLC. for $671.39 by 8/27/2020.

Newmont Admin., Inc. to TOTM Production Group, LLC. for $983.42 by 9/11/2020.

Administrative Account Services check to Brock Bowers for $341.21 on 9/15/2020.

### BA Bowers, LLC

TMTE, Inc. payment to BA Bowers, LLC. for $43,674.69 on its 2018 1099 form.

**Cumulative Total: $58,616.30**